Pages 1 - 223

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )   NO. 3:21-cr-00374-MMC-2
                                )
JOSEPH HUFFAKER,                )
                                )
          Defendant.            )
_____)

San Francisco, California
Tuesday, July 8, 2025

**TRANSCRIPT OF PROCEEDINGS**

**(EXCERPT - BRENDON "JACY" TATUM)**

**APPEARANCES:**

For Plaintiff:

                CRAIG H. MISSAKIAN
                United States Attorney
                1515 Clay Street
                Oakland, California 94612
        BY:  **ABRAHAM H. FINE**
                **BENJAMIN K. KLEINMAN**
                **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

                FERRONE LAW GROUP, APLC
                4333 Park Terrace Drive - Suite 200
                Westlake Village, California 91631
        BY:  **RICHARD CEBALLOS**
                **ROBERT L. BAUMANN**
                **ATTORNEYS AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
                Official Reporter, CSR No. 12219

1    <u>**APPEARANCES**</u>:    (CONTINUED)

2    Also Present:          Special Agent Duncan Haunold, FBI
                            Veronica Hernandez, Paralegal
3                           Michael Easter, Investigator

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

Tuesday, July 8, 2025 - Volume

<u>**GOVERNMENT'S WITNESSES**</u>                                    <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**TATUM, BRENDON (RECALLED)**</u>
(PREVIOUSLY SWORN)                                          4      0
Direct Examination by Mr. Fine (Continued)                  4      0
Cross-Examination by Mr. Ceballos                         109      0

**E X H I B I T S**

<u>**TRIAL EXHIBITS**</u>                                <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

  13                                                          35    0

  71                                                          13    0

  72                                                           9    0

  151                                                         67    0

  154                                                         95    0

  157                                                         79    0

  169                                                         41    0

  180                                                         86    0

  192                                                         33    0

| | |
|---|---|
| 1 | **Tuesday - July 8, 2025**                          **9:00 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | (Begin Excerpt.) |
| 5 | **THE COURT:**  Very good.  All right.  Let's get |
| 6 | Mr. Tatum back. |
| 7 | (Brendon Tatum steps forward to resume the stand) |
| 8 | **THE COURT:**  Okay.  Mr. Tatum, if you'll come back up |
| 9 | to the stand, please.  Just have a seat.  You need not be |
| 10 | re-sworn.  Please be seated.  You remain, however, under the |
| 11 | oath you took yesterday. |
| 12 | Do you understand that? |
| 13 | **THE WITNESS:**  Yes, ma'am. |
| 14 | **BRENDON TATUM**, |
| 15 | called as a witness for the Government, having been previously |
| 16 | duly sworn, testified further as follows: |
| 17 | **THE COURT:**  Very good, then.  Mr. Fine, you can |
| 18 | continue at this point. |
| 19 | **MR. FINE:**  Thank you, Your Honor. |
| 20 | **THE COURT:**  All right. |
| 21 | DIRECT EXAMINATION (Continued) |
| 22 | BY MR. FINE: |
| 23 | **Q.**   Good morning, Mr. Tatum. |
| 24 | **A.**   Good morning, sir. |
| 25 | **Q.**   So when we left off yesterday, we were talking about what |

1    you did when you were working legitimate interdiction.

2        Do you remember that?

3    A.    Yes.

4    Q.    So, Mr. Tatum, when you worked interdiction, who at the

5    Rohnert Park Department of Public Safety, if anyone, would you

6    notify before you went out?

7    A.    Our main dispatch center.  And if the commander or one of

8    the commanders was working, we'd notify them, or the sergeant,

9    or watch duty that was on in charge of the street.

10   Q.    And why would you notify dispatch?

11   A.    If we had to pull a case number, for officer safety, if we

12   called, they would know who we are, where we're at, and to

13   notify them that we were on duty.

14   Q.    And why would you notify the command staff?

15   A.    Same thing.  That they would know we're on duty.  If

16   something happened, they weren't behind the ball, wondering

17   who's out there, how many people.  Mainly for officer safety

18   reasons.

19   Q.    And kind of on that note, was interdiction work

20   potentially dangerous?

21   A.    Extremely, yes, sir.

22   Q.    How so?

23   A.    Walking up to a vehicle, not knowing who you're contacting

24   is very dangerous.  So being out of the city, only having the

25   backup that you either have right with you or sometimes it's

TATUM - DIRECT / FINE

1    another car or another officer that's down the highway, you

2    never know what you're going to come upon when you walk up to a

3    car.

4    Q.   And you mentioned yesterday that when you went to other

5    jurisdictions, you would let those jurisdictions know

6    beforehand as well; is that right?

7    A.   Yes, that's correct.

8    Q.   And was that for the same officer safety rationale?

9    A.   Yes.  That way if they could have a heads-up if we had an

10   incident, they would know, "Oh, it's Rohnert Park."  They would

11   know the vicinity where to go.

12   Q.   Now, while it was operating, did the interdiction team

13   keep statistics of its seizures?

14   A.   Yes, we did.

15        MR. FINE:  Ms. Hernandez, could you please show the

16   witness what's already been admitted into evidence as

17   Exhibit 79.  And if we could publish that to the jury as well.

18   BY MR. FINE:

19   Q.   Mr. Tatum, what is this document?

20   A.   This is a spreadsheet I created back in December of 2016

21   of some of the interdiction stops and stats.

22   Q.   And just looking at this -- this spreadsheet, when you

23   have the names together under officers, so if we take

24   December 5 it says "Huffaker/Tatum."

25        Do you see that?

**TATUM - DIRECT / FINE**

1   A.   I do.  Yes, sir.

2   Q.   And do the names being listed together mean that those

3   officers were working in the same patrol car on that day?

4   A.   Yes.

5   Q.   And then next -- the next column over, "hours," what does

6   that mean?

7   A.   That's the hours that we worked on December 5, or on that

8   day.

9   Q.   So if we take, for example, the four days on this chart,

10  December 5, December 6, December 7, and December 8,

11  approximately how many hours does that show you working with

12  Mr. Huffaker?

13  A.   42.

14  Q.   And was it common for you and Mr. Huffaker to go out

15  together to do interdiction work?

16  A.   Yeah, it was.

17  Q.   Fair to say you spent a significant amount of time doing

18  interdiction work together?

19  A.   Yes, sir.

20  Q.   Mr. Tatum, drawing your attention to the year 2015, around

21  that time, did the -- did RPDPS institute a policy regarding

22  the use of body cameras for police officers?

23  A.   They did, yes, sir.

24  Q.   What was the policy?

25  A.   That body cameras were to be worn while you're on duty any

1    time you're contacting somebody in a police incident.  And you

2    have to download them afterwards, charge them; but, basically,

3    that you're responsible for wearing them at all times when

4    you're on duty.

5    **Q.**    So let's break that down a little bit.

6         You said you're responsible for wearing them at all times

7    when on duty; is that right?

8    **A.**    Yes, sir.

9    **Q.**    And when would you have to turn them on?

10   **A.**    Prior to contacting a citizen or making contact with

11   somebody that you've -- would think would be a law enforcement

12   encounter.

13   **Q.**    So if you pulled over a car, at what point would you have

14   to turn on the body cam?

15   **A.**    Prior to making contact with the driver or the passenger

16   in the vehicle.

17   **Q.**    And just when you say "making contact," what does that

18   mean?

19   **A.**    Sorry.  Prior to introducing yourself or saying "hello,"

20   or asking for any information from the driver or passenger.

21   **Q.**    And did that body camera policy apply to interdiction

22   work?

23   **A.**    Yes, it did, yes, sir.

24   **Q.**    While the interdiction team was operating, did RPDPS have

25   policies in place regarding what officers were supposed to do

1  with narcotics that had been seized as evidence?

2  **A.**   Yes, they did.

3  **Q.**   What was the policy?

4  **A.**   They were to be photographed at the location that they

5  were collected or seized, packaged, labeled, brought back to

6  the station, given a barcode or another Rohnert Park ID number

7  from the barcode system, and -- I'm sorry.

8  **Q.**   Oh, continue, please.

9  **A.**   Thank you.

10      Taped, packaged, and then placed into a secure evidence

11  locker.

12  **Q.**   Were narcotics sometimes seized as found property?

13  **A.**   Yes, they were.

14  **Q.**   Can you describe what that means?

15  **A.**   Yes.  When an officer contacted an individual and that

16  individual didn't claim that those narcotics were theirs, or

17  there was no evidence, direct evidence connecting them to those

18  narcotics, we would collect them as found property to remove

19  them off the street and book them in not as evidence but as

20  found property to be destroyed.

21          **MR. FINE:**  Your Honor, at this time the Government

22  would move to admit Exhibit 72, which is a stipulated exhibit.

23          **THE COURT:**  All right.  72 is admitted.

24      (Trial Exhibit 72 received in evidence.)

25  \\\

1    BY MR. FINE:

2    Q.    Mr. Tatum, do you recognize this document?

3    A.    Yes, sir, I do.

4    Q.    What does it appear to be?

5    A.    This is an e-mail that Joe Huffaker sent out in October of

6    2016 to the interdiction team.

7    Q.    And was the interdiction team fully running at that point?

8    A.    Yes, it was.

9    Q.    What's the subject of the e-mail?

10   A.    "Interdiction follow-ups."

11   Q.    And can you read the first sentence of the e-mail, please.

12   A.    Yes.  (As read):

13        "Hey guys, Sergeant Tatum requested I send out

14        this e-mail with some requests and reminders."

15   Q.    Why did you send -- why did you ask Mr. Huffaker to send

16   out this e-mail?

17   A.    Just to keep our interdiction team up to date on what to

18   do, how to do it.  Sometimes we would get really busy and stuff

19   would fall through the cracks.  So just a reminder of:  Hey,

20   this is what we need to be doing.  Make sure you're doing A, B,

21   and C, and following these steps.

22   Q.    Why did you ask Mr. Huffaker to send it as opposed to a

23   different member of the interdiction team?

24   A.    Joe took a lot of initiative and he was really good at

25   interdiction and had -- shared my passion of interdiction and

1    was competent.  And I had these -- had faith in whatever I

2    asked Joe to send something out or follow up, he would complete

3    it and I know it wouldn't fall through the cracks.  So

4    sometimes I would get busy and do other stuff so I would ask

5    him to help.

6    Q.   And so let's go through this just a little bit.

7         If you'd look at the first dash under reminders there.

8    And I could just read it.  It says (as read):

9              "When you obtain, draft, and/or serve search

10        warrants, it needs to be documented in Ileads."

11             Were search warrants a common part of interdiction

12   work?

13   A.   Yes, they were.

14   Q.   And can you describe for the jury what a search warrant

15   is?

16   A.   Yes.  A search warrant is something that we write up

17   describing probable cause to a judge or a magistrate outlining

18   the facts of why we think there's evidence to be located inside

19   of a package or inside of a house.  So we would write up a

20   document saying we -- we believe there will be narcotics or

21   evidence found at 123 Main Street --

22             THE COURT:  Sorry.  I'm trying to unwind the cord

23   here.  Keep going.

24             THE WITNESS:  Thank you.

25        -- at 123 Main Street, because A, B, and C.  We'd present

TATUM - DIRECT / FINE

1  that in to the judge, and ultimately they sign or deny that

2  search warrant, giving us permission to search.

3  **BY MR. FINE:**

4  **Q.**   And this e-mail says search warrants needs to be

5  documented in I/LEADS.  What is I/LEADS?

6  **A.**   I/LEADS was the computer system that Rohnert Park used to

7  do all their informational reports, criminal cases.  Basically,

8  an information system that Rohnert Park used to store and write

9  reports.

10  **Q.**   And if we go down to the next dash, it says (as read):

11          "Same thing for drafting/obtaining destruction

12      orders."

13      What's a destruction order?

14  **A.**   A destruction order is kind of the same thing.  We would

15  write up a fact about if we stopped a car and there was say,

16  100 pounds of marijuana inside the car, the Court allows and

17  only requires 10 pounds of that marijuana to be kept as

18  evidence.

19      So we would outline the facts of why we stopped the car,

20  how we stopped them, ask the judge's permission to have the

21  other 90 pounds destroyed so we didn't have to -- so the

22  evidence people didn't have to store all of the evidence; that

23  they would take a sample of that hundred pounds, and we would

24  retain that hundred pounds.  And the judge would say yes or no,

25  you could destroy the rest, and the destruction order

1    documented that.

2    Q.    And was obtaining destruction orders a common part of

3    interdiction work?

4    A.    Yes, it was.

5            MR. FINE:  Your Honor, at this time, the Government

6    would move to admit Exhibit 71, which is another stipulated

7    exhibit.

8            THE COURT:  All right.  71 is admitted.

9        (Trial Exhibit 71 received in evidence.)

10   BY MR. FINE:

11   Q.    Mr. Tatum, do you recognize this exhibit?

12   A.    I do.  Excuse me.  Yes, sir, I do.

13   Q.    What is it?

14   A.    This is another e-mail that Joe Huffaker sent out to the

15   interdiction team back in August of 2016.

16   Q.    And, again, the interdiction team was up and running at

17   that point?

18   A.    Yes, it was.

19   Q.    And what's the subject of the e-mail?

20   A.    "Interdiction Templates."

21   Q.    And then does it appear that there are a number of

22   attachments to this e-mail?

23   A.    Yes.

24   Q.    What are those attachments?

25   A.    A cell phone template, a notice of electronic

1    communication search warrant, a marijuana traffic stop

2    destruction order, bank search warrant, and a seizure order

3    document.

4    Q.    And could you read the first paragraph of the e-mail.

5    A.    Yes.  (as read):

6              "Here are the templates that I use for

7         interdiction-related stuff.  Just wanted to get them

8         to you guys in case you need/don't have them/want

9         newer templates."

10   Q.    And then could you read the next paragraph as well?

11   A.    Yes.  (as read):

12             "As always, review the whole document so that you

13        don't have any incorrect info in your newly created

14        warrant/destruction order."

15   Q.    And then at the end, the e-mail is signed "Joe"; is that

16   right?

17   A.    Yes, sir.

18   Q.    Fair to say there was a lot of paperwork involved when you

19   were doing legitimate interdiction work?

20   A.    Extremely, yes, sir.

21             MR. FINE:  Ms. Hernandez, could you please turn to

22   page 2 of the document?

23   BY MR. FINE:

24   Q.    Mr. Tatum, what does this document appear to be?

25   A.    This would be the first page of one of the search

1  warrants, a template of one of the search warrants.

2  **Q.**   So if you were going to get a search warrant based on

3  interdiction work, you would fill in something like this

4  paperwork?

5  **A.**   Correct.

6  **Q.**   And --

7          **MR. FINE:**  Ms. Hernandez, could you please go to

8  page 14 of the document.

9  **BY MR. FINE:**

10  **Q.**   And, Mr. Tatum, what is this?

11  **A.**   This is a draft of the destruction order we would use --

12  or a template of the destruction order we were using back in

13  2016.

14  **Q.**   And you mentioned before that if you wanted to obtain a

15  destruction order from a judge, what would you need to do to

16  get that destruction order?

17  **A.**   You would write the case information on this document,

18  meet with a judge, present the facts, and then have the judge

19  or magistrate sign and approve to have the narcotics or

20  whatever was written in the destruction order be destroyed.

21          **MR. FINE:**  Ms. Hernandez, I think we can take this

22  document down.

23  **BY MR. FINE:**

24  **Q.**   Mr. Tatum, while the interdiction team was operating, did

25  the department have policies in place regarding the steps that

**TATUM - DIRECT / FINE**

1  officers were supposed to take when they pulled over a car?

2  **A.**   Yes.

3  **Q.**   What was that policy?

4  **A.**   Notifying -- first step would be using your police radio

5  to notify dispatch of the license plate, the location of the

6  stop, and any other pertinent info prior to exiting the vehicle

7  and making contact with the driver.

8  **Q.**   Would you typically ask for the driver's driver's license

9  and registration or insurance?

10  **A.**   Yes.   Once we exited the car, we'd go up and talk to the

11  driver, sometimes tell them why they were being stopped and

12  then ask them for their license, registration, and insurance.

13  **Q.**   Mr. Tatum, drawing your attention to the 2015, 2016 time

14  frame, generally, ballpark, how much marijuana was the

15  interdiction team seizing during this time period?

16  **A.**   Hundreds of pounds.

17  **Q.**   And how did this volume of marijuana seizures affect the

18  department's operations?

19  **A.**   They were overwhelmed.   The evidence and records

20  department was overwhelmed.

21  **Q.**   And so what happened?

22  **A.**   They ultimately came up with ideas to store the marijuana

23  in part of the fire bay lockdown room.   Once that was full,

24  they ultimately bought a shipping container and placed that

25  shipping container in the back lot for the interdiction team to

1   use to store and keep marijuana, overflow marijuana that

2   wouldn't fit in the evidence lockers inside the building.

3   Q.   How many shipping containers did the department ultimately

4   get?

5   A.   One that I remember, for sure.

6   Q.   And what would happen when the shipping container filled

7   up with marijuana?

8   A.   We would -- or I would take it to be destroyed sometimes.

9   Q.   Can you describe that process?

10  A.   Yes.  The shipping container was secured by a lock.  The

11  evidence and records supervisor and techs had the key.  So

12  we'd ask them, or I would ask them, to unlock the shipping

13  container so that we could take marijuana out to be destroyed.

14  They would open it, remove whatever marijuana was to be

15  destroyed, and take it to a local property and farm, dig a

16  hole, and bury it, and have it destroyed.

17  Q.   So once you -- once the shipping container would fill up,

18  you took marijuana to a local farm and buried it; is that

19  right?

20  A.   Yes, that's correct.

21  Q.   Where was that local farm?

22  A.   It was on Snyder Lane, it was in the city of -- the City

23  of Rohnert Park, just outside the city limits, just by a side

24  of the street, basically.  One side of the street was

25  Rohnert Park, one side of the street wasn't; but it was less

**TATUM - DIRECT / FINE**

1   than 4 miles from Rohnert Park headquarters.

2   **Q.**   And how did it come about that you chose that location to

3   begin burying the marijuana?

4   **A.**   I was friends with the property owner.  They're longtime

5   Rohnert Park residents and they had a tractor there.  And when

6   I was in the -- actually, no, that's -- that's it.

7   **Q.**   And who -- whose property was it?

8   **A.**   Dennis and Gary Tatman.

9   **Q.**   Now, Mr. Tatum, did burying marijuana at the farm comply

10  with the department narcotics destruction policies?

11  **A.**   No, it did not.

12  **Q.**   Mr. Tatum, during this 2015, 2016 time frame, did you

13  steal marijuana that was meant to be buried?

14  **A.**   I did, yes, sir.

15  **Q.**   How would you go about stealing it?

16  **A.**   Rather than take the marijuana to be destroyed, I took the

17  marijuana and gave it to somebody to sell.

18  **Q.**   Why did you begin stealing the marijuana?

19  **A.**   I lost track of important things in my life and didn't

20  realize the effect that -- the consequences of what I was doing

21  at the time, and kind of lost -- lost my way in life.

22  **Q.**   Mr. Tatum, fair to say you started stealing the marijuana

23  to make money; is that right?

24  **A.**   Yes, sir, that's fair.

25  **Q.**   How did you decide which marijuana to steal?

**TATUM - DIRECT / FINE**

1  **A.**    The quality of the marijuana -- the quality of the

2  marijuana.  The higher quality, the higher value it was going

3  to be worth.

4  **Q.**    So you chose to steal the higher-quality marijuana; is

5  that right?

6  **A.**    Yes, that's correct.

7  **Q.**    How would you determine the quality of the marijuana?

8  **A.**    Visually just looking at it, smelling it.  Just over the

9  years talking to people we'd stop, training.  You can just kind

10  of identify something that appears to be better or worth more

11  money than something else.

12  **Q.**    Now, you mentioned that when you stole the marijuana, you

13  would then sell it to someone; is that right?

14  **A.**    Yes.

15  **Q.**    At first, who did you begin selling the marijuana to?

16  **A.**    A guy named Joe Porcaro.

17  **Q.**    What's your relationship with him?

18  **A.**    He is my uncle by marriage.

19  **Q.**    Then at some point, did you begin selling your marijuana

20  to somebody else?

21  **A.**    I did, yes, sir.

22  **Q.**    Who did you begin selling your marijuana to at that point?

23  **A.**    A friend named Billy Timmins.

24  **Q.**    And do you recall roughly what time period you made the

25  switch to Billy Timmins?

**TATUM - DIRECT / FINE**

1   A.   Late '16, early '17.

2   Q.   And do you recall why you switched to Mr. Timmins?

3   A.   I do.  Joe and I just kind of had a falling out about him

4   being greedy and wanting more money and --

5   Q.   Apologies.  When you say "Joe," you mean Joe Porcaro?

6   A.   Yes, sir.  Sorry.

7        And just disagreement, so we both went our separate ways

8   and stepped back.

9   Q.   What was your arrangement with Mr. Timmins?

10  A.   That he would sell the marijuana and we'd split the

11  profits 50 percent.

12  Q.   How did he pay you?  Did he pay you in cash?

13  A.   Yes, cash.

14  Q.   Was it calls always in cash?

15  A.   Yes, sir.

16  Q.   Mr. Tatum, focusing on just 2016 alone, how much money did

17  you make from stealing marijuana in that year?

18  A.   A little under $150,000.

19  Q.   In the whole -- I'm talking about the whole year of 2016.

20  Was it more?  Was it over $400,000?

21  A.   Oh, the whole time, sorry.  I thought you meant just '16.

22  Yes, a little under $450,000.

23  Q.   Mr. Tatum, did you declare that extra income on your

24  taxes?

25  A.   I did not, no, sir.

**TATUM - DIRECT / FINE**

1  Q.   So, Mr. Tatum, in addition to the crimes that I asked you

2  about yesterday like extortion and obstruction of justice,

3  you've also committed tax fraud; is that right?

4  A.   Yes, sir.

5  Q.   Have you pled guilty to tax fraud?

6  A.   Yes, sir, I did.

7  Q.   Now, Mr. Tatum, once you started to make money from

8  stealing marijuana, did that change how you approached drivers

9  on the highway when you were working interdiction?

10  A.   Yes.  Yeah.

11  Q.   How did it change?

12  A.   The more drivers I stopped or we stopped, the more chances

13  we had to steal marijuana.

14  Q.   And so around that time, did you begin extorting marijuana

15  from drivers?

16  A.   Yes.

17  Q.   And as you said, was that so you could have more marijuana

18  to steal and then sell?

19  A.   Absolutely, yes, sir.

20  Q.   Can you describe how you went about extorting these

21  drivers?

22  A.   Yes.  A lot of times drivers wouldn't consent to a search

23  or would deny that there was marijuana in the car, and I or we

24  would threaten or suggest that if the driver or passenger

25  didn't comply, that we would take them to jail.

TATUM - DIRECT / FINE

1   Q.   Can you kind of take us through how a typical stop worked

2   when you were extorting a driver?

3   A.   Yes.  From which, like, point or --

4   Q.   You pulled them over and then what happened?

5   A.   Okay.

6        Contact the passenger or contact the driver through the

7   passenger side, out of the roadway.

8        Sometimes introduce ourselves, sometimes not.  Ask for

9   driver's license, registration, insurance.  Ask them kind of

10  questions about where they're going, what brought them to this

11  location or if they're traveling.

12       If we smelled marijuana, we would ask them about the

13  marijuana or ask them if they had any contraband, narcotics,

14  large amounts of currency.  Have them exit the vehicle to have

15  a further discussion.  Sometimes they would admit that there's

16  marijuana in the car.  Sometimes they wouldn't.

17       And search for the marijuana.  Ask them if they had

18  medical paperwork to possess or transport the marijuana.

19       After some point, you know, having all those discussions,

20  they would either say, "Yes, the marijuana is mine" or "No."

21  And if they said it was theirs, sometimes we would or I would

22  suggest that they were going to be arrested if they don't turn

23  the marijuana over.

24  Q.   Would you, essentially, give the drivers a couple of

25  options?

1   **A.**    Yes.

2   **Q.**    What were the options you gave them?

3   **A.**    To either say the marijuana is not theirs or go to jail.

4   **Q.**    How did the drivers typically react when faced with those

5   options?

6   **A.**    They would say it's not theirs.

7   **Q.**    And -- continue.

8       And then what would happen next when they said it wasn't

9   theirs?

10  **A.**    We would steal the marijuana and take it and put it in our

11  patrol car.

12  **Q.**    When you were extorting marijuana from drivers, would you

13  occasionally receive complaints after the fact?

14  **A.**    Sometimes, yes.

15  **Q.**    What happened with those complaints?  Did they go

16  anywhere?

17  **A.**    No.

18  **Q.**    Was it the norm that someone would complain after the

19  fact?

20  **A.**    No.

21  **Q.**    So most people you never heard from again after you

22  extorted them; is that right?

23  **A.**    Yeah, it's fair to say.

24  **Q.**    Mr. Tatum, I'd now like to draw your attention to January

25  of 2017.

1    Around that time period, did the RPDPS interdiction

2    operations cease?

3    A.    They did, yes, sir.

4    Q.    Why did interdiction cease?

5    A.    Marijuana was becoming even more legal in California and

6    enforcement of marijuana through our -- the district attorney's

7    office in Sonoma County, they were stepping back and weren't --

8    weren't wanting to process and accept a lot of criminal cases

9    for marijuana, and ultimately told the chiefs in Sonoma County

10   that they weren't going to be doing marijuana cases as much.

11   Q.    And as a result, was the interdiction team disbanded?

12   A.    Yes.

13   Q.    How was that change communicated to you?

14   A.    Verbally and in a memo, written e-mail.

15   Q.    By whom?

16   A.    Our chief, Chief Masterson.

17   Q.    And how was that news communicated to the rest of the

18   interdiction team?

19   A.    Through myself and Commander Taylor.

20   Q.    Did you and Mr. Huffaker have discussions about

21   interdiction operations being ceased?

22   A.    We did.

23   Q.    What was Huffaker's -- Mr. Huffaker's reaction to the

24   interdiction team being disbanded?

25   A.    He was disappointed.  And -- yeah, disappointed, mad.

TATUM - DIRECT / FINE

1  Q.   How did he express that?

2  A.   By telling me it was bullshit, and that we could still do

3  other interdiction stuff; we just didn't have to focus on

4  strictly marijuana, that there was other ways that maybe we

5  could still be able to stay out there and do interdiction, not

6  have to just focus on marijuana.

7  Q.   So during the year of 2017, after the interdiction team

8  had been disbanded, did you and Mr. Huffaker have discussions

9  about trying to get the interdiction team back up and running?

10 A.   We did, several times.

11 Q.   So that was several conversations about that; is that

12 right?

13 A.   Yes.

14 Q.   What did Mr. Huffaker say on that topic?

15 A.   Kind of the same thing about going to command staff and

16 presenting other options for the interdiction team to stay

17 together.  There was a lot of low morale at the department, so

18 having a specialty assignment or keeping the interdiction team

19 would possibly help keep officers and keep retention of them

20 and not allow them or not want them to leave because we had

21 something cool to go do.

22 Q.   So let's break that down a little bit.

23      You mentioned a specialty assignment?

24 A.   Uh-uh.

25 Q.   What's that?

**TATUM - DIRECT / FINE**

 1   **A.**   Anything outside of patrol.  So like a collateral

 2   assignment -- narcotics, detective, K9, interdiction, motor --

 3   just something besides driving a patrol car -- patrol car every

 4   day.

 5   **Q.**   And were specialty assignments attractive to officers at

 6   the department?

 7   **A.**   Oh, yeah, a hundred percent.

 8   **Q.**   Why is that?

 9   **A.**   Because nobody really wants to sit in a patrol car and

10   just do basic police work every day, day after day.  They like

11   to mix it up and have fun and do other assignments.

12   **Q.**   And you mentioned that morale was low; is that right?

13   **A.**   Yes.

14   **Q.**   Can you describe that a little bit more about why morale

15   was low?

16   **A.**   There was a vote of no confidence going on about that time

17   about the chief and the -- a lot of the upper command staff

18   wasn't or weren't very supportive of, like, the line troops,

19   the officers and firefighters.  Just different policies and

20   procedures being implemented that a lot of the guys weren't

21   happy with.

22        Nothing that I can recall specifically.  I just know a lot

23   of the guys weren't happy.  The majority of the officers

24   weren't happy during that time.

25   **Q.**   Now, going back to your discussions with Mr. Huffaker

TATUM - DIRECT / FINE

1    about trying to get the interdiction team back up and running,

2    was overtime pay a factor in your discussions?

3    A.    Yeah.  It was.

4    Q.    How so?

5    A.    We had $40,000 at our discretion to work any time we

6    wanted, and with interdiction being taken away, we weren't

7    going to be able to have any time to make extra money doing

8    interdiction overtime.

9    Q.    Now, during this time in 2017 had you been reassigned to

10   the fire division?

11   A.    Yes.

12   Q.    And had Mr. Huffaker been assigned to the fire division as

13   well?

14   A.    Yes, that's correct.

15   Q.    Did both of you remain assigned to the fire division

16   throughout 2017?

17   A.    Yes, I believe so.

18   Q.    And during this time period, what were the specific steps

19   you took to try and get the interdiction team back up and

20   running?  And when I say "you," I mean, you and Mr. Huffaker.

21   A.    We talked to interdiction guys several times and said:

22   Hey, come up with ideas about how we can still go out there.

23        There was a couple of guys that were leaving or wanting to

24   lateral to other departments.  We suggested those guys say:

25   Hey, I'm going to leave if interdiction doesn't get brought

1  back.

2      We met with a lot of the commanders and presented ideas

3  about how interdiction could still stay up and going, minus

4  targeting cannabis -- marijuana.  Met with the chief privately

5  in his office several times and presented ideas and said:  Hey,

6  guys are going to leave because interdiction is going away.

7  **Q.**   So you mentioned these meetings with -- with

8  Chief Masterson in his office.  Was Mr. Huffaker there for any

9  of these meetings?

10  **A.**   Yes, he was.

11  **Q.**   And what was Chief Masterson's response to your efforts to

12  get the interdiction team back up and running?

13  **A.**   He said no every time.

14  **Q.**   And he said no directly to both you and Mr. Huffaker?

15  **A.**   Yes.

16  **Q.**   Now, I believe, Mr. Tatum, you mentioned conversations

17  regarding federal law enforcement; is that right?

18  **A.**   Correct.

19  **Q.**   What did you and Mr. Huffaker discuss regarding

20  coordination with federal law enforcement?

21  **A.**   We had met the DEA supervisor and had discussions about

22  using federal funding to allow us to kind of be under the

23  federal umbrella to go out and do interdiction with the federal

24  money paying for our overtime.  And presented these ideas to

25  both the command staff and the chief about the DEA supervisor

**TATUM - DIRECT / FINE**

1  wanting us to come up there and do interdiction with them.

2  Q.   And who was this DEA supervisor?

3  A.   Ryan Sibbald.

4  Q.   And you presented these ideas to Chief Masterson; is that

5  right?

6  A.   Several times, yes.

7  Q.   And what was his response?

8  A.   He still said, no, it wasn't happening.

9  Q.   And ultimately, did you even ever receive any approval

10  from any of the federal agencies like DEA or FBI or ATF to

11  resume any sort of interdiction efforts?

12  A.   No.

13  Q.   These were just kind of discussions going on?

14  A.   Hopes and discussions, yep.

15  Q.   Was there any kind of memorandum or written document

16  saying the federal government had given you authority to do

17  interdiction work?

18  A.   No, there wasn't.

19  Q.   How did Mr. Huffaker react to Chief Masterson's consistent

20  denials of your requests to get interdiction back up and

21  running?

22  A.   Disappointed, and, you know, pissed off.  We were both

23  pissed off.  We loved to go out there and do interdiction.  And

24  it was -- a couple of times he said it was the best time in his

25  career and then it was just taken away.

TATUM - DIRECT / FINE

1    Q.    Now, drawing your attention to November and December

2    of 2017.   Around this time, did you and Mr. Huffaker have

3    discussions about going out on the road and pulling over

4    drivers?

5    A.    We did, yes, sir.

6    Q.    What was the nature of those discussions?

7    A.    We discussed going out and doing, basically, illegal

8    interdiction, or doing interdiction and not telling the

9    department.

10   Q.    And what was the initial tone of these conversations?

11   A.    Kind of joking around, you know, having drinks or just

12   hanging out and kind of spitballing ideas and just kind of

13   joking around about it.

14   Q.    And then at some point did the tone of the conversation

15   shift?

16   A.    Yeah.   The more we talked about it, the more realistic or

17   comfortable it got and then just kind of put it into play.

18   Q.    Did you talk about what you would do with the marijuana

19   that you seized during this illegal interdiction?

20   A.    Yes, sir, we did.

21   Q.    And what did you and Mr. Huffaker say about that?

22   A.    That I would give it to Billy Timmins and he would sell

23   it.   And Billy would get 50 percent and Joe and I would split

24   50 percent and -- he would get 25.   I would get 25 percent.

25   Q.    And was the -- the way you would dispose of the marijuana

1  and make money from it, was that like you discussed one time in

2  passing or was it discussed multiple times?

3  **A.**   Multiple times.

4  **Q.**   Now, once these discussions got more serious, did

5  Mr. Huffaker say why he wanted to do this?

6  **A.**   Yeah.

7  **Q.**   What did he say?

8  **A.**   We weren't making money in overtime and we both wanted to

9  make money.

10 **Q.**   So fair to say money was a -- the main factor for doing

11 this?

12 **A.**   Yes, sir.

13 **Q.**   Now, Mr. Tatum, I want to talk about the final

14 conversation that you and Mr. Huffaker had before you actually

15 went out and did this.

16      What did you discuss during this final conversation?

17 **A.**   We discussed what we'd wear to not get caught.  So don't

18 wear, you know, our badges, don't take our badges, don't bring

19 our body cams.  Wear an unmarked -- or we'd be taking an

20 unmarked car.  Don't identify as, you know, Rohnert Park police

21 when we walk up there.  Just basically anything that would

22 identify us as Rohnert Park cops, don't say or don't have it on

23 you.

24 **Q.**   And where did these discussions between you and

25 Mr. Huffaker take place?

**TATUM - DIRECT / FINE**

1  A.  Sometimes at work.  At his house.  Yeah, those two

2  locations.

3  Q.  You said you would discuss what you would wear.  Tell us

4  what you decided to wear.

5  A.  Basically, everything we used to wear during interdiction,

6  so some boots, jeans, our tac vest minus the cloth badge.  No,

7  like, hard uniform badge, no body camera.  Just our basic

8  plainclothes uniform minus -- minus anything with

9  "Rohnert Park."

10 Q.  So the main difference between this illegal activity you

11 were going to do and the legitimate interdiction you had done

12 more than a year before was you left your Rohnert Park badges

13 and insignia at home; is that right?

14 A.  That is correct, yes, sir.

15 Q.  And you left the body cam at home; right?

16 A.  Correct.

17 Q.  Did you -- were you planning to notify anyone that you

18 were going out there?

19 A.  No.  We made sure we didn't call dispatch or didn't tell

20 anybody.

21 Q.  Why not?

22 A.  That was the purpose.  We weren't allowed to go out there,

23 so we'd be telling on ourselves and get caught.

24 Q.  Did you discuss how you would identify yourselves to

25 drivers if anyone asked who you were with?

1   A.   We did, yes.

2   Q.   And what did you and Mr. Huffaker say on that point?

3   A.   We decided that we'd tell people we were the ATF and draw

4   off their attention to any type of local law enforcement, and

5   not draw attention to, like, the DEA or somebody locally that

6   they could complain to or get back to.

7   Q.   And what is the ATF?

8   A.   Alcohol, Tobacco, Firearms, and Explosives.

9   Q.   And can you just describe maybe a little more as to why

10  you specifically picked that agency to identify as?

11  A.   We didn't know anybody that worked for the ATF.  I had

12  worked with federal agencies prior and knew they were local and

13  knew their office.  So I didn't know anybody at the ATF and

14  Mr. Huffaker didn't know anybody at the ATF, so we both

15  thought, we've never met anybody at the ATF, we didn't know

16  where they were or how they would come up on 101.

17  Q.   So fair to say if you identified as ATF you thought it was

18  less likely that it would trace back to you and Mr. Huffaker?

19  A.   Yes, sir, that's correct.

20       MR. FINE:  Your Honor, at this point the Government

21  would move to admit Exhibit 192, which is a stipulated exhibit.

22       THE COURT:  Okay.  192 is admitted.

23       (Trial Exhibit 192 received in evidence.)

24  BY MR. FINE:

25  Q.   Mr. Tatum, I want to walk through this a little bit.

TATUM - DIRECT / FINE

1           Do you see Rohnert Park on this map?

2   A.    Yes, sir.

3   Q.    Where is Rohnert Park?

4   A.    Towards the middle.

5   Q.    It's kind of at the bottom of that blue line; is that

6   right?

7   A.    Yes.

8   Q.    And then did you and Mr. Huffaker discuss where you were

9   going to conduct this activity?

10  A.    We did.

11  Q.    And where was that?

12  A.    Cloverdale/Hopland area.  North -- north of Geyserville,

13  where we usually would always do legitimate interdiction.

14  Q.    And so if you look at this map, that kind of the -- the

15  top of the blue line, is that about where Cloverdale is?

16  A.    Yes, sir.

17  Q.    And then if you go a little farther up kind of just under

18  the white bubbles, do you see Hopland there?

19  A.    Yes, I do.

20  Q.    And was that kind of the area that you and Mr. Huffaker

21  were going to conduct this activity?

22  A.    Yes.  South of Hopland -- not in the town of Hopland but

23  south of Hopland to Cloverdale.

24          MR. FINE:  Ms. Hernandez, if we could show the witness

25  an exhibit that isn't yet in evidence, that's Exhibit 13.

1   BY MR. FINE:

2   Q.   Mr. Tatum, do you recognize this exhibit?

3   A.   I do, yes, sir.

4   Q.   What is it?

5   A.   This is a photograph of one of the Rohnert Park unmarked

6   SUVs.

7   Q.   And is this SUV similar to the one that you and

8   Mr. Huffaker would go out in when you conducted this activity?

9   A.   Yes, sir.

10  Q.   Is it a fair and accurate copy of a picture of one of

11  those SUVs?

12  A.   From this angle, yes, sir.

13          MR. FINE:  Your Honor, I'd move to admit Exhibit 13.

14          THE COURT:  Any objection to 13?

15          MR. CEBALLOS:  No, Your Honor.

16          THE COURT:  13 is admitted.

17      (Trial Exhibit 13 received in evidence.)

18          MR. FINE:  And if we can publish that to the jury,

19  please.

20  BY MR. FINE:

21  Q.   Did you -- so you described before that you and

22  Mr. Huffaker discussed what you were going to do with the

23  marijuana once you seized it; right?

24  A.   Yes, we did.

25  Q.   And you said you and Mr. Huffaker had discussed selling

1  that marijuana to Billy Timmins?

2  **A.**   Yes, giving it to him to sell for us.

3  **Q.**   And you and Mr. Huffaker expected money in return for that

4  marijuana; is that right?

5  **A.**   Yeah, absolutely.

6  **Q.**   How would you describe the relationship between

7  Mr. Huffaker and Mr. Timmins before you and Mr. Huffaker went

8  out and did this?

9  **A.**   Acquaintances.  We all hung out and had drinks and

10 barbecued, spent time together at different parties; cordial

11 but acquaintances.

12 **Q.**   Fair to say you were much closer with Mr. Timmins than

13 Mr. Huffaker was at this point?

14 **A.**   Oh, yeah.  Yes, sir.

15 **Q.**   So, Mr. Tatum --

16      **MR. FINE:**   And, Ms. Hernandez, I think we can take

17 this exhibit down.  Thank you.

18 **BY MR. FINE:**

19 **Q.**   During the early part of December of 2017, did you and

20 Mr. Huffaker execute on the plan that you had just described?

21 **A.**   We did.

22 **Q.**   Approximately how many days did you and Mr. Huffaker go

23 out during the month of December, 2017?

24 **A.**   Three to four times.

25 **Q.**   And approximately how many marijuana seizures did you and

1    Mr. Huffaker make during these three to four times out?

2    **A.**    Five or six, approximately.

3    **Q.**    And when you and Mr. Huffaker were doing this, how would

4    you decide which cars to stop?

5    **A.**    Just based on our prior training and experience stopping

6    cars when we were doing legitimate interdiction.  Rental cars

7    Toyota trucks, the training we went through taught us smugglers

8    or people with contraband were usually white males between the

9    ages of 25 and 35.  Just kind of go off what we were trained.

10   **Q.**    So when you and Mr. Huffaker went up north to extort

11   drivers, can you walk us through kind of the routine you would

12   go through when you pulled over a car?

13   **A.**    Yes.  Depending on who's driving, the driver is -- the

14   driver of the police car would be the cover officer.  So the

15   police officer in the front passenger seat would usually be the

16   contact.  They'd go up passenger side, contact the driver or

17   the passenger through the window:  Hey, we stopped you because

18   of whatever.  Do you have your license, registration, and

19   insurance?  Where are you headed?  Is this your car?  Are you

20   traveling?  Where are you staying?  How long are you going to

21   be in California?  Are you visiting someone?

22        Try to get a story that locks them into something that the

23   innocent motoring public would answer normally and not show any

24   signs of being nervous or afraid.

25        Either smell the odor of marijuana or they'd admit that

1   there's some other contraband in the car or not admit.

2       Ultimately, have the driver exit, come back off the

3   shoulder, have a further conversation about where they're

4   headed, you know, kind of ask them more questions about that.

5   Ask them about the contraband in the car, is it theirs or they

6   just driving it for somebody.  Where are they headed.  How

7   much.  If they have medical forms.  Just kind of have a

8   conversation about what their plan is while driving and where

9   they're heading, ultimately.

10  Q.   And at what point in the stop would you essentially extort

11  the marijuana from the driver?

12  A.   When all that was exhausted and they would say they

13  weren't going to turn the marijuana over or that they were not

14  going to disclaim it or say it wasn't theirs.

15  Q.   And when you had that part of the discussion, would both

16  you and Mr. Huffaker be present with the driver?

17  A.   Yes.

18  Q.   Was -- was it kind of important that the driver kind of

19  feel intimidated at that point?

20  A.   It helped, yes, sir.

21  Q.   Now, after you and Mr. Huffaker seized marijuana,

22  you know, by the side of the road, what would you do with it?

23  A.   Remove it from the driver's vehicle and put it in the back

24  of our police car or the unmarked SUV.

25  Q.   And then what did you do with the marijuana at that point?

1   A.   We'd either just leave it in there, keep working the

2   highway; or if it was the end of the day, we'd go home.

3   Q.   And if you had the, you know, you'd kind of gotten all the

4   marijuana you are going to get for that day, would you call

5   anyone?

6   A.   Sometimes, yes.

7   Q.   Who would you call?

8   A.   Billy Timmins.

9   Q.   And would you make those calls to Timmins often while you

10  were still out on the road with Mr. Huffaker?

11  A.   Yes.

12  Q.   And was Mr. Huffaker present for those phone calls between

13  you and Mr. Timmins?

14  A.   He was, yes, sir.

15  Q.   Most of the time, how did you go about giving the

16  marijuana to Mr. Timmins?

17  A.   Take it to his house or we'd meet up somewhere back in

18  Rohnert Park.

19  Q.   And most of the time, you would just give the marijuana to

20  Mr. Timmins; is that right?

21  A.   Yes.  I'd be by myself.

22  Q.   Was there one occasion where something different happened

23  in terms of giving the marijuana to Mr. Timmins?

24  A.   Yes.

25  Q.   Can you describe that occasion?

1   **A.**    Yes.   In December, when Joe and I were out working illegal

2   interdiction --

3   **Q.**    And sorry, Mr. Tatum, when you say "working illegal

4   interdiction," you mean extorting marijuana from drivers?

5   **A.**    Yes.   I'm sorry.

6        We had too much marijuana that filled up the car, so I

7   called Billy.   He came up to the Cloverdale area and met up

8   with us on an exit off the shoulder off 101.   And Joe and I

9   unloaded the marijuana into his car and he took it back home

10  and left.

11  **Q.**    Do you remember what exit it was?

12  **A.**    The Commisky exit.

13  **Q.**    What is the Commisky exit?

14  **A.**    On the Sonoma/Mendocino border right by Cloverdale and

15  Hopland.

16  **Q.**    Let's kind of break that down a little bit.

17       So you call Mr. Timmins, and what do you say?

18  **A.**    We had a prearranged -- like a -- like "Hey, we might call

19  you if we have too much weed."

20       "So, hey, we're up in Cloverdale.   You want to come up and

21  meet us?

22       "Okay.   Where?"

23       Tell him the exit.   One particular time he didn't remember

24  where the exit was, so he kept calling and calling.   We would

25  meet up.   Commisky exit is kind of a dirt road off 101.   You

TATUM - DIRECT / FINE

 1   can't really see it from 101.

 2       It was kind of rainy, misty.  So we pulled down that road.

 3   Joe and I got out.  Billy got out.  We -- it was -- the weed

 4   was in some garbage bags, put them in the back of his SUV, and

 5   he left.  We went out and went back on the highway.

 6   Q.   And approximately how much marijuana did you and

 7   Mr. Huffaker load into Mr. Timmins' car?

 8   A.   Over 20 pounds.

 9   Q.   And how long did the whole interaction take?

10   A.   Less than three minutes.  It was quick.  Just -- you don't

11   want people to see you, so you -- in and out.  Throw it in the

12   car, get back in, and leave.

13       MR. FINE:  Your Honor, at this point, the Government

14   would move to admit Exhibit 169, which is a stipulated exhibit.

15       THE COURT:  All right.  169 is admitted.

16       (Trial Exhibit 169 received in evidence.)

17       MR. FINE:  And, Ms. Hernandez, if we could go to

18   page 530 of the exhibit.

19   BY MR. FINE:

20   Q.   Mr. Tatum, does this appear to be a Verizon phone bill?

21   A.   Yes, it does.

22   Q.   And it's for Kassie Bridges; is that right?

23   A.   Yes.

24   Q.   Who is Kassie Bridges?

25   A.   My wife.

TATUM - DIRECT / FINE

1    Q.    And were you on the same phone account with your wife?

2    A.    Yes.  We have the same bill, same plan.

3    Q.    And looking at the top right corner, what's the date range

4    for this phone bill?

5    A.    November 9 of '17 to December 8 of '17 -- 2017.

6          MR. FINE:  Ms. Hernandez, if we could go to page 538

7    of the document.

8    BY MR. FINE:

9    Q.    And, again, in the top left, it says "Kassie Bridges";

10   right?

11   A.    Yes, it does.

12   Q.    And then there's a phone number below that beginning with

13   707?

14   A.    Yes.

15   Q.    Whose phone number is that?

16   A.    Joe's, Joseph Huffaker's.

17   Q.    Is that Joe's or is that a different phone number?

18         I'm sorry.  There are a lot of phone numbers on here.  I'm

19   talking about the phone number right under Kassie Bridges that

20   says iPhone 6, so the phone number on the account?

21   A.    Oh, that's my phone.

22   Q.    So that (707)775-8317, that's your phone number; is that

23   right?

24   A.    Yes.

25   Q.    And then next to it, it says "iPhone 6"; is that right?

**TATUM - DIRECT / FINE**

1    A.    Yes, it is.  Yes, it does.

2    Q.    And did you have an iPhone 6 at that time?

3    A.    I did, yes, sir.

4            MR. FINE:  Ms. Hernandez, if we could zoom out.  Thank

5    you.

6    BY MR. FINE:

7    Q.    Let's start with December 4 of 2017.  Did you go out to

8    the Cloverdale/Hopland area with Mr. Huffaker on that date?

9    A.    Yes, I did.

10   Q.    And did you have a phone call in the morning with

11   Mr. Huffaker before going out?

12   A.    I did.

13   Q.    So looking at the first line here at 7:48 a.m., it looks

14   like you had a phone call with a number (707)291-3466?

15   A.    Yes.

16   Q.    Do you recognize that phone number?

17   A.    Yes.  That is Joe Huffaker's phone number.

18   Q.    And that appears to be a one-minute call; is that right?

19   A.    Correct, yes, sir.

20   Q.    And generally, when you and Mr. Huffaker were going to go

21   up north to do this, would you -- was it your pattern to have a

22   phone call in the morning?

23   A.    Yes.

24   Q.    Staying on December 4, if we look at a series of calls at

25   12:25, 12:33, 12:35, and 5:03 -- maybe I can circle some of

```
 1   those.

 2        Do you see those four calls?

 3   A.   Yes, I do.

 4   Q.   For the first three calls, what does it show as the

 5   origination location?

 6   A.   Hopland, California.

 7   Q.   And is that around where you and Mr. Huffaker were,

 8   you know, extorting drivers on that day?

 9   A.   Yes, sir.

10   Q.   And, again, how far is that from Rohnert Park?

11   A.   40, 45 minutes north.

12   Q.   And if we look at 5:46 p.m., and that's right -- right

13   about there, did you see another call there?

14   A.   I do.

15   Q.   And it looks like you called a number (707)484-9727?

16   A.   Yes, I did.

17   Q.   Do you recognize that phone number?

18   A.   I do.

19   Q.   Whose phone number is that?

20   A.   Billy Timmins.

21   Q.   So the pattern here, it looks like you called Mr. Huffaker

22   in the morning, you go up to the Hopland-Cloverdale area, and

23   then you call Mr. Timmins; is that right?

24   A.   That's correct.

25   Q.   Now, if we could move down the page to December 6.
```

1          Mr. Tatum, did you go out that date with Huffaker,

2    December 6?

3    A.   Yes, I did.

4    Q.   And did you and Mr. Huffaker have a call in the morning

5    before going out?

6    A.   We did, yes, sir.

7    Q.   So if you look right up here, December 6 at 8:35 a.m.,

8    whose phone number is that again?

9    A.   Joe Huffaker's.

10   Q.   And it looks like you had a two-minute call; is that

11   right?

12   A.   Yes.

13   Q.   And then if we go down the page, there's a series of calls

14   between -- beginning at about 11:14 a.m.

15          Do you see that?

16   A.   I do, yes, sir.

17   Q.   And it looks like for that series of it looks like seven

18   calls, what does it show for the origination location?

19   A.   Also Hopland, California.

20   Q.   And then looking at a call at 12:29 p.m., the second in

21   that series, and then also the rest of the page beginning at

22   1:24 p.m., it looks like there were a series of calls with that

23   same number; is that right?

24   A.   Yes.

25   Q.   And who is that (707)484-9727 number again?

1    **A.**    Billy Timmins.

2    **Q.**    And then at the bottom of the page, it looks like there

3    were about six calls in a row; right?

4    **A.**    Yes.

5    **Q.**    And then looking towards the right side, it looks like a

6    majority of those were incoming calls; is that right?

7    **A.**    Yes.  It's also correct.

8    **Q.**    Do you recall why there were so many incoming calls from

9    Mr. Timmins on that afternoon?

10    **A.**    Yes.  As I previously said, that's when he was trying to

11    find where Joe and I were.  He kept calling.  Didn't understand

12    or couldn't find the exit to where we were so he kept calling

13    and calling and calling.

14    **Q.**    Mr. Tatum, I'd like to draw your attention to December 18

15    of 2017 -- sorry.  Just to go back to that -- apologies.

16        Just to go back to that December 6 date.  You said that's

17    when Mr. Timmins was calling and calling and calling; is that

18    right?

19    **A.**    Yes.

20    **Q.**    And then after that is when you and Mr. Huffaker and

21    Mr. Timmins met on the side of the road?

22    **A.**    Yes.  He finally found us at the exit and we gave him the

23    marijuana.

24    **Q.**    Now I'd like to draw your attention to December 18

25    of 2017.

TATUM - DIRECT / FINE

```
 1        Were you and Mr. Huffaker out in the Cloverdale/Hopland
 2   area that day?
 3   A.    Yes, we were.
 4   Q.    And, again, did you follow the same pattern?  Did you have
 5   a phone call in the morning?
 6   A.    Yes.
 7        MR. FINE:  Ms. Hernandez, if you could go to page 545
 8   of this document.
 9   BY MR. FINE:
10   Q.    And I'd like to draw your attention to a call on
11   December 18 at 9 -- or December 18 at 9:16 a.m.
12   A.    Yes, I see it.
13   Q.    And is that 219 number, whose number is that?
14   A.    Joe Huffaker's.
15   Q.    And it was a two-minute call; is that right?
16   A.    Yes, it was.
17   Q.    And then looking at calls right after that, at 12:41 p.m.
18   and 1:36 p.m., what are the -- what's the origination location
19   for those calls?
20   A.    Hopland, California.
21   Q.    Thank you.
22        MR. FINE:  And, Ms. Hernandez, we can take it off the
23   screen for now.
24   BY MR. FINE:
25   Q.    Mr. Tatum, on that day, did you and Mr. Huffaker pull over
```

TATUM - DIRECT / FINE

1    a white Mercedes SUV?

2    **A.**    We did, yes, sir.

3    **Q.**    Why did you pull that car over?

4    **A.**    We thought that the driver was involved in illegal

5    activity, probably had something illegal in his car.

6    **Q.**    And what made you think that?

7    **A.**    He fit the description of our training, white male, clean

8    car, paper license plates, out of Oakland.  You know, not

9    originating from the local area we were at.

10    **Q.**    And when you say paper license plates, were they like

11    dealer plates?

12    **A.**    Yes.

13    **Q.**    How many people were in this car that you pulled over?

14    **A.**    Just one.

15    **Q.**    What did he look like?

16    **A.**    White male, probably mid to late twenties, early thirties.

17    **Q.**    And what happened after you and Mr. Huffaker pulled over

18    the car?

19    **A.**    I was driving the police car so Joe was sitting in the

20    passenger seat.  Joe went up and contacted the driver, started

21    to have a conversation.  And at some point, two CHP officers

22    pulled up behind us.

23    **Q.**    So before we get to that point, you said you pulled over

24    the car, and at some point did the driver exit the car?

25    **A.**    Yes, at some point.

TATUM - DIRECT / FINE

1  Q.   And where did he go?

2  A.   We always have them stand off to the side of the roadway.

3  So off the shoulder, kind of in -- off the shoulder to the

4  median.

5  Q.   And where was he standing in relation to his own car?

6  A.   Would have been the passenger rear quarter panel.

7  Q.   So kind of by the back of his car?

8  A.   Yeah.

9  Q.   And were you and Mr. Huffaker there with him?

10  A.   Yes, on and off.

11  Q.   And what was the discussion with the driver like?

12  A.   Asked him where he was coming from.  I believe we already

13  could smell the marijuana in some boxes.  So just having a

14  conversation about where he was headed, what he was up to, just

15  trying to figure out what his connection to the marijuana was.

16  Q.   And while you and Mr. Huffaker are having that discussion

17  with the driver, are both of you armed?

18  A.   With our guns?

19  Q.   Yes.

20  A.   Oh, yes.  Yeah.  Sorry, yes.

21  Q.   And are you visibly armed so he could see your guns?

22  A.   Yeah, yeah.

23  Q.   So you're having this discussion with the driver and what

24  happened next?

25  A.   At some point a CHP cruiser comes up behind us.  I

**TATUM - DIRECT / FINE**

1    recognized -- actually, I recognized one of the -- one of the

2    guys at first, and I knew the other guy at some point, but I

3    walked back and have a conversation with the two CHPs.

4    Q.    So let's break that down a little bit.  You and

5    Mr. Huffaker are talking to the driver of the car; is that

6    right?

7    A.    Yes.

8    Q.    And then CHP pulls up behind you?

9    A.    At some point, yes.

10   Q.    And you said you walked back to CHP at that point?

11   A.    I did.

12   Q.    And tell us what happened when you contacted CHP.

13   A.    They were just getting out of their cars and I kind of met

14   them at their hood.  We had a conversation going, you know,

15   "Hey, good to see you.  What are you guys up to?"

16        I told them we were up there doing some federal

17   interdiction and he was like, "Oh, cool."

18        Told him we were good, didn't need any help and the

19   conversation ended.  They got back in their car and took off.

20   Q.    How long did the conversation with CHP take?

21   A.    Less than five minutes.

22   Q.    And you said you recognized the CHP officers?

23   A.    I did.

24   Q.    Who were they?

25   A.    I recognized Scott.  He -- I knew him through an

**TATUM - DIRECT / FINE**

1  electrician.  And then he was on training.  He was a new CHP

2  officer.  And then I recognized his trainer, the FTO.  Or he

3  recognized me and then I remembered that I knew him from drug

4  task force stuff back in the day.

5  **Q.**  So after the CHP drove away, what happened next?

6  **A.**  Walked back up to the car, met back up with Joe and the

7  driver, and continued discussing the marijuana.

8  **Q.**  At some point, did the driver ask you for identification?

9  **A.**  He did.

10  **Q.**  And what happened next?

11  **A.**  We told him we were with the ATF.  Didn't -- didn't show

12  him our ID or didn't say anything.  Said we were with the ATF

13  and that's all he needed to know.

14  **Q.**  Now, can you describe the marijuana this driver had with

15  him?

16  **A.**  Yes.  Was in some boxes.  There was, like, bud marijuana

17  in bags.  And then he had, like, concentrated cannabis in

18  little containers, so, like, not liquid cannabis but kind of

19  like a wax concentration of cannabis.

20  **Q.**  And when you say "bud marijuana," what do you mean by

21  that?

22  **A.**  Like the end result of when you harvest it, like a nugget

23  or a bud.  Yeah.

24  **Q.**  And you said it was in bags; is that right?

25  **A.**  Yes.

**TATUM - DIRECT / FINE**

1  Q.   Approximately how many bags were there?

2  A.   Over 20.

3  Q.   Okay.  And so CHP has driven off.  You and Mr. Huffaker

4  are there in the back of -- you know, by the back of the car

5  with this driver and you're talking about the marijuana; is

6  that right?

7  A.   Correct.

8  Q.   And what happened next?

9  A.   The driver told us that he had some samples he was trying

10  to take somewhere.  He had paperwork showing that the

11  concentrated cannabis looked legitimate but the bud marijuana

12  didn't look legitimate just by talking to him and his answers.

13      So ultimately we let him keep the concentrated cannabis

14  and stole the bud marijuana from him.  Took it out of the bag

15  and put it in our car.

16  Q.   And, you know, what did you say to him as you were doing

17  this?

18  A.   We explained to him that the paperwork that he had for the

19  concentrated cannabis appeared to be legitimate and, you know,

20  we've done hundreds of cases, you know, we didn't believe what

21  he was saying about the bud marijuana.  So we allowed him to

22  keep that.  He made reference to a receipt or a case number.

23  We told him he wouldn't get either of those; that he would get

24  something in the mail from the ATF or Washington at some point.

25  Q.   And did you tell him what would happen if he tried to

TATUM - DIRECT / FINE

1    fight the marijuana seizure?

2    **A.**    That -- yeah.  That ultimately the marijuana was going to

3    be destroyed so he wouldn't get it back.  And that it was still

4    going to be gone, so fighting it was a waste of his time.

5    **Q.**    Now, let's talk about the day after.

6        The next day, did you receive a call from someone in

7    Mendocino County?

8    **A.**    I did, yes, sir.

9    **Q.**    Who called you?

10    **A.**    One of the major crimes, I think it was a sergeant at the

11    time.  I don't remember his name, but somebody from the major

12    crimes sheriff's office in Mendocino.

13    **Q.**    What was the nature of that discussion?

14    **A.**    There was as a complaint from a driver that was stopped on

15    the 18th, and he was trying to identify who the officers were.

16    He talked to all of his deputies, nobody was responsible for

17    the stop.  He talked to CHP and CHP remembered seeing Joe and I

18    up there, so he was calling to see if I remembered if that was

19    the stop.

20    **Q.**    And what did you say?

21    **A.**    That it was us, yeah.  I took responsibility for the

22    complaint.

23    **Q.**    And after receiving this call, what did you do next?

24    **A.**    I went to the department and booked in some marijuana,

25    some different marijuana, two boxes of different marijuana.

TATUM - DIRECT / FINE

1   **Q.**   Did you get a case number?

2   **A.**   I did.

3   **Q.**   Just kind of describe that process a little bit.

4   **A.**   Called dispatch, got a case number for booking in the

5   marijuana so you'd be able to identify it.  Got two boxes, put

6   some marijuana -- marijuana in it, put the stickers on it and

7   sealed them up with tape and put them in evidence.

8          **MR. FINE:**  Ms. Hernandez, could you please put on the

9   screen what's already been admitted as Exhibit 14, and if we

10  could show that to the jury.

11  **BY MR. FINE:**

12  **Q.**   Do you recognize this document, Mr. Tatum?

13  **A.**   I do.

14  **Q.**   So in the top left corner, do you see a case number?

15  **A.**   Yes.

16  **Q.**   And is that the case number you received when you wanted

17  to book in this property?

18  **A.**   It is.

19  **Q.**   And then below that, under "collected date," what does it

20  say?

21  **A.**   12/18/2017.

22  **Q.**   And then "collected by," it says "Joe Huffaker"; right?

23  **A.**   Correct.

24  **Q.**   Why does it say "Joe Huffaker" there?

25  **A.**   So there's the collector and the booker.  Sometimes

TATUM - DIRECT / FINE

 1  they're both.  So sometimes the collector is the same person.

 2  Sometimes when you're searching something, there's somebody

 3  that finds it and there's somebody that books it in.  So Joe

 4  was the collector, and I was the person booking it in.

 5  Q.   When you made the traffic stop the day before on

 6  December 18th, where did you say the marijuana was in the car?

 7  A.   In the rear passenger cargo area.

 8  Q.   And was Officer Huffaker technically the one who found and

 9  recovered the marijuana?

10  A.   Yes.

11  Q.   And is that why you listed him here?

12  A.   Correct.

13  Q.   And then going down, the first line, it says "12/19" --

14  I'm reading from right about here -- "12/19/2017 at about

15  3:31 p.m." and it says "logged-in user."  It has your name?

16  A.   It does, yes, sir.

17  Q.   Does that mean you were the one who actually booked in the

18  marijuana?

19  A.   Yes.

20       MR. FINE:  Ms. Hernandez, if you could put on the

21  screen what's already been admitted as Exhibit 195 and go to

22  page 6.  And if we're able to clear my doodles from the screen,

23  that would be great.  Thank you.

24  BY MR. FINE:

25  Q.   Mr. Tatum, prior to today, have you reviewed this picture?

1  A.    I have, yes, sir.

2  Q.    What does it depict?

3  A.    This depicts the marijuana that I booked in under this

4  case number that day.

5  Q.    And was the marijuana that you booked into evidence

6  different than what you had taken from the white Mercedes?

7  A.    Yes.

8  Q.    Why did you book in different marijuana?

9  A.    I didn't have the marijuana to book in.  I had already

10  given it to Billy.  It was already gone, so I needed any

11  marijuana to book in under a case, under this case to cover our

12  story.

13  Q.    And how did the quality of this marijuana that you booked

14  in compare to the quality of the marijuana you had seized the

15  day before?

16  A.    The quality that we stole the day before was better than

17  this marijuana and worth more.

18        MR. FINE:  Ms. Hernandez, if we could put back on the

19  screen Exhibit 169 and go to page 545 of that exhibit.

20     And 169 is already in evidence.

21  BY MR. FINE:

22  Q.    And I'm directing -- or, Mr. Tatum, I'd like to direct

23  your attention to a call at 2:43 p.m. on December 19.

24        MR. FINE:  And Ms. -- perfect.  Thank you,

25  Ms. Hernandez.

**TATUM - DIRECT / FINE**

1      So I'm going right about here.

2  **BY MR. FINE:**

3  **Q.**   Is that about the time you received the call from the

4  person in the Mendocino County Sheriff's Office?

5  **A.**   Yes, sir.

6  **Q.**   And for the destination location of that call, do you see

7  Ukiah, California?

8  **A.**   I do, correct.

9  **Q.**   Where is Ukiah, California?

10  **A.**   It is north of Hopland.

11  **Q.**   Is it in Mendocino County?

12  **A.**   Yes, in Mendocino County.

13  **Q.**   And how long was that call?

14  **A.**   Three minutes.

15  **Q.**   And is that -- that's about the time you received the call

16  from the person in Mendocino County?

17  **A.**   Yes, sir, it is.

18  **Q.**   And then a little bit below that it shows calls at

19  4:11 p.m. and 4:13 p.m.

20  **A.**   Yes.

21  **Q.**   Who are those two phone calls with?

22  **A.**   Joe Huffaker.

23  **Q.**   And for the second of those phone calls -- it kind of

24  looks, at 4:11 you called him and then at 4:13 there was a call

25  back.

1          Is that what it appears to be?

2  A.   Yes.

3  Q.   And that second call, how long was that?

4  A.   Eight minutes.

5  Q.   What did you and Mr. Huffaker discuss on that call?

6  A.   That we'd been IDed by CHP and that it didn't look good.

7  Q.   Did you tell him about the call you received from

8  Mendocino County?

9  A.   Yes.

10 Q.   What was his reaction?

11 A.   Surprised, scared, not happy.  We were both, you know,

12 scared.

13 Q.   Did you tell him what you had done in regards to the

14 marijuana?

15 A.   Yes.

16 Q.   What did you tell him?

17 A.   That I booked in some weed, so at least if it goes

18 anywhere else, there's a trail that the weed is accounted for

19 and it's booked in.  So we can kind of cover our trails as it

20 not being stolen because it's still booked in.

21 Q.   What was his reaction when you told him that?

22 A.   Yeah.  We -- that was -- that was the plan.

23 Q.   After this call from Mendocino and booking in this

24 marijuana, did you and Mr. Huffaker continue going up north to

25 extort drivers?

1    **A.**    No.

2    **Q.**    Why did you stop?

3    **A.**    Because the gig was up.  Like we had the heat on us.

4    There was -- couldn't get away with it, you know, people -- we

5    were in trouble.

6              **MR. FINE:**  Your Honor, I see we're coming up on about

7    10:30.  This might be a logical place to break.

8              **THE COURT:**  I was just going to ask you.  So fine.

9         All right.  Ladies and gentlemen, please remember my

10   admonition, and we'll take a 15-minute break.  So come back at

11   quarter to 11:00.

12                   (The jury leaves the courtroom.)

13      (Proceedings were heard out of the presence of the jury.)

14             **THE COURT:**  Mr. Tatum, you're free to step down.

15             **THE WITNESS:**  Thank you.

16             **THE COURT:**  A couple things, Counsel, I just want to

17   take up with you quickly.  I had received two different

18   documents that look almost like the same in content, but one

19   was filed before the other, both yesterday, and both described

20   as parties' additional stipulations regarding evidence.

21      What's the difference?  They apparently were filed, one by

22   Mr. Ceballos, and one by the Government.

23      Is it just both of you doing the same thing?

24             **MR. FINE:**  Yes, Your Honor.  I can explain.  We had

25   agreed to some stipulations over the weekend --

1      THE COURT:  Okay.

2      MR. FINE:  -- and I think Mr. Ceballos was -- wasn't

3  able to file them until Monday morning, but the Government

4  wanted to get them on file just to make sure we had them in

5  time.

6      THE COURT:  All right.  Just wanted to make sure.

7  Didn't look like there was any difference.

8      Then also I was advised by Ms. Geiger this morning that

9  there was a question raised by the U.S. Attorney about how we

10  wanted to put the admitted exhibits -- or give the admitted

11  exhibits to the jury once they go out.

12      Should they be the hard copies of the documents or loaded

13  onto a laptop?  And apparently, the Government wanted to know

14  so that Ms. Hernandez or someone could start that process.

15      I don't know how long it would take.

16      Have you done this before or someone in your office done it

17  before, where you have submitted exhibits and given the jurors

18  a laptop?

19      MR. FINE:  If you could give me one moment, Your

20  Honor, to consult with Ms. Hernandez.

21      THE COURT:  Oh.  Okay.  Fine.

22                      (Pause in proceedings.)

23      MR. FINE:  So, Your Honor, my understanding is that in

24  the past there's been a court computer and that Ms. Hernandez

25  has provided a flash drive to plug in with the exhibits.

TATUM - DIRECT / FINE

1          THE COURT:  A single flash drive with all the exhibits

2     on it.  Is that it?

3          MS. HERNANDEZ:  Yeah.

4          MR. FINE:  Yes, Your Honor.

5          THE COURT:  I don't know how that worked.  I don't

6     think we have one.  Do we have one?

7        We do apparently have something that we could give them,

8     I guess a laptop, a court laptop.  I don't know.

9        Have you ever had experience with this particular way of

10    submitting exhibits?

11         MR. CEBALLOS:  No.  Normally, we just make hard copies

12    for the jurors, but I guess that means we'll have to put our

13    exhibits on a separate flash drive.

14         THE COURT:  I'm not sure.  I guess that's what we

15    would do one each.

16       I don't know that it's preferable.  There are some

17    exhibits, as you've been describing them, have hundreds of

18    pages, apparently.  So that would be a pretty bulky exhibit.

19    Then, again, I gather they maybe have written the pages down

20    when you've called the witness's attention to it.

21       I mean, I'd be willing to give it a try.  We could also ask

22    them what they think might be the most helpful, and then they

23    could just go out and talk about it and come back and tell us

24    what they think.

25         MR. FINE:  Your Honor, in every trial that I've done,

 1    we've done digital exhibits on a flash drive, and that's worked

 2    pretty well.  If the jurors wanted --

 3              THE COURT:  Well, that's what I asked you, have you

 4    done that before.  You went over and talked to Ms. Hernandez.

 5              MR. FINE:  My apologies.  Ms. Hernandez, I will say,

 6    has done many, many more trials than I have.

 7              THE COURT:  I asked you if you had any experience.

 8              MR. FINE:  Sorry.

 9              THE COURT:  I think the question was you or anybody in

10    your office, and your response was "Let me go talk to her."

11    That would leave me -- leaves me with the impression that you

12    haven't done it, but maybe she knows something you don't.

13         So, all right.  Well, I'm willing to give it a try.  Let's

14    put it that way, and if we run into problems, we run into

15    problems.

16         All right.  I would like the record to show that during

17    today's testimony -- I don't know about yesterday.  We had a

18    crowd here yesterday.  But counsel for Mr. Tatum has been

19    present and if -- counsel, if you have any concern about

20    something proceeding, you can call it to my attention.

21         Okay.  That's Stuart Hanlon.

22         All right.  Thank you.  Then we'll take our break, and I'll

23    ask Ms. Geiger to tell the jury we're going to take five extra

24    minutes because we went five longer out here to clear up some

25    things.

1          **MR. FINE:**  Stuart Hanlon, H-A-N-L-O-N.

2               (Recess taken at 10:34 a.m.)

3               (Proceedings resumed at 10:52 a.m.)

4          **THE COURTROOM DEPUTY:**  Please come to order.

5          **THE COURT:**  All right.  I understand there was some

6     concern about the arrangement of certain of the equipment

7     blocking the court reporter.  At this point we've moved

8     whatever she was complaining about.

9          Are you able to use this screen where it is as effectively?

10         **MR. FINE:**  Yes, Your Honor.  I can make it work.

11         **THE COURT:**  All right.  Fine.  Thank you.

12         Then we'll continue by bringing in the jury.

13          (Proceedings were heard in the presence of the jury.)

14         **THE COURT:**  Okay.  All right.  The jurors are back.

15         **THE COURTROOM DEPUTY:**  Please be seated.

16         **THE COURT:**  Please be seated, everyone.

17         **MR. FINE:**  Thank you, Your Honor.

18         **THE COURT:**  Let's continue with direct examination of

19    Mr. Tatum.

20         **MR. FINE:**  Thank you, Your Honor.

21    BY MR. FINE:

22    **Q.**   Mr. Tatum, before we left off, we were talking about the

23    marijuana that you booked in as found property at Rohnert Park;

24    right?

25    **A.**    Yes, sir.

**TATUM - DIRECT / FINE**

1   Q.   And you said that wasn't the same marijuana that you had

2   seized on December 18; is that right?

3   A.   Correct.  It was not the same.

4   Q.   So going back to that stop on December 18 -- and I want to

5   focus you on the point when you and Mr. Huffaker were talking

6   to the driver outside of the vehicle.

7       Do you recall that?

8   A.   Yes, I do.

9   Q.   At some point, did you and Mr. Huffaker give the driver a

10   couple of options?

11   A.   We did.

12   Q.   What were the options you gave him?

13   A.   To turn the marijuana over, say it wasn't his or say it

14   was found property, pretty much disclaim it.  Or if he wanted

15   to say it was his, then we write a case.  He'll go to court,

16   get arrested.  And ultimately, the marijuana was going to be

17   destroyed, so he wouldn't get it back anyways.

18   Q.   And what was the driver's reaction to that?

19   A.   He wasn't happy.  We argued back and forth.  But

20   ultimately, he said okay.  And we stole it, and put it in the

21   car.

22   Q.   Now, when the driver was getting these options, was it you

23   giving them or Mr. Huffaker or some combination?

24   A.   It would have been both of us, yeah.

25   Q.   And when you were going out and extorting marijuana around

1    this time period, would you always follow the same routine as

2    to the roles you and Mr. Huffaker would play?

3    **A.**    Yes.    We had -- it was consistent on if somebody was

4    driving, the passenger, the police officer, either Joe and I,

5    would contact.    So, like, contact,cover, contact, cover.    So

6    whoever was driving would be the cover, unless there was a

7    whole bunch of people in the car, then we'd both go up

8    together.    But usually the driver would just be the cover

9    officer kind of watching traffic and watching the scene.

10   **Q.**    And was -- when you and Mr. Huffaker were doing this, was

11   one person always the driver or did you mix it up?

12   **A.**    We'd switch, yeah.    If you get -- go somewhere or -- yeah,

13   we'd rotate.

14   **Q.**    And then on this December 18 stop, you said the driver had

15   approximately 20 pounds of bud marijuana; is that right?

16   **A.**    Yeah, it was -- I believe it was more than 20, but

17   approximately -- no less than 20.    20 to 23 pounds.

18   **Q.**    Now, I want to briefly take you back to the other incident

19   you described where you met -- where you and Mr. Huffaker met

20   Mr. Timmins on the side of the road.

21        Do you recall that?

22   **A.**    I do.

23   **Q.**    Approximately how much marijuana do you think you and

24   Mr. Huffaker loaded into Mr. Timmins' car?

25   **A.**    Several garbage bags full.    Enough -- enough that we had

1    to get rid of it.  We didn't have any more room in our SUV.  So

2    no less than 40 pounds approximately.

3    Q.   And is that just kind of a rough ballpark?  It was a lot?

4    A.   It was a lot, yes.

5    Q.   Mr. Tatum, did you and Mr. Huffaker end up making money

6    from the seizures that you conducted in December of 2017?

7    A.   We did.

8    Q.   Who provided you with that money?

9    A.   Billy Timmins.

10   Q.   And how much money was it?

11   A.   A little -- excuse me -- a little over 27,000.

12   Q.   And how much did you get and how much did Mr. Huffaker

13   get?

14   A.   We split it.  A little over 13,000 each.

15   Q.   And how was it provided?  Did Mr. Timmins give it directly

16   to you?

17   A.   He did.

18   Q.   And then what did you do with the money?

19   A.   I gave Joe half and I took the other half, cash.

20   Q.   Approximately how long after the December 2017 extortions

21   did Mr. Timmins provide you with this money?

22   A.   I don't recall specifically.

23   Q.   Can you ballpark it?  Was it a couple of days?  Was it a

24   few weeks?  Was it months?

25   A.   Less than a month.

TATUM - DIRECT / FINE

1   Q.   Less than a month but more than a week?

2   A.   Yes.

3   Q.   When you gave the money to Mr. Huffaker, did he say

4   anything about how he was going to deposit the money?

5   A.   We eventually had a conversation about how -- how he

6   deposited -- he told me how he deposited it.

7   Q.   Can you describe that conversation.

8   A.   Yes.  He said he had some workers' comp checks that he was

9   going to deposit at the same time, and that's what he -- he

10  deposited the cash with the workers' comp checks.

11  Q.   Did he say anything more about that?

12  A.   Not that I recall.

13  Q.   Now, around the same time period, did you and Mr. Huffaker

14  purchase a set of hunting rifles?

15  A.   We did, yes, sir.

16       MR. FINE:  Your Honor, at this point, the Government

17  would move to admit Exhibit 151, which is a stipulated exhibit.

18       THE COURT:  All right.  151 is admitted.

19       (Trial Exhibit 151 received in evidence.)

20  BY MR. FINE:

21  Q.   Now, Mr. Tatum, looking at this exhibit, it appears to be

22  an e-mail on the bottom and then you forwarding that e-mail; is

23  that right?

24  A.   Correct.

25  Q.   What's the e-mail on the bottom?

**TATUM - DIRECT / FINE**

1   **A.**   The e-mail on the bottom?

2   **Q.**   Yes.

3   **A.**   Oh.  It's from mitch@gunwerks to Joe Huffaker.

4   **Q.**   And it says -- the name says Joe Huffaker but it's your

5   e-mail address; right?

6   **A.**   Correct.

7   **Q.**   And were you the one who had been in contact with Mitch

8   from Gunwerks?

9   **A.**   Yes.

10  **Q.**   And then the body of the e-mail just said "his"; right?

11  **A.**   Yes.

12  **Q.**   And then it looks like you forward the e-mail to

13  Mr. Huffaker; is that right?

14  **A.**   Yes.

15  **Q.**   And what's the date of the e-mail?

16  **A.**   January 2, 2018.

17  **Q.**   So that's approximately two weeks after the -- the

18  December 18 extortion; is that right?

19  **A.**   Correct, it is.

20  **Q.**   What is Gunwerks?

21  **A.**   They are a custom gun manufacturer.  They build custom

22  rifles and ammunition for hunting and long-range shooting.

23  **Q.**   And is hunting something you and Mr. Huffaker would do

24  together?

25  **A.**   A lot, yes, sir.

TATUM - DIRECT / FINE

1           **MR. FINE:**  Ms. Hernandez, could you go to the second

2    page, please.

3    **BY MR. FINE:**

4    **Q.**   So is this a -- an invoice that was attached to the e-mail

5    you forwarded to Mr. Huffaker?

6    **A.**   Yes, it was.

7    **Q.**   And you'll recall that e-mail said "his"; right?  So this

8    is Mr. Huffaker's invoice?

9    **A.**   It is.

10   **Q.**   If we look in the top left of the document, it says

11   Gunwerks, LLC, and then it has an address; right?

12   **A.**   Yes, sir.

13   **Q.**   What's the city and state for Gunwerks listed?

14   **A.**   Burlington, Wyoming, United States.

15   **Q.**   And then below that it says "Bill To" and then it says

16   "Joe Huffaker"; is that right?

17   **A.**   Yes, sir.  Yes.

18   **Q.**   Okay.  And then it has 7278 Circle Drive.

19           Is that Mr. Huffaker's address?

20   **A.**   It is, yes, sir.

21   **Q.**   And then for the phone number, is that Mr. Huffaker's

22   phone number?

23   **A.**   Yes, it is.

24   **Q.**   And then it looks like it's your e-mail below that?

25   **A.**   Yes.

TATUM - DIRECT / FINE

1   Q.   And does it have your e-mail because you were the contact

2   person for the -- you were arranging the purchase?

3   A.   Yes.

4   Q.   Under "Notes" below that, and you see right here, that's

5   where I'm talking about, it says "Law Enforcement."

6        Do you know what that means?

7   A.   Yes.  They give law enforcement a discount.  So he noted

8   that it was a law enforcement sale.  Mitch, Mitch noted.

9   Q.   And so if we just kind of go down to the bottom.

10       MR. FINE:  Ms. Hernandez, maybe you could blow up the

11   bottom kind of half of the page.

12   BY MR. FINE:

13   Q.   If we just kind of go line by line, Item 1, it says --

14   it's a lot of letters and a lot of numbers and then it says

15   "Gunwerks LR1000 Rifle."

16       Do you know what that rifle is?

17   A.   I do.

18   Q.   What is it?

19   A.   That's the rifle Joe purchased.

20   Q.   And did you purchase the same one as well?

21   A.   I did, yes, sir.

22   Q.   And what was the unit price for that?

23   A.   $7,050.

24   Q.   And then what's this second item?

25   A.   It's a Nightforce scope.

TATUM - DIRECT / FINE

1   Q.   What's a scope?

2   A.   It mounts -- it's a magnifying device that mounts on top

3   of the rifle.

4   Q.   And then the next item is what?

5   A.   Ammunition for the gun.

6   Q.   And it looks like for the quantity, it was a -- 10 boxes.

7        Does that look right?

8   A.   Yes.

9   Q.   And then what's Item Number 4, what's that?

10  A.   That's a ballistic range finder that they sell.  They

11  match up to the caliber of the rifle and the mathematical

12  program inside the range finder to laser distances to shoot.

13  Q.   And what's the range finder?

14  A.   Measures the distance between one point and another.

15  Q.   And then last, it looks like there's one more item,

16  Number 5.  What's that?

17  A.   Those are -- that is a bipod, which is used to -- it's

18  kind of like a triangle but with no base.  It's to stabilize

19  the front of the gun for shooting.

20  Q.   And then it looks like the subtotal is about $13,565?

21  A.   Correct.

22  Q.   And the 10 percent discount, is that the law enforcement

23  discount you got?

24  A.   Yes, sir.

25  Q.   All right.

1    **MR. FINE:**  I think -- Ms. Hernandez, I think we can

2    take this off.  Thank you.

3    **BY MR. FINE:**

4    Q.   Did you and Mr. Huffaker ever receive these guns?

5    A.   We did, yes.

6    Q.   Did you ever see Mr. Huffaker's gun?

7    A.   I did.

8    Q.   How did you see that?

9    A.   We went shooting and hunting a couple of times together.

10   Q.   Mr. Tatum, now, turning your attention back to December

11   of 2017.  Did you fill out overtime requests for the times that

12   you and Mr. Huffaker went out during that month?

13   A.   No, I did not.

14   Q.   Why not?

15   A.   Because we weren't allowed.  We would have got caught.

16   People would have asked why we were working overtime when we

17   weren't allowed to.

18   Q.   And you didn't want to get caught; right?

19   A.   Yes.

20        **MR. FINE:**  Ms. Hernandez, if we could put on the

21   screen Exhibit 171, which I believe is already in evidence.

22   And if we could go to page 187 of the document.

23   **BY MR. FINE:**

24   Q.   Now, Mr. Tatum, this is your time sheet for the week in

25   December of 2017, ending in December 9; is that right?

TATUM - DIRECT / FINE

1    A.    Yes, sir.

2    Q.    And you've circled "fire" up in the upper right corner; is

3    that right?

4    A.    Correct.

5    Q.    Why is that?

6    A.    That's the home division.  I was assigned to the fire

7    division at that time.

8    Q.    And you testified that you and Mr. Huffaker went out to

9    commit extortions on Monday, December 4, right?

10   A.    I did, yes.

11   Q.    And is there any work time noted for that day?

12   A.    No, sir.

13   Q.    And you also testified that you and Mr. Huffaker went out

14   to commit extortions on December 6; is that right?

15   A.    Yes, that's correct.

16   Q.    And is there any work time noted for that day?

17   A.    No, there's not.

18        MR. FINE:  Ms. Hernandez, could we go to page 190 of

19   the document, please.

20   BY MR. FINE:

21   Q.    And, Mr. Tatum, you also testified that you and

22   Mr. Huffaker went out to commit extortions on December 18 of

23   2017; is that right?

24   A.    Yes, sir.

25   Q.    And that's this date here that I'm circling?

1   **A.**   Yes, it is.

2   **Q.**   And what does it show for that date?

3   **A.**   There's no entries.  It's blank.

4          **MR. FINE:**  And, Ms. Hernandez, I think we could take

5   that down.  Thank you.

6   **BY MR. FINE:**

7   **Q.**   Now, Mr. Tatum, let's fast-forward about two months to

8   February of 2018.

9          I'd like to draw your attention to on or about February 13

10  of 2018 at approximately 9:28 a.m.

11         Around that time, did you receive a phone call from Tom

12  Allman?

13  **A.**   Yes, I did.

14  **Q.**   Who is Tom Allman?

15  **A.**   He was the Mendocino County sheriff during that time.

16  **Q.**   What was the nature of your conversation with him?

17  **A.**   He called me for a favor.  He was getting a lot of media

18  press and was pissed off because his department was getting

19  blamed for our traffic stop, for Rohnert Park's traffic stop.

20  Excuse me.

21         And it was an election year.  He said that he wanted to

22  get re-elected, and he asked me to do a press release on the

23  traffic stop that he was getting blamed for.

24  **Q.**   And this traffic stop, this is the traffic stop related to

25  the call you had received from Mendocino County two months

1    earlier; is that right?

2    **A.**    It is.

3    **Q.**    And that was the stop where CHP pulled up?

4    **A.**    Correct.

5    **Q.**    And then you got a call the next day from Mendocino

6    County; is that right?

7    **A.**    It is.

8              **MR. FINE:**   Ms. Hernandez, if we could please put on

9    the screen again Exhibit 169, which is already in evidence.

10       And we could go to page 565 whenever it's up.  And if we

11   could zoom in on a phone call on February 13 at 9:28 a.m.

12   **BY MR. FINE:**

13   **Q.**    Looking at that, you see the destination location is

14   Ukiah, California; is that right?

15   **A.**    Yes, sir.

16   **Q.**    And is that in Mendocino County?

17   **A.**    It is.

18   **Q.**    Now, what is the next call just a few minutes later at

19   9:45 a.m.?  Who did you call there?

20   **A.**    I called Joe.

21   **Q.**    And how long did that phone call last?

22   **A.**    18 minutes.

23   **Q.**    What did you and Mr. Huffaker discuss during this

24   18-minute phone call?

25   **A.**    I told him that the sheriff called me, that he was pissed,

1    that -- basically reiterated what the sheriff had told me, that

2    he wanted a press release regarding the traffic stop, and that

3    I needed his help to remember the event from the traffic stop

4    to put out in the press release.

5    **Q.**   What was Mr. Huffaker's reaction to hearing that this stop

6    from two months earlier had resurfaced?

7    **A.**   Not -- not happy.  Yeah.  Again, we were both scared and

8    thought that we'd got away with this, but here we are,

9    two months later, having to deal with it again to try to cover

10   up what we did.

11   **Q.**   What happened after you and Mr. Huffaker had this

12   18-minute phone call?

13   **A.**   I drove down to his house and called our commander.  Told

14   him about the conversation I had with the sheriff.  Told him

15   that the sheriff wanted a press release.

16        Commander Taylor said:  Okay.  I authorize you to send one

17   out.

18        And Joe and I proceeded to draft and remember the facts

19   from the traffic stop to put out in the press release.

20   **Q.**   So let's break that down a little bit.  You said after you

21   and Huffaker talked for 18 minutes, you went to his house; is

22   that right?

23   **A.**   I did.

24   **Q.**   And then you called Commander Taylor?

25   **A.**   Correct.

1   Q.   Was Mr. Huffaker there with you when you called

2   Commander Taylor?

3   A.   He was.

4   Q.   And you said this was at Mr. Huffaker's house?

5   A.   Yes.

6   Q.   And after the phone call, what did you and Mr. Huffaker

7   do?

8   A.   We started to talk about what we remembered from the stop,

9   the details about the car, the driver, and what we remembered.

10  Q.   Were you -- was someone typing something while you guys

11  were having this discussion?

12  A.   Yes.  Mr. Huffaker used his wife's computer and was typing

13  while we were talking about it, talking about what to put out

14  in the press release.

15      MR. FINE:  Ms. Hernandez, if you could show the

16  witness what's been marked as Exhibit 157, which is not in

17  evidence.

18      THE COURT:  Now, I'm assuming the new position of that

19  screen is not visible to the jury, but I just want to confirm.

20      Can any of the jurors see the screen where it is now that

21  it is on the little table next to Mr. Fine?

22      No?  Okay.  Thank you.

23  BY MR. FINE:

24  Q.   Mr. Tatum, do you recognize this exhibit?

25  A.   Yes, sir, I do.

TATUM - DIRECT / FINE

1   Q.   And this exhibit, again, has two e-mails; right?  There's

2   a bottom e-mail and then a top e-mail?

3   A.   Correct.

4   Q.   Let's start with the bottom e-mail, what is that?

5   A.   That is Joe's wife Tristin Huffaker sent me a document on

6   February 13, 2018.

7   Q.   To your Gmail; is that right?

8   A.   Yes, to my e-mail.

9   Q.   And then the second e-mail on the top, it looks like

10  you're forwarding that e-mail; is that right?

11  A.   Yes.  I forwarded it from my personal Gmail account to my

12  Rohnert Park police e-mail account.

13  Q.   And it says there was a set of attachments or one

14  attachments to this set of e-mails?

15  A.   Yes.

16         MR. FINE:  Ms. Hernandez, if we could go to the second

17  page.

18  BY MR. FINE:

19  Q.   Is this the document that was attached to the e-mails?

20  A.   It was, yes, sir.

21  Q.   And what is this document?

22  A.   This is one of the drafts that Joe and I completed talking

23  about the stop that we did, out- -- outlining some of the facts

24  for the press release.

25  Q.   Mr. Tatum, before testifying here today, have you reviewed

**TATUM - DIRECT / FINE**

1  this exhibit?

2  **A.**   I have.

3  **Q.**   And is it a fair and accurate copy of the e-mail that you

4  received and the draft press release that you and Mr. Huffaker

5  drafted?

6  **A.**   Yes, sir, it is.

7          **MR. FINE:**  Your Honor, we move to admit Exhibit 157.

8          **THE COURT:**  Is there an objection?

9          **MR. CEBALLOS:**  No, Your Honor.

10         **THE COURT:**  157 is admitted.

11      (Trial Exhibit 157 received in evidence.)

12         **MR. FINE:**  And if we could publish to the jury the

13  first page.

14  **BY MR. FINE:**

15  **Q.**   And, again, Mr. Tatum, the bottom e-mail is from Tristin

16  Huffaker's Gmail account; right?

17  **A.**   Yes.

18  **Q.**   And that's because you and Mr. Huffaker were using his

19  wife's computer to draft this; is that right?

20  **A.**   Yes, sir.

21  **Q.**   And then the top e-mail is you forwarding from your

22  personal e-mail to your Rohnert Park e-mail?

23  **A.**   It is.

24  **Q.**   And is that so you could later issue the press release?

25  **A.**   Yes.

1          **MR. FINE:**  And, Ms. Hernandez, if we could please go

2    to the second page.

3    **BY MR. FINE:**

4    **Q.**  Mr. Tatum, can you just take a minute to review this

5    document.

6    **A.**  (Witness examines document.)

7          Okay.

8    **Q.**  And if you could read the first sentence.

9    **A.**  (As read):

10               "During the month of December 2017, members of

11          the Rohnert Park Department of Public Safety

12          conducted a traffic enforcement stop on a white SUV

13          vehicle in the area of the Sonoma/Mendocino County

14          line."

15   **Q.**  Now, it says "white SUV."  When you and Mr. Huffaker wrote

16   this draft press release, which traffic stop did you have in

17   mind?

18   **A.**  The white Mercedes that we had stopped.

19   **Q.**  And that's the one we were discussing earlier where the

20   driver had two different types of marijuana; is that right?

21   **A.**  Yes, sir.

22   **Q.**  And if you could -- looking at the second paragraph, could

23   you read the second sentence starting with "Throughout."

24   **A.**  Yes.  (As read):

25               "Throughout the cargo and seating area of the

```
 1              SUV, the officers noticed several large cardboard
 2              boxes that were partially being covered by a
 3              blanket."
 4   Q.   Mr. Tatum, when you stopped the white Mercedes, do you
 5   recall the marijuana being in the back of the car under a
 6   blanket?
 7   A.   I do, yes, sir.
 8   Q.   Now, looking at the third paragraph, the first sentence,
 9   can you read that?
10   A.   Yes. (As read):
11              "During the officer's investigation, it was
12              determined that the driver was transporting --
13              transporting a large amount of processed cannabis bud
14              along with concentrated cannabis outside of the state
15              and federal guidelines for possessing and
16              transporting cannabis."
17   Q.   And why did you and Mr. Huffaker put that sentence in
18   there?
19   A.   To help justify why we -- well, we were trying to make it
20   look like we seized, but why we stole the bud marijuana,
21   because it was outside the guidelines.
22   Q.   And, again, some of the facts there about both the
23   processed bud and the concentrated cannabis, that's consistent
24   with the stop you and Mr. Huffaker did on the white Mercedes?
25   A.   Yes, sir.
```

1   Q.   Mr. Tatum, can you read the last paragraph here, starting

2   with "During the time."

3   A.   Yes.   (As read):

4            "During the time of this routine traffic stop, no

5        other agencies, including the Mendocino County

6        Sheriff's Office or Hopland Tribal Police, were

7        involved or assisted with the investigation."

8   Q.   Why did you and Mr. Huffaker add this last paragraph?

9   A.   To satisfy the sheriff's request that nobody in Mendocino

10  was involved.  His office wasn't involved.  He wanted to make

11  it clear that Rohnert Park was fully responsible for the

12  traffic stop.

13  Q.   Now, did this draft press release that you and

14  Mr. Huffaker drafted, did it mention that you had extorted

15  marijuana from the driver of the white Mercedes?

16  A.   No, sir.

17  Q.   Did the press release indicate that you had identified

18  yourselves as ATF agents?

19  A.   No, it did not.

20  Q.   Mr. Tatum, did you issue the press release later that day?

21  A.   I did.

22  Q.   And that was on February 13 of 2018; is that right?

23  A.   Approximately, yes.

24           MR. FINE:  And I think we can take this down.  Thank

25  you, Ms. Hernandez.

1    BY MR. FINE:

2    Q.    Mr. Tatum, the next day, did you -- the next day after you

3    issued this press release, did you receive a call from an FBI

4    agent?

5    A.    I did.

6    Q.    What did the FBI agent say to you?

7    A.    He wanted the police report regarding the traffic stop Joe

8    and I did because the driver was complaining to the FBI as well

9    as the sheriff's office in Mendocino County.

10   Q.    Can you describe the conversation a little more?  What

11   else was discussed?

12   A.    He requested a case number and the case because he wanted

13   to follow up and possibly file charges against this driver and

14   wanted documentation to do so.

15   Q.    And at that point, did you and Mr. Huffaker know the name

16   of the person who you had stopped in the white Mercedes?

17   A.    No, we had no idea.

18   Q.    And so did the FBI agent provide you with any information

19   in that regard?

20   A.    He did.

21   Q.    What did he provide you with?

22   A.    He provided the name, date of birth, all the information

23   about the driver, which turned out to be a different traffic

24   stop, not the white Mercedes stop.

25   Q.    Did he provide you the name Ezekial Flatten?

TATUM - DIRECT / FINE

1  **A.**   Yes, he did.

2  **Q.**   And did he provide you with a date of December 5 of 2017?

3  **A.**   He did.

4  **Q.**   Now, you said he also asked you for a police report; is

5  that right?

6  **A.**   He did.

7  **Q.**   Did a police report exist at that point?

8  **A.**   No, it did not.

9  **Q.**   Why not?

10  **A.**   We stole the marijuana.  We weren't intending to prosecute

11  this guy or retain any information about the driver.  We didn't

12  want to get caught or in trouble, so we just -- it wasn't a

13  legitimate stop.  We were breaking the law.

14  **Q.**   Now, the next day, did you call Mr. Huffaker?

15  **A.**   I did.

16  **Q.**   What did you tell him?

17  **A.**   Reiterated what the FBI guy told me, that he gave me the

18  name.  Because Joe and I both talked about we don't even

19  remember who this guy was.  So he gave -- told Joe that he gave

20  me the name and all the information about the guy.  Gave me the

21  date, and Joe and I thought that that traffic stop was also on

22  the 5th, so we just went with that date based upon what the FBI

23  guy -- the date that the FBI guy gave us.

24  **Q.**   So you told Mr. Huffaker specifically that you had

25  received a call from the FBI; is that right?

1    **A.**    Yes, I did.

2    **Q.**    What was Mr. Huffaker's reaction to hearing that the FBI

3    had called you?

4    **A.**    Worried.  Same thing, we were both worried that this was

5    not going away and it wasn't looking good.

6              **MR. FINE:**  Ms. Hernandez, could you please put back on

7    the screen Exhibit 169, which is already in evidence.  And go

8    to page 565 of the document.  Sorry.  Maybe 566, the next day.

9         And if we could zoom in on February 15.

10   **BY MR. FINE:**

11   **Q.**    So starting at 4:57 p.m. on February 15, do you see a call

12   there?

13   **A.**    I do.

14   **Q.**    And it looks like there was a voice mail; is that right?

15   **A.**    Yes.

16   **Q.**    And then it looks like Mr. Huffaker called you back the

17   next call?

18   **A.**    Yes; correct.

19   **Q.**    And how long was that call?

20   **A.**    15 minutes.

21   **Q.**    15 minutes.

22        And what did you discuss on that call?

23        Sorry.  I should give you more context.  This is

24   February 15.  This is what -- this is the day after you

25   received the call from the FBI agent; is that right?

TATUM - DIRECT / FINE

```
 1   A.    Yes.  Discussed what to write about and how we needed to

 2   document what happened.

 3         MR. FINE:  Your Honor, at this time the Government

 4   would move to admit Exhibit 180, which is a stipulated exhibit.

 5         THE COURT:  180 is admitted.

 6         (Trial Exhibit 180 received in evidence.)

 7   BY MR. FINE:

 8   Q.    Now, this -- who is this e-mail from?

 9   A.    Joe Huffaker.

10   Q.    And what's the date and time?

11   A.    February 15, 2018, at 5:41 p.m.

12   Q.    So this is just about an hour after you had spoken on the

13   phone; right?

14   A.    Correct.

15   Q.    And the e-mail is sent to who?

16   A.    To me.

17   Q.    To your personal e-mail; right?

18   A.    Yes, sir.

19   Q.    And what's the subject line of the e-mail?

20   A.    It says "Review."

21   Q.    And what is it?  What's the body of this e-mail?

22   A.    These are some of the facts that Joe and I talked about on

23   the phone that were documented in a document about the traffic

24   stop on the 5th, which really occurred on the 18th.

25   Q.    So let's talk about that.  It's got the date of December 5
```

1    right here.

2    **A.**    Yes.

3    **Q.**    And then it's got the name of Ezekial Flatten right here;

4    is that right?

5    **A.**    Yes, sir.

6    **Q.**    And at the time you and Mr. Huffaker were drafting this

7    police report, did you believe Ezekial Flatten was the person

8    that you had stopped in the white Mercedes?

9    **A.**    Yes.

10   **Q.**    And, again, why did you think that?

11   **A.**    We never retained the driver's info.  And when the FBI

12   agent called me, this is the name and information he gave me

13   about the driver that was complaining on the 5th.

14   **Q.**    And same with the December 5 date, is that the date that

15   the FBI agent gave you?

16   **A.**    Correct.

17   **Q.**    At some point a few months later, did you determine that

18   you and Mr. Huffaker did not, in fact, stop Zeke Flatten on the

19   5th?

20   **A.**    We did, yes.

21   **Q.**    How did you determine that?

22   **A.**    Based upon a couple of news articles that came out about

23   Mr. Flatten talking about the stop and the interaction with the

24   officers.  And the way they were dressed, the conversation, we

25   both were like, we never stopped this guy.  Nothing was --

1  there was nothing about the stop that we recognized about what

2  Mr. Flatten was saying happened.

3  Q.   Did you actually later determine that the stop of the

4  white Mercedes had been a different person and had occurred on

5  December 18?

6  A.   Yes.

7  Q.   Now, this document on the screen, this draft e-mail, this

8  wasn't the final version of the police report you ultimately

9  submitted; is that right?

10  A.   No, it was not.

11  Q.   Before you finalized, were some more details added to the

12  police report?

13  A.   Yes.

14  Q.   And did you and Mr. Huffaker meet up in person to discuss

15  adding those details?

16  A.   We did.

17  Q.   Can you describe that?

18  A.   We met at the police department, went over this document

19  and some final documents, some final facts, and then ultimately

20  submitted the final document into the I/LEADS computer system.

21       MR. FINE:   Ms. Hernandez, could you please put on the

22  screen Exhibit 194, which is already in evidence.

23  BY MR. FINE:

24  Q.   Is this the final police report that you and Mr. Huffaker

25  submitted?

1    A.    Yes.

2          MR. FINE:    And, Ms. Hernandez, if we could go to

3    page 4 of the document.

4    BY MR. FINE:

5    Q.    Now, Mr. Tatum, right here it says nar- -- oops.

6    "Narratives"; is that right?

7    A.    Yes, it does.

8    Q.    What is the narratives portion of a police report?

9    A.    The interaction, the words that were used to describe the

10   traffic stop.

11         MR. FINE:    And my apologies, Ms. Hernandez.    Could we

12   go one page back, actually.    And I can --

13   BY MR. FINE:

14   Q.    Now, again, as we've discussed, it says the date of

15   December 5; right?

16   A.    Yes, it does.

17   Q.    But that wasn't the right date?

18   A.    No, it was not.

19   Q.    And similarly, on the third paragraph it says Ezekial

20   Flatten; right?

21   A.    Yes.    Also incorrect.

22   Q.    Looking at that third paragraph, can you read the first

23   sentence?

24   A.    Yes.    (As read):

25         "I asked Mr. Flatten where he was headed"

TATUM - DIRECT / FINE

1    Q.    Sorry.  I -- no, I said the wrong thing.  I meant the --

2    can you read the first sentence, is what I meant, of the third

3    paragraph.

4    A.    (As read):

5              "Officer Huffaker and I exited our marked patrol

6         vehicles and contacted the driver and sole occupant

7         of the vehicle," comma, "Ezekial Flatten, DOB

8         10/5/72."

9    Q.    Now, were you and Mr. Huffaker driving a marked police

10   vehicle when you stopped the white Mercedes?

11   A.    No, we weren't.

12   Q.    And did you and Mr. Huffaker discuss adding that portion

13   to the police report?

14   A.    We did.

15   Q.    And why did you add that portion?

16   A.    To make it look more authentic and that the driver should

17   have known who we were and trying to discredit why he was

18   complaining.

19   Q.    Can you read the next sentence, the -- I'll be more

20   precise.  The second sentence of the third paragraph starting

21   with "Officer Huffaker and I."

22   A.    Yes.  (As read):

23              "Officer Huffaker and I identified ourselves as

24         Rohnert Park DPS officers and advised him he was

25         speeding."

TATUM - DIRECT / FINE

1   Q.   Now, when you stopped the white Mercedes, did you identify

2   yourselves as Rohnert Park police officers?

3   A.   No.  That was a lie.

4   Q.   Can you read the next sentence after that beginning with

5   "Officer Huffaker and I were."

6   A.   Yes.  (As read):

7        "Officer Huffaker and I were dressed in full

8        police uniform including names, badges, and ID

9        numbers."

10  Q.   Was that true?

11  A.   That was a lie.

12  Q.   Now, moving down to the fourth paragraph, this one, can

13  you read the second line that starts with "Throughout."

14  A.   Yes.  (As read):

15       "Throughout the cargo and seating area of the

16       SUV, I noticed several large cardboard boxes that

17       were partially being covered by a blanket."

18  Q.   And, again, that's referring to something that did happen

19  on the December 18 stop; right?

20  A.   Correct.  Yes, sir.

21  Q.   Now, going to the bottom of the page, right here, can you

22  read that paragraph?

23  A.   Yes.  (As read):

24       "During this time, a California highway patrol

25       officer and his trainee arrived to assist us.

```
 1        Mr. Flatten said 'I'm glad they showed up.  I didn't
 2        think you guys were real cops.  I kept hearing about
 3        people getting ripped off.'"
 4             End quote.
 5   Q.   Now, during the stop of the white Mercedes, California
 6   highway patrol did pull up; right?
 7   A.   They did.
 8   Q.   But the driver of the white Mercedes actually say this?
 9   A.   Yes.
10   Q.   He said this exact quote or something like that?
11   A.   Yes.
12        MR. FINE:  And if we could go to the next page.
13   BY MR. FINE:
14   Q.   This is the second page of the police report; is that
15   right?
16   A.   Yes, it is.
17   Q.   Looking at the last paragraph, right here, can you read
18   that?
19   A.   Yes.  (As read):
20             "Case forwarded to the DA's office for filing a
21        violation of 11357(c)(2) H&S, possession of more than
22        1 ounce of marijuana, against Mr. Flatten."
23   Q.   Now, did you actually forward this case to the DA's
24   office?
25   A.   No, I did not.
```

TATUM - DIRECT / FINE

1  **Q.**   So that part wasn't true either; right?

2  **A.**   That was a lie.

3  **Q.**   Now, did anywhere in this police report describe that you

4  extorted marijuana from the driver of the white Mercedes?

5  **A.**   No, sir.

6  **Q.**   Did anywhere in this police report describe that you

7  identified yourself as ATF agents?

8  **A.**   Could you repeat that?

9  **Q.**   Sure.  Did the police report, did this police report that

10  you and Mr. Huffaker submitted, did it say that you identified

11  yourself as ATF agents?

12  **A.**   I don't believe so, no.

13  **Q.**   And you said you and Huffaker reviewed the final version

14  of this police report before it was submitted; is that right?

15  **A.**   Yes, we did.

16  **Q.**   After you finalized and submitted this police report, did

17  you send it to the FBI agent?

18  **A.**   Yes, I e-mailed him the report.

19         **MR. FINE:**  Ms. Hernandez, could you please put on the

20  screen and just show the witness Exhibit 50 -- 154, which is

21  not yet in evidence.

22  **BY MR. FINE:**

23  **Q.**   And, again, Mr. Tatum, this is a document that has two

24  e-mails; is that right?  There's one on the bottom and one on

25  the top?

TATUM - DIRECT / FINE

1   A.   Yes, sir.

2   Q.   Let's start with the e-mail on the bottom.  Who was that

3   from?

4   A.   It's from me.

5   Q.   To whom?

6   A.   To Agent Heinrich at the FBI.

7   Q.   And what's the date?

8   A.   February 20, 2018.

9   Q.   And then what is the top e-mail?

10  A.   The top e-mail is from me to Joe Huffaker's e-mail,

11  personal e-mail.

12  Q.   And what's the date on that?

13  A.   March 15, 2018.

14  Q.   And it looks like there are two attachments; is that

15  right?  If you look --

16  A.   Yes.  That's correct.

17  Q.   And are the attachments the police report and the press

18  release?

19  A.   Correct.

20  Q.   Mr. Tatum, before testifying here today, have you reviewed

21  this exhibit?

22  A.   I have.

23  Q.   Is it a fair and accurate copy of the e-mail that you sent

24  to Jeremy Heinrich at the FBI that's the bottom e-mail?

25  A.   Yes, sir.

1   Q.   And is the top a fair and accurate copy of the e-mail that

2   you forwarded to Mr. Huffaker?

3   A.   It is.

4        MR. FINE:  Your Honor, the Government would move to

5   admit Exhibit 124.

6        THE COURT:  Is there an objection?

7        MR. CEBALLOS:  No, Your Honor.

8        THE COURT:  154 is admitted.

9     (Trial Exhibit 154 received in evidence.)

10  BY MR. FINE:

11  Q.   And so, Mr. Tatum, just showing the jury again.  The

12  bottom e-mail is what?

13  A.   The bottom e-mail is the final report that I sent to the

14  FBI agent letting him know that he received it or that I sent

15  it.

16  Q.   And could you just read the e-mail.

17  A.   Yes.  (As read):

18        "Morning, brother.  Attached are the two docs we

19      have on this guy.  If you need anything else, hit me

20      back.  Thanks again.  Be safe out there, man, Jacy."

21  Q.   Why do you call him brother?

22  A.   Just a police term, a brotherhood of police officers.

23  Q.   And Jeremy Heinrich is the same FBI agent who had called

24  you a few days earlier; is that correct?

25  A.   Correct, yes, sir.

TATUM - DIRECT / FINE

1  Q.   And the top e-mail looks like you had forwarded this to

2  Mr. Huffaker; is that right?

3  A.   Yes, sir.

4  Q.   Why did you forward it to him almost a month later?

5  A.   I don't remember.

6  Q.   Was that around the time of your IA testimony?

7  A.   Yes, it was.

8  Q.   Does that help you recall why you were forwarding this to

9  Mr. Huffaker at that time?

10 A.   Yes.  We were preparing to give our statements for the

11 internal investigation.

12       MR. FINE:  And then, Ms. Hernandez, if you could just

13 go to the next page of the document.

14 BY MR. FINE:

15 Q.   And, again, this is the police report we were discussing

16 earlier?

17 A.   Yes, sir.

18 Q.   And it was attached to the e-mail; is that right -- that

19 you sent to the FBI?

20 A.   Correct.

21       MR. FINE:  And then, Ms. Hernandez, if we could just

22 go to the second-to-last page of the document.

23 BY MR. FINE:

24 Q.   This is the press release; is that right?

25 A.   It is, yes, sir.

TATUM - DIRECT / FINE

1    Q.    And that was also attached to the e-mail you sent to the

2    FBI?

3    A.    It was, yes.

4    Q.    Thank you.

5            MR. FINE:  Ms. Hernandez, I think we can take that

6    down.  Thank you.

7    BY MR. FINE:

8    Q.    Mr. Tatum, at some point after you sent this police report

9    and press release to the FBI agent, did the Rohnert Park

10   Department of Public Safety open an internal investigation?

11   A.    They did, yes, sir.

12   Q.    Drawing your attention to March 22 of 2018, were you

13   called to testify in the internal investigation on or around

14   that date?

15   A.    I was.

16   Q.    Did you lie during your testimony?

17   A.    Basically the whole time, yes, sir.

18   Q.    What did you lie about?

19   A.    I'm sorry?

20   Q.    What did you lie about?

21   A.    Everything.  That we had permission to go out and do

22   interdiction.  That the traffic stop was legal.  That we never

23   stole the marijuana.  Basically trying to keep our lie the

24   truth as long as we could.

25   Q.    Now, did Mr. Huffaker also give testimony in the internal

1   investigation on the same day, March 22 of 2018?

2   A.   He did.

3   Q.   How do you know that?

4   A.   We discussed what we were going to say before our

5   testimony, and we discussed what we told the investigator

6   after.

7           MR. FINE:   Ms. Hernandez, could you please put back on

8   the screen Exhibit 169, which is already in evidence, and then

9   go to page 578 of the document.  So -- and then if we could

10  zoom in a little bit on March 21 of 2018.

11  BY MR. FINE:

12  Q.   Now, that's the day before you and Mr. Huffaker both

13  testified at the internal investigation; correct?

14  A.   Yes, sir.

15  Q.   Now, looking at a series of three calls beginning at

16  4:08 p.m., do you see those?

17  A.   Yes, sir, I do.

18  Q.   And who are those phones calls with?

19  A.   Those are phone calls with Joe and I.

20  Q.   And how long are each of the phone calls?

21  A.   First one is six minutes; the second one is four minutes;

22  and the third one is two minutes.

23  Q.   And then do you see another call here at 8:04 p.m.?

24  A.   I do.

25  Q.   And who was that call with?

1    **A.**    Also with Joe.

2    **Q.**    How long is that call?

3    **A.**    That is an incoming 12-minute phone call.

4              **MR. FINE:**  And then if we could go to March 22 at

5    7:13 a.m.  So -- sorry, Ms. Hernandez, just right below where

6    we've zoomed in.

7         Sorry.  March 22 at -- it might be -- it might be the next

8    page.  I apologize.

9         Yes, this one right at the top.

10   **BY MR. FINE:**

11   **Q.**    Do you see that call?

12   **A.**    Yes, sir, I do.

13   **Q.**    Is that the morning of your and Mr. Huffaker's testimony?

14   **A.**    Yes, it is.

15   **Q.**    And how long is that call?

16   **A.**    That's a 16-minute incoming call.

17   **Q.**    And what did you and Mr. Huffaker discuss during those

18   series of calls?

19   **A.**    As I previously said, what we were going to tell the

20   investigator to keep our stories straight.  That we both had

21   the same answers.  We both were going to tell the same lies

22   pretty much to try to cover up and get away with what we did.

23   **Q.**    Now, Mr. Tatum, drawing your attention now to June 6 of

24   2018, were you and Mr. Huffaker called to testify again in the

25   internal investigation on that date?

1  A.    Yes, we were.

2  Q.    What was the purpose of that additional day of testimony?

3  A.    That was when we were trying to clarify the date of the

4  December 5 and December 18, and --

5  Q.    So --

6  A.    -- clear up the fact that those two dates were not

7  accurate.

8  Q.    So by that time, you had determined that you had not

9  actually stopped Ezekial Flatten on December 55; is that right?

10  A.    Yes, that's correct.

11  Q.    And you had been confusing it with a different stop;

12  right?

13  A.    Correct.

14  Q.    And so the purpose of that extra day of testimony was just

15  to clear all that up?

16  A.    It was.

17        MR. FINE:  Now, Ms. Hernandez, if we could go back to

18  the phone records again.  Exhibit 169 and page 604 of the

19  document.

20  BY MR. FINE:

21  Q.    And if you look --

22        MR. FINE:  If we could zoom in on June 6.

23  BY MR. FINE:

24  Q.    At 10:16 a.m., do you see a call there?

25  A.    I do, yes, sir.

**TATUM - DIRECT / FINE**

1  **Q.**  And who was that call with?

2  **A.**  Between -- excuse me -- between Joe and I again.

3  **Q.**  How long was that call?

4  **A.**  22 minutes.

5  **Q.**  And is that right before you had your internal

6  investigation testimony?

7  **A.**  Yes, it is.

8  **Q.**  And what did you discuss during -- during that call?

9  **A.**  Went over the facts again just to make sure we were on the

10  same page, and reiterated what we were going to lie about and

11  what we were going to say.

12  **Q.**  Now, Mr. Tatum, I've got just a couple other topics I'd

13  like to cover with you.  We're going to jump around in time a

14  little bit.

15       Drawing your attention to the fall of 2023, by that time

16  had you pled guilty already to extorting marijuana from drivers

17  with Joseph Huffaker?

18  **A.**  Yes, sir, I did.

19  **Q.**  And had you also pled guilty to obstruction of justice

20  with Joseph Huffaker?

21  **A.**  Yes, sir.

22  **Q.**  Were you cooperating with the Government at that time?

23  **A.**  I was.

24  **Q.**  Around that time, did you tell Billy Timmins that you had

25  given his name to the FBI?

TATUM - DIRECT / FINE

1  A.    Yes, I did.

2  Q.    Where did that conversation take place?

3  A.    In the Kaiser hospital parking lot in Santa Rosa, inside

4  his car.

5  Q.    Tell us about that conversation.

6  A.    I told him I couldn't protect him anymore.  That I -- that

7  the FBI knew that I was giving the marijuana to somebody and

8  that I had to tell the truth.  And if I didn't tell the truth,

9  that it was going to be more trouble for me.  And I told him I

10 tried to protect him and keep his name out of it, but I had to

11 be honest.

12 Q.    Did you tell him that you needed him to corroborate his

13 involvement in your and Mr. Huffaker's scheme?

14 A.    No.

15 Q.    Did you tell him to say anything untruthful to the FBI?

16 A.    Nope.  I did not.

17 Q.    But did you tell him that you would be telling the FBI

18 about the incident on the side of the road with Mr. Huffaker?

19 A.    I told him I need to tell the truth about his involvement

20 in what had happened.

21 Q.    How would you describe your relationship with Mr. Timmins

22 today?

23 A.    He hates me.  We don't talk.

24 Q.    Mr. Timmins [sic], drawing your attention back to 2018, at

25 that time were you involved in workers' compensation litigation

**TATUM - DIRECT / FINE**

1  with the City of Rohnert Park?

2  **A.**   I was.

3  **Q.**   And as part of that lawsuit, did you sit for a deposition?

4  **A.**   I did.

5  **Q.**   What's a deposition?

6  **A.**   It's giving statements or testimony, not with a judge

7  present but with being still sworn in to tell the truthful --

8  truthful information about the topic.

9  **Q.**   So you're under oath, right, when you give a deposition?

10  **A.**   Yes, you are.

11  **Q.**   And did you lie in that deposition about what you and

12  Mr. Huffaker did in December of 2017?

13  **A.**   I did.

14  **Q.**   Now, Mr. Tatum, jumping around again and turning your

15  attention to the spring of 2024, so that's, you know, a little

16  more than a year ago.

17      By that time you had already pled guilty to the federal

18  crimes we've discussed; right?

19  **A.**   Yes, sir.

20  **Q.**   Were you under supervision by federal pretrial services at

21  that time?

22  **A.**   I was, yes, sir.

23  **Q.**   And was one of the conditions of that supervision that you

24  not have any relationship with marijuana?

25  **A.**   It was.

**TATUM - DIRECT / FINE**

1  Q.    Now, in March of 2024, was an administrative search

2  warrant executed on your property?

3  A.    It was, yes.

4  Q.    Did that search warrant relate to the growing of

5  marijuana?

6  A.    It did.

7  Q.    And, Mr. Tatum, you knew that marijuana was being grown on

8  your property before that warrant was executed; right?

9  A.    Yes, sir.

10  Q.    And that was a violation of your terms of supervision; is

11  that right?

12  A.    I did not think it was a violation at the time.

13  Intentionally.

14  Q.    Mr. Tatum, you knew that you couldn't have any

15  relationship with marijuana per your supervision terms; right?

16  A.    Yes.

17  Q.    And you knew that marijuana was being grown on your

18  property; right?

19  A.    Yes.

20  Q.    And so that's a violation; right?

21  A.    Yes, it is.

22  Q.    Mr. Tatum, you've -- you've testified that you pled guilty

23  to federal crimes; right?

24  A.    Yes, sir, I did.

25  Q.    Did you plead guilty to conspiracy to commit extortion

**TATUM - DIRECT / FINE**

1   under color of official right?

2   **A.**   Yes, I did.

3   **Q.**   And is that guilty plea based on the criminal activity

4   you've testified about yesterday and today?

5   **A.**   It is.

6   **Q.**   Did you also plead guilty to obstruction of justice,

7   falsifying records in a federal investigation?

8   **A.**   I did, yes, sir.

9   **Q.**   And is that guilty plea based on the criminal activity

10  you've testified about yesterday and today?

11  **A.**   Yes, sir.

12  **Q.**   Have you also pled guilty to tax evasion?

13  **A.**   Yes, sir.

14  **Q.**   Now, Mr. Tatum, you pled guilty pursuant to a cooperation

15  agreement; right?

16  **A.**   I did.

17  **Q.**   Under this agreement, what is it -- what is your

18  understanding of what you're required to do?

19  **A.**   Cooperate with the Government, meet when I'm requested to,

20  testify truthfully, and ultimately tell the truth.

21  **Q.**   If you hold up your end of the agreement, what is your

22  understanding of what the Government will do?

23  **A.**   They will tell the Court that I cooperated honestly and

24  truthfully, and pass that along to the Court.

25  **Q.**   Are you familiar with what's called a 5K letter?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    What's a 5K letter?

3    **A.**    Basically what I just described, that the Government would

4    write a letter on my behalf to the Court saying that I

5    testified and cooperated and that I could potentially get a

6    lower sentence, a lower prison sentence.

7    **Q.**    And have you been sentenced yet for the crimes you've

8    committed?

9    **A.**    No, I have not.

10   **Q.**    Sitting here today, do you know what sentence you're going

11   to get?

12   **A.**    No, I do not.

13   **Q.**    Who decides your sentence?

14   **A.**    Ultimately, the judge does.

15   **Q.**    What is your understanding as to what happens if you lie

16   at this trial?

17   **A.**    That there's no 5K deal and there's no -- no -- there's no

18   deal.

19   **Q.**    What is the only thing you have to do at this trial?

20   **A.**    Tell the truth.

21           **MR. FINE:**  No further questions, Your Honor.

22           **THE COURT:**  All right.  Then we will go to

23   cross-examination.

24       And, now, I see it's five to 12:00.  Would you prefer to

25   start now, Mr. Ceballos, or would you like to wait until after

**PROCEEDINGS**

1    the lunch break to start?

2         **MR. CEBALLOS:**  I'd prefer after the lunch break, Your

3    Honor.

4         **THE COURT:**  Okay.  I think that's fair.

5      So, now, ladies and gentlemen, it's a little before 12:00.

6    Why don't we just say come back at 1:00, as you've been doing.

7    And so the five minutes I may use in some way to just talk to

8    counsel briefly.  So thank you very much.

9         Remember my admonition.  Come back at 1:00.  Thank you.

10                   (The jury leaves the courtroom.)

11       (Proceedings were heard out of the presence of the jury.)

12         **THE COURT:**  Okay.  Jurors have stepped out, and you

13    may step down.

14         **THE WITNESS:**  Thank you.

15         **THE COURT:**  To come back at 1:00, obviously,

16    Mr. Tatum.

17         **THE WITNESS:**  Yes, ma'am.

18         **THE COURT:**  Just off the record.

19                   (Discussion off the record.)

20         **THE COURT:**  Thank you, Counsel, for cooperating in

21    this matter.

22       I may look around at other courtrooms and see what their

23    arrangements are.  We may want to do something different here,

24    I'm not sure.  But as long as you can do and it work with it.

25       And then, Mr. Ceballos, you checked that out also earlier?

PROCEEDINGS

1              MR. CEBALLOS:  Yes.

2              THE COURT:  Great.

3        Okay.  Anything before we break?

4              MR. CEBALLOS:  No.

5              MR. FINE:  No, Your Honor.

6              THE COURT:  Okay.  Don't forget to let me know if you

7    have come up with any research on the question of what comes in

8    if the Government is allowed to put in any type of prior

9    statement regarding presence at the December 18 stop.  Okay.

10             MR. FINE:  Thank you, Your Honor.

11             THE COURT:  Thank you.  We're in recess.

12                        (Recess taken at 11:56 a.m.)

13        (Proceedings were heard out of the presence of the jury.)

14                        (Proceedings resumed at 1:02 p.m.)

15             THE COURTROOM DEPUTY:  Please come to order.

16             THE COURT:  Okay.  Shall we bring in the jury?

17   Everybody ready?

18             MR. CEBALLOS:  Yes.

19             THE COURT:  Okay.

20                        (The jury enters the courtroom.)

21        (Proceedings were heard in the presence of the jury.)

22             THE COURTROOM DEPUTY:  Please be seated.

23             THE COURT:  All right.  Looks like everyone is ready,

24   so whenever you'd like to proceed, Mr. Ceballos.

25             MR. CEBALLOS:  Thank you, Your Honor.

TATUM - CROSS / CEBALLOS

1          <u>CROSS-EXAMINATION</u>

2     BY MR. CEBALLOS:

3     Q.    Good afternoon, Mr. Tatum.

4     A.    Good afternoon, sir.

5     Q.    Mr. Tatum, I'm going to ask you a bunch of questions.  If

6     at any time you don't understand my question, just feel free to

7     say, "I don't understand, restate it," and I'll be happy to do

8     that.  All right?

9     A.    Thank you.  Thank you.

10    Q.    Now, before you were interviewed by internal affairs,

11    Mr. Simpson, you actually prepared a document that was entitled

12    "Back Story of RP Interdiction."

13          Do you remember that?

14    A.    Briefly, yes, sir.

15          MR. CEBALLOS:  If we can put up Exhibit 149.

16    BY MR. CEBALLOS:

17    Q.    Okay.  Consists of about 13 pages.  Basically, you give an

18    entire history of the interdiction team; is that correct?

19    A.    I don't remember all 13 pages.

20    Q.    We'll go through them.  How about that?  All right?

21          THE COURT:  Okay.  Now, this is not an exhibit in

22    evidence.

23          MR. CEBALLOS:  That's correct.  It is not.

24          THE COURT:  All right.

25    \\\

TATUM - CROSS / CEBALLOS

1   BY MR. CEBALLOS:

2   Q.   So interdiction began initially in about 2014; is that

3   correct, with Matt Snodgrass?

4   A.   That is correct.

5   Q.   And that was because he had the K-9, the dog; right?

6   A.   Yes, sir.

7   Q.   So it was just you and Officer Snodgrass conducting

8   interdiction but very limited; is that correct?

9   A.   Yes, sir.

10  Q.   It was limited both in jurisdiction, you really couldn't

11  go much beyond the city lines, and you really were limited with

12  overtime; correct?

13  A.   Yes.

14  Q.   Okay.  Nonetheless, you and Officer Snodgrass were

15  somewhat successful during that short period of time in 2014.

16  You did, according to this, 28 interdictions?

17  A.   Yes, sir.

18  Q.   And, in fact, you list the case numbers for these

19  interdictions?

20  A.   Yes, sir.

21  Q.   And 2015 is when the interdiction team really took off.

22  That's when my client, Mr. Huffaker, joined your team, along

23  with several other officers:  Officer Snyder, Officer Miller,

24  Officer Medina.  So you now had five officers, including

25  yourself; is that correct?

TATUM - CROSS / CEBALLOS

1   A.   Yes, sir.

2   Q.   And during that time, the department sent you and the rest

3   of the team to various trainings throughout not only the state,

4   but throughout the country?

5   A.   That's correct, yes, sir.

6   Q.   One of those trainings was something referred to as Black

7   Asphalt; is that correct?

8   A.   Yes.

9   Q.   What is that and where is it?

10  A.   Actually, I think it was Desert Snow.

11  Q.   Okay.

12  A.   I don't remember Black Asphalt.

13  Q.   Okay.  Desert Snow.  Is that the main training for

14  interdiction?

15  A.   Yes.

16  Q.   Okay.  Where is that and what is it?

17  A.   I went to Oklahoma.

18  Q.   Okay.

19  A.   I don't remember where else.

20  Q.   Well, that training in Oklahoma is, what, a three-,

21  four-day training session?

22  A.   Yes.  Approximately, yes, sir.

23  Q.   And did the other members of the team, Snodgrass, my

24  client, Miller, the rest of them go with you at that time?

25  A.   No, sir.

TATUM - CROSS / CEBALLOS

1   **Q.**   Okay.  So you went first?

2   **A.**   Correct.

3   **Q.**   Who -- did anyone go with you?

4   **A.**   No.

5   **Q.**   Okay.  But as the year progressed, you and the other team

6   members went to more and more training?

7   **A.**   Yes, sir.

8   **Q.**   In fact, even after the DA said, "I'm not going to

9   prosecute any marijuana cases, no more cases will be filed,"

10  the department still sent you to training; is that right?

11  Various trainings?  It didn't stop?

12  **A.**   If you could refer to a date --

13  **Q.**   Sure.

14  **A.**   -- to be accurate.

15  **Q.**   So in February of 2017, after you were told no more

16  interdictions, the department still sent you to Operation

17  Jetway.  That's a DEA training?

18  **A.**   Where -- was that down here in San Francisco?

19  **Q.**   I don't know, sir.  You went to the training.

20  **A.**   I don't remember.

21  **Q.**   That was for any agency that wanted to work with the DEA,

22  you had to attend their mandatory training?

23  **A.**   I believe that was down here.

24  **Q.**   All right.

25  **A.**   If I remember right.

**TATUM - CROSS / CEBALLOS**

1  Q.   There was another marijuana symposium that you also

2  attended later on in that same month, February of 2017?

3          THE COURT:  Is that a question?

4          MR. CEBALLOS:  Yes.

5          THE COURT:  Okay.

6          MR. CEBALLOS:  Yes, Your Honor.

7          THE WITNESS:  Do you know where that was?

8  BY MR. CEBALLOS:

9  Q.   No.

10  A.   I don't recall that.

11  Q.   Did you attend asset forfeiture training the following

12  month, in March of 2017, or did you send a team to attend

13  training?

14  A.   I don't recall if I did or not.

15  Q.   Did you attend a training called the national interdiction

16  training in Pennsylvania in May of 2017?

17  A.   Yes, that I remember.

18  Q.   Okay.  The department sent you to that training, along

19  with the other officers?

20  A.   Yes, they did.  Yes, sir.

21  Q.   Okay.  And they sent you even though the DA and your own

22  Chief Masterson said, "We're not doing anymore interdictions";

23  is that correct?

24  A.   Yes.

25  Q.   In 2015 --

1          MR. CEBALLOS:  If we can turn to the second page on

2    this.

3    BY MR. CEBALLOS:

4    Q.   You talked a little bit on direct about different

5    policies.  One of them had to do with the uniform.  And, in

6    fact, you wrote kind of a short synopsis here about what your

7    standard uniform was when you were working interdiction; is

8    that correct?

9          MR. CEBALLOS:  If we can scroll down.  Oh.

10   BY MR. CEBALLOS:

11   Q.   Do you see that?

12        So in that, you --

13   A.   I do not see that on this page.

14   Q.   Do you see where it talks about -- I'm sorry.

15        THE COURT:  Well, you're planning on putting the --

16        MR. CEBALLOS:  I'm sorry.  Third -- third page.

17        THE COURT:  Excuse me, Mr. Ceballos.

18        MR. CEBALLOS:  Okay.

19        THE COURT:  If you're going to go into the content of

20   the document, it probably should be offered in evidence.

21   Unless you just want to put some of the content in, and then I

22   can find out if there's any objection to it.

23        MR. CEBALLOS:  I'm just going to put in some of the

24   content at this time, Your Honor, depending how the witness

25   responds.

TATUM - CROSS / CEBALLOS

1          THE COURT:  Well, all right.  So the question is:  Is

2    there any objection to going into some of the contents of this

3    document?

4          MR. FINE:  At this point, there is, Your Honor.

5    There's no foundation and the document appears to be hearsay.

6          THE COURT:  I'm sorry.  So is there an objection?  Are

7    you anticipating, let's say, an objection?

8          MR. FINE:  Yes, I anticipate an objection.

9          THE COURT:  What part did you want to ask him about

10   without putting the content in?  If you describe where it is so

11   counsel can see wherever this is.

12         MR. CEBALLOS:  I'm sorry.  This is on the third page

13   of this document.

14   BY MR. CEBALLOS:

15   Q.   And, again, Mr. Tatum, this is a document that you

16   prepared just prior to your internal affairs interview; is that

17   correct?

18   A.   Yes.

19         THE COURT:  Is it on the third page now?

20         MR. CEBALLOS:  Yes, it is.

21         THE COURT:  I've got something on the screen.

22         MR. CEBALLOS:  Yes.

23         THE COURT:  What part did you want to ask him about?

24   BY MR. CEBALLOS:

25   Q.   So on the third page, you indicate --

TATUM - CROSS / CEBALLOS

1          THE COURT:  Excuse me.  Without describing the

2   content, where is it on the page so somebody who is looking at

3   it could tell what you were talking about?

4          MR. CEBALLOS:  The middle section where it identifies

5   the uniform.

6          THE COURT:  Well -- all right.  Is it the part that is

7   kind of like squared off by itself in the center there?

8          MR. CEBALLOS:  Yes, Your Honor.

9          THE COURT:  All right.  And you want to ask him what?

10  If he said all that?

11         MR. CEBALLOS:  Yes.

12         THE COURT:  All right.

13  BY MR. CEBALLOS:

14  Q.   Mr. Tatum --

15         THE COURT:  No, just a moment.  Is there any objection

16  to it or not?

17         MR. FINE:  No objection to that part, Your Honor.

18         THE COURT:  Fine.  Go ahead.

19         MR. CEBALLOS:  Thank you.

20  BY MR. CEBALLOS:

21  Q.   Mr. Tatum, you indicated in this document what your

22  standard uniform was when you and your team did interdiction;

23  is that correct?

24  A.   Yes.  This is one of the uniforms that I suggested.

25  Q.   And this is actually the uniform that you and the other

1   members actually would use when you did your interdiction; is

2   that correct?  You weren't in full uniform?

3   A.   Sometimes we were.

4   Q.   But other times you weren't, you were more casual?

5   A.   Yes, sir, that's correct.

6   Q.   As long as these criteria were followed that you have

7   listed here; is that correct?

8   A.   No.

9   Q.   Well, what other uniform would you wear?

10  A.   Rohnert Park had their approved uniform standard.  This

11  was what the interdiction team -- this was the accepted -- one

12  of the accepted uniforms to be worn during interdiction.  But I

13  didn't -- this wasn't an official from-the-department document,

14  or approved uniform, I would say.

15  Q.   Well, Mr. Tatum, just before where it says "boots or

16  closed-toe shoes," you say, "Our approved police uniform during

17  the two years and eight months consisted of," and you list --

18       MR. FINE:  Your Honor, objection.  This is not from

19  the part that was let in.

20       THE COURT:  Well, and to the extent it may be

21  considered a prior statement that's somewhat different, I'll

22  overrule the objection.  But, again, if you're going to ask him

23  about the content, either offer it and offer whatever exception

24  to the hearsay rule there is that you're relying on and I'll

25  see if there's still an objection or not.

TATUM - CROSS / CEBALLOS

1           **MR. CEBALLOS:**  All right.

2   **BY MR. CEBALLOS:**

3   Q.   So, Mr. Tatum, you do indicate that that was the approved

4   uniform or one of the approved uniforms for interdiction; is

5   that correct?

6   A.   Yes, sir, that's correct.

7   Q.   All right.  Now, as the year progressed and you're now in

8   2016 -- well, let me back up.

9        2015, how many interdictions did you do?

10  A.   I don't recall the exact number.

11  Q.   Would it be approximately 43?

12  A.   I don't recall.

13  Q.   Your commander at the time was Jeff Taylor; is that

14  correct?

15  A.   In what year?

16  Q.   2016.

17  A.   We -- the first interdiction commander was Pat Strauss,

18  who was transitioned in and out between '15 and '16.

19  Q.   Okay.  So when did Commander Taylor actually become your

20  commander, your boss?

21  A.   I don't recall the specific date.

22  Q.   You went to a training event called Homeland Security

23  Investigations; is that correct, with Commander Taylor?

24  A.   Could you refer to a date or --

25  Q.   March of 2016.

TATUM - CROSS / CEBALLOS

1    **A.**    I don't recall that specific training.

2    **Q.**    Do you recall getting an award for successful interdiction

3    of illicit bulk cash, seizing over $2.4 million during this

4    event during --

5    **A.**    Yes.  That was in Nevada.  I do remember that, yes, sir.

6    **Q.**    Okay.  And Commander Taylor was with you?

7    **A.**    Yes, he was.

8    **Q.**    And in that same year, your department nominated you as

9    officer of the year, or you were awarded officer of the year?

10   **A.**    Yes, sir, I was.

11          **MR. CEBALLOS:**  If we can go to Exhibit 72, just break

12   off this.

13   **BY MR. CEBALLOS:**

14   **Q.**    You were talking a little bit on direct about adhering to

15   policies such as uniforms.  And you actually had

16   Mr. Huffaker -- Huffaker e-mail the rest of the team.

17          Do you see that in front of you?  You discussed it on

18   direct examination?

19   **A.**    I do, yes, sir.

20   **Q.**    Basically, you had my client e-mail the team members,

21   essentially, that they needed to follow policy on these various

22   topics; is that correct?

23   **A.**    Yes.  Just a reminder about what we're doing and to abide

24   by it, yeah.

25   **Q.**    Okay.  Why did you need him to tell the rest of the

1   members to do that?

2   **A.**   Could you repeat that?

3   **Q.**   Why did you ask him to send this e-mail out to the rest of

4   the members?

5   **A.**   I had a lot of other duties to take care of, and Joe was

6   responsible.  He was knowledgeable, as I previously said.  And

7   he was one of the first motivated guys that wanted to do

8   interdiction, so I know it would be -- it would get handled if

9   he did it.

10  **Q.**   In 2016 when you had him send this memo, you were already

11  going around extorting people and taking their marijuana; is

12  that correct?

13  **A.**   That's correct.

14  **Q.**   Okay.  So you wanted Joe, my client, to send a memo to the

15  rest of the team telling them to follow the rules and policies,

16  but you were out there ripping off people --

17  **A.**   That is correct.

18  **Q.**   Were you more concerned that if your team members did not

19  follow policy, that somehow what you were doing might get

20  detected?  Is that why you sent it to him?

21  **A.**   No, that had nothing to do with it.

22  **Q.**   Do you think it was hypocritical to have him send this

23  out, even though you are basically out extorting people?

24  **A.**   Of course.  Yes, sir.

25  **Q.**   In 2016, you indicated you did 42 interdictions?

1          **MR. CEBALLOS:**  If we could switch back to Exhibit 149.

2    And while -- yeah.

3    **BY MR. CEBALLOS:**

4    **Q.**   Do you see what's indicated there?

5    **A.**   I do.  I see 42.

6    **Q.**   And, again, you actually went ahead and counted the number

7    of interdictions you did for that year?

8    **A.**   That's correct, yes.

9    **Q.**   So from 2014 to 2015, now 2016, how many interdictions do

10   you think you did, you and your team?

11   **A.**   Is it 22 and 42?  So 64?

12   **Q.**   Are you asking me or telling me?  You're the one that

13   wrote this.  You did the interdiction.

14   **A.**   Correct.  I don't remember what the first total number

15   was, so I was trying to remember that, plus 42.

16   **Q.**   All right.  Would it be fair to say that during these

17   years, 2015, 2016, you are very successful with this unit?

18   **A.**   That's fair to say.

19   **Q.**   Okay.  And when I say successful, you're seizing a lot of

20   marijuana?

21   **A.**   We did.

22   **Q.**   Was it like over 3,000 pounds?

23   **A.**   I don't recall the specific total, but it was a lot.

24   **Q.**   Well, why don't we turn that page.  Can we scroll down

25   where it says "interdiction on hold."  Do you see where it

TATUM - CROSS / CEBALLOS

```
 1   begins "Up until that point" --
 2            MR. FINE:  Your Honor.
 3   BY MR. CEBALLOS:
 4   Q.   -- the last paragraph?
 5            MR. FINE:  We would object to continued use of this
 6   document in this format without it being in evidence.
 7            THE COURT:  Okay.
 8            MR. CEBALLOS:  We're using it --
 9            THE COURT:  Excuse me?
10            MR. CEBALLOS:  I was going to say we were going to use
11   it to refresh his recollection.
12            THE COURT:  Well, it's not the way you're doing it.
13   For example, if you are going to use a document to refresh a
14   witness's recollection, you don't read its content into the
15   record.  You call the witness's attention to whatever it is.
16       If it's online, you can just actually ask him to look at
17   paragraph 2 or whatever it is, and ask the witness:  Does that
18   refresh your recollection?
19       If they say, "Yes," fine.  Then they will tell you what
20   they remember.  And if they say, "No, it doesn't," then you're
21   going to have to look for some other exception, basically, that
22   you can rely on.  They may exist.  So far you haven't
23   identified any of them.
24       So do you want him to look at it and see if it refreshes
25   his recollection?
```

TATUM - CROSS / CEBALLOS

1        MR. CEBALLOS:  Yes, Your Honor.

2        THE COURT:  All right.  What paragraph do you want him

3   to look at?

4        MR. CEBALLOS:  This would be the second-to-last

5   paragraph.

6        THE COURT:  All right.  And what is your question?

7   What -- how much in poundage did they seize over what period?

8        MR. CEBALLOS:  During the 2015/'16 period.

9        THE COURT:  Those two years?

10       MR. CEBALLOS:  Yes.

11       THE COURT:  Okay.  Do you want to take a look at that?

12       THE WITNESS:  Yes, ma'am.

13       THE COURT:  Ask him if it --

14       MR. CEBALLOS:  Does that refresh your recollection?

15       THE WITNESS:  I see that it says that I -- that we

16  seized over 3,000 pounds, but I don't remember writing this, if

17  that's what you're asking.  I know it's my document, but...

18       THE COURT:  No, he's not asking you.  It could have

19  been written by somebody else.  Doesn't matter.

20       THE WITNESS:  Okay.

21       THE COURT:  He's just asking, looking at it, does it

22  bring back to your mind how much you seized?

23       THE WITNESS:  No, it does not.

24       THE COURT:  Okay.

25  \\\

TATUM - CROSS / CEBALLOS

1  BY MR. CEBALLOS:

2  Q.   You prepared this document; that's correct?

3  A.   I did.

4  Q.   So reading the document you prepared, you're saying it

5  doesn't refresh your recollection?

6  A.   I see it says that we seized over 3,000 pounds, but I

7  don't recall the exact amount that we seized during that time.

8  Q.   I'm not asking for an exact amount, Mr. Tatum.

9  A.   Okay.

10 Q.   I'm saying does this give you an approximation of how much

11 marijuana you seized, you and your team seized during this

12 period of time?

13 A.   Yes, sir.

14 Q.   Okay.  So it was 3,000 pounds, give or take?

15 A.   Yes, sir.  Sorry, I didn't understand.

16 Q.   And in addition, do you recall that you had obtained or

17 seized $2.8 million of illegal drug money?

18 A.   Yes.

19 Q.   Including 10 firearms?

20 A.   Based upon looking at this, yes.

21 Q.   That refreshes your recollection by looking at that; is

22 that correct?

23 A.   It doesn't refresh my recollection.  It just says that we

24 seized 10 firearms.

25 Q.   Okay.  Mr. Tatum, I'm not trying to trick you here.

**TATUM - CROSS / CEBALLOS**

1    All right?  I'm just showing you a document you prepared.

2    **A.**    Yes, sir.

3    **Q.**    Okay.  All right.  I'm just asking for your honest

4    response.  Okay?

5    **A.**    Yes.

6    **Q.**    All right.

7    **A.**    I understand that.

8    **Q.**    So during this period of time, you're doing so well,

9    does -- how is Commander Taylor supervising you and the rest of

10   the team?

11   **A.**    We would have indirect meetings or informal meetings.

12   We'd go over what days we were going to work.  Kind of

13   indirect.

14   **Q.**    Was he a micromanager?

15   **A.**    No.

16   **Q.**    Okay.  So he pretty much let you do your own thing?

17   **A.**    I would propose things and times and he would give his

18   input.

19   **Q.**    Okay.  But you would determine, essentially, the schedule

20   you would go out and do an interdiction; is that correct?  You

21   didn't have a set time?

22   **A.**    I would ask the guys on the team, "Hey, do these days work

23   for everybody," before I put it on the calendar or asked

24   Taylor's permission.  So I'd get everybody's feedback to make

25   sure people were going to work.

TATUM - CROSS / CEBALLOS

1   Q.   You wouldn't go out as a team, the entire group, when you

2   did interdiction; is that correct?

3   A.   We did.

4   Q.   Okay.  But other times it would just be you and one other

5   officer, like my client or Officer Snodgrass?

6   A.   Correct.

7   Q.   All right.  So when you did these interdictions, it wasn't

8   the entire group of five that went out.  Sometimes they did,

9   but other times it could just be two of you?

10  A.   Correct, yes, sir.

11  Q.   And other times, you would just do it by yourself; is that

12  correct?

13  A.   Before it was actually the interdiction team, yeah, I went

14  out by myself.

15  Q.   And during the period of time in 2015 to 2016, did you

16  ever do interdiction by yourself?

17  A.   Yes.

18  Q.   All right.

19  A.   I did.

20  Q.   The use of body-worn cameras, you indicated that your

21  understanding is they had to be used every time you made an

22  encounter with a civilian; is that right?

23  A.   Yes, sir.

24  Q.   So in every interdiction stop that you or your team, did

25  you require the officers to put -- or turn on their body-worn

TATUM - CROSS / CEBALLOS

1  camera?

2  **A.**    In the beginning, when we started interdiction, we -- it

3  was when body cameras were first being rolled out so it was

4  unclear if we had to use them.  So in the beginning, we did not

5  use them.

6  **Q.**    It was unclear because the policy said that you had to be

7  in uniform.  It was officers wearing uniform had to wear that.

8  But you and your team, they weren't in uniforms; is that

9  correct?

10  **A.**    We were in a uniform but not a full police, like, dress

11  uniform, I would say, but a -- yeah.

12  **Q.**    That's how you got around the policy is you basically

13  justified, the policy says if you're in uniform, you have to

14  have the camera; if you're not in uniform, well, then, it's

15  discretionary?

16  **A.**    We didn't do that to try to get around the policy.  That

17  was what specialty narcotics units wore.  That was just kind of

18  common nonofficial uniform.

19  **Q.**    Okay.  So when you did these interdiction stops where you

20  extorted marijuana from individuals, you had your body-worn

21  camera on?

22  **A.**    Some of them, yes, sir.

23  **Q.**    You actually videotaped yourself with your camera

24  extorting people of their marijuana?

25  **A.**    Yes, sir.

TATUM - CROSS / CEBALLOS

1  Q.   And did any of your supervisors, Commander Taylor or even

2  Masterson, ever come to you and say, "Listen, we reviewed your

3  body camera.  What are you doing?"

4  A.   No, sir, they did not.

5  Q.   At any point in your career at Rohnert Park, did any

6  supervisor come to you and say, "We're going to review your

7  body-worn camera"?

8  A.   Yes.

9  Q.   You in particular?

10  A.   Yes.

11  Q.   When you were on the interdiction team?

12  A.   Yes.

13  Q.   Okay.  And who was that that reviewed it?

14  A.   Christine Giordano was the records supervisor so she had

15  access to it.  I remember her and --

16  Q.   But she is not your supervisor.  She's just a records

17  clerk; correct?

18  A.   No.  I was trying to remember who in command staff would

19  have reviewed it with her.

20       I do not remember who exactly, though.

21  Q.   So you can't -- at this point you can't remember if any

22  supervisor ever set you aside and say, "Hey, Jacy, we reviewed

23  your body camera.  We have some questions."?

24  A.   No.

25  Q.   The storing of the marijuana.  You've testified on direct

TATUM - CROSS / CEBALLOS

1    that when it got to a point you were seizing so much you could

2    no longer keep it inside the station, you had to put it

3    outside; is that correct?

4    **A.**    Yes, sir.

5    **Q.**    All right.  And who had access to that, that storage

6    container?

7    **A.**    The evidence property techs, the evidence supervisors, and

8    the interdiction team.

9    **Q.**    And did you also maintain a key yourself?

10    **A.**    No.

11    **Q.**    You didn't have a key in your -- the drawer of your desk?

12    **A.**    Not in my desk but there was a key in the evidence

13    property office.

14    **Q.**    Did you have access to that?

15    **A.**    Everybody did, yes, sir.

16    **Q.**    And when it came time to destroy the excess marijuana, you

17    actually had to have someone take a document to a judge to have

18    a judge authorize the destruction of the marijuana; is that

19    correct?

20    **A.**    To do it the legal way, yes, sir.

21    **Q.**    All right.

22          **MR. CEBALLOS:**  Could we put up Exhibit 141.

23          **THE COURT:**  This likewise is not in evidence so when

24    you say "put up," do you mean just in front of the witness or

25    what?

1          MR. CEBALLOS:  Just for the witness, Your Honor.

2          THE COURT:  All right.  Maybe you can make that clear

3    when you --

4          MR. CEBALLOS:  Yes.

5          THE COURT:  -- ask your assistant to help you.  Okay.

6    BY MR. CEBALLOS:

7    Q.   Do you see that, Mr. Tatum?

8    A.   Yes, sir, I do.

9    Q.   And is this one of several pages of what is referred to as

10   a destruction order that you or your team would have to fill

11   out, submit to a judge to get authorization to destroy

12   marijuana; is that correct?

13   A.   Yes, sir.

14         MR. CEBALLOS:  And if we can scroll down.

15   BY MR. CEBALLOS:

16   Q.   This document had to be prepared by one of -- you or one

17   of your team members and it had to be signed under penalty of

18   perjury; is that correct?

19        Do you see that on the bottom?

20   A.   Yes, sir, I do.

21   Q.   Okay.  And you basically had your officers fill this form

22   out and submit it to the judge; is that correct?

23   A.   If it was their case, or I was on the case with them as a

24   sergeant, it's normal for the officer to do a lot of the

25   paperwork.  So they would do the paperwork and I would either

TATUM - CROSS / CEBALLOS

1  help with booking evidence or other stuff.  But since it was

2  the case officer -- whoever was the case officer usually did

3  the destruction order.

4  Q.   In this particular exhibit here, who was that officer?

5  A.   Matt Snodgrass.

6  Q.   All right.  And you admit that the destruction of the

7  marijuana, right, taking it to the farm, was in violation of

8  policy; is that correct?

9  A.   Yes, it was.

10  Q.   Okay.  Did anyone in your department know that's what you

11  were doing?

12  A.   A hundred percent.

13  Q.   And when I say anyone, I mean supervisors like

14  Commander Taylor or Director Masterson.

15  A.   Yes, sir.

16  Q.   Which one?  One?  Both?

17  A.   Can I explain?

18  Q.   Yes.

19  A.   So for two and a half years we destroyed marijuana at the

20  farm.  We checked out a back- -- a city-owned backhoe that was

21  owned by public works to dig the holes to destroy the

22  marijuana.

23      So the records supervisor would get -- she would either

24  let us in to get marijuana to be destroyed or one of the

25  evidence techs would let us in to be -- to get marijuana to be

TATUM - CROSS / CEBALLOS

1  destroyed.

2      But they never questioned where the marijuana was going or

3  where the destruction order was for that marijuana, if that

4  makes sense.

5  **Q.**  Did Commander Taylor know that you were destroying the

6  marijuana --

7  **A.**  Yes.

8  **Q.**  -- at that particular location, at that -- was it

9  Mr. Tatman?

10  **A.**  Yes, sir.

11  **Q.**  All right.  He knew that?

12  **A.**  Yes, sir.

13  **Q.**  Did you tell him?  Or did he accompany you to destroy

14  any --

15  **A.**  We showed him pictures.

16  **Q.**  You showed him photos?

17  **A.**  Yes, sir.

18  **Q.**  And when was that?

19  **A.**  One of the first times we went there, Joe actually drove

20  the backhoe and we took pictures of Joe on the backhoe digging

21  the holes for the marijuana.

22  **Q.**  Okay.  And do you know how much marijuana you buried that

23  time?

24  **A.**  The -- with the tractor?

25  **Q.**  Yes.

1    A.    No, sir, I don't recall.

2    Q.    All right.  And did Commander Taylor at any point say

3    you're not supposed to do this; this is in violation of policy?

4    A.    No.

5    Q.    Okay.  Did Director Masterson know that you were burying

6    marijuana there?

7    A.    I can't say for sure.

8    Q.    Isn't Director Masterson's house just across the street

9    from where this location is, Mr. Tatman's property?

10   A.    Yes, sir, it is.

11          MR. CEBALLOS:  If we could put up Exhibit 79.

12          THE COURT:  All right.  This exhibit is in evidence?

13          MR. CEBALLOS:  Yes.

14      I think this one has been published; is that correct?

15   Admitted?

16          THE COURT:  Pardon me?

17          MR. CEBALLOS:  Has this one been admitted?

18          THE COURT:  79 is in evidence already.  It has --

19          MR. CEBALLOS:  All right.  So can we publish this for

20   the jury.

21          THE COURT:  Yes, it's in evidence.

22   BY MR. CEBALLOS:

23   Q.    Mr. Tatum, you --I think you indicated you actually

24   prepared this chart or -- is that correct?

25   A.    Yes, sir, it is.

TATUM - CROSS / CEBALLOS

1    Q.    And why did you do that?

2    A.    I believe the command staff and the chief wanted stats so

3    when it came time to justify budgets and to get more overtime,

4    they could use this to use it as a reason why and show our

5    productivity, what we were doing.

6    Q.    So did Director Masterson specifically asked you, "Jacy --

7    Sergeant, I need you to present something to me so I can

8    justify continuing the unit, the interdiction team"?

9    A.    Somebody in command staff asked me to do this.  I wouldn't

10   have taken the time to do this.  I didn't like busy work so

11   somebody asked me to do it.

12   Q.    All right.  Did Director Masterson ever talk to you about

13   this?

14   A.    Yes.

15   Q.    All right.  And did he commend you for the good job that

16   you and your team were doing?

17   A.    Several times, yes.

18   Q.    And this was not the only chart or interdiction that you

19   did; you did several of these?

20   A.    Yes, sir, I did.

21   Q.    Starting at what point?  This says December 6, 2016.

22   A.    I remember doing quite a few.  So I don't know if it was

23   before December or continued from December into January of

24   2017.

25   Q.    Would this have been one of the last ones you did because

TATUM - CROSS / CEBALLOS

1  the following month, January 2017, that's essentially when

2  interdiction was placed on hold?

3  **A.**    That is correct.  So this would have been the last one,

4  yes, sir.

5  **Q.**    So going into January of 2017, you attended a meeting with

6  the DA, your chief, maybe your commanders and you're actually

7  present when the DA says, "I'm not filing any more cases"; is

8  that correct?

9  **A.**    Yes, that's correct.

10  **Q.**    All right.  How did that make you feel?

11  **A.**    Upset, discouraged, bummed for my team.

12  **Q.**    Well, also bummed for yourself, right, because you were

13  using this interdiction team to go and extort drivers of

14  marijuana?

15  **A.**    Yes, sir, I was.

16  **Q.**    Without being allowed to do this, that cash cow comes to

17  an end; is that correct?

18  **A.**    Correct.

19  **Q.**    So your being upset wasn't for the team.  It was more for

20  yourself?

21  **A.**    No.  As I just stated, it was for -- I still had feelings

22  for my team.  They were my guys and I saw they were upset,

23  but...

24  **Q.**    Okay.  So you had feelings for your team.  What about the

25  people that you extorted and robbed?

TATUM - CROSS / CEBALLOS

1   A.   Did I have feelings for them?

2   Q.   Yeah.

3   A.   Yes, sir, I did.

4   Q.   But you still continued to do it; is that correct?

5   A.   I did, yes, sir.  I was in a bad time in my life, and I

6   regret doing that.

7   Q.   How many people do you think that you extorted and robbed

8   during this period of time?

9   A.   I don't know.

10  Q.   20?  40?  Stop me.  50?  A hundred?

11  A.   I don't know, sir.

12  Q.   It could be over a hundred people?

13  A.   I don't know.

14  Q.   Do you remember the first time you extorted someone?

15  A.   No, sir, I don't.

16  Q.   You don't remember the first time you decided to basically

17  forsake the oath as a police officer and decide, you know,

18  today is the day I'm going to rob somebody; I'm going to extort

19  someone?

20  A.   No, sir.

21  Q.   Do you remember, was it 2015?

22  A.   I don't recall, sir.

23  Q.   Could it have been earlier, in 2014?

24  A.   I don't remember.

25  Q.   Do you remember where the first time you extorted someone?

**TATUM - CROSS / CEBALLOS**

1    **A.**    No, sir, I don't.

2    **Q.**    You just completely drew a blank as to the first

3    individual, the first party you basically robbed?

4    **A.**    As I said, sir, this was over nine years ago.  And I'm

5    ashamed and I took responsibility for what I did.  And I've

6    tried to move past the bad things I did and become a better

7    person.  So I -- I do not recall.

8    **Q.**    Notwithstanding the DA announcing there's no more

9    interdiction, you nonetheless continued to push for the team to

10   survive, to stay active?

11   **A.**    The team did, along with myself.

12   **Q.**    The team did, along with yourself.  You wanted it to

13   continue, right, independent of the team?

14   **A.**    I just said that, yes, sir.

15   **Q.**    All right.

16        And so you would talk to your commander.  You would talk

17   to Masterson and urge him, "I know what the DA says, but we

18   need to keep this going"?

19   **A.**    Correct.

20   **Q.**    In fact, you had a contact in the DEA.  I think you

21   mentioned his name.  Was it Ryan Sibbald?

22   **A.**    Yes, sir.

23   **Q.**    All right.  And he actually went to your chief -- and I'm

24   going to use the word "chief" and "director" interchangeably,

25   but we're talking about the same person, Masterson.

TATUM - CROSS / CEBALLOS

1      Agent Sibbald went to your chief and tried to convince him
2  to let you guys continue but on the federal side; is that
3  correct?
4  **A.**   I don't think Ryan ever talked to the chief.  I think he
5  talked to Commander Johnson.
6  **Q.**   All right.  But he talked to you as well; right?
7  **A.**   Yes.  He did.
8  **Q.**   In fact, you and Agent Sibbald had a number of
9  conversations where he was urging you, "Let's keep that team
10  going.  Let's keep your team going"?
11  **A.**   Yes, sir.
12  **Q.**   All right.  And you would either go to your chief -- you
13  went to your chief yourself; right?
14  **A.**   One of the times, yeah.
15  **Q.**   And other times you would take some of your team members
16  like my client or the other officers and approach the chief and
17  say, "Chief, we need to keep this going"?
18  **A.**   The chain of command, the officers wouldn't go up and talk
19  to the chief about something that's been already discussed.  So
20  as I previously testified, officers were going to leave, so
21  morale-wise we went up and talked to the chief to try to
22  present a bigger issue.
23  **Q.**   You would meet with the commanders instead of the chief?
24  **A.**   On one occasion, yes.
25  **Q.**   Okay.  And that's Commander Taylor; correct?

**TATUM - CROSS / CEBALLOS**

1   **A.**    No, not Commander Taylor.

2   **Q.**    Who did you meet with?

3   **A.**    Commander Aaron Johnson and Commander Mike Bates.

4   **Q.**    Okay.  Do you remember indicating on this backstory that

5   you and Agent Sibbald continued to pitch the idea to all your

6   supervisors -- Taylor, Johnson, Bates, and even Masterson?

7   **A.**    I do not recall.

8   **Q.**    Would it refresh your recollection to review what you

9   wrote?

10  **A.**    It would.

11          **MR. CEBALLOS:**  If we can go back to Exhibit 149 and

12  the Bates stamp number ends in 48.

13          **THE COURT:**  I'm sorry.  Which number?

14          **MR. CEBALLOS:**  Exhibit 148, the Bates Number ends in

15  48.

16          **THE COURT:**  It's Exhibit 149, I think, you're on,

17  isn't it?

18          **MR. CEBALLOS:**  Yes.

19          **THE COURT:**  Not 148.  But what page did you want him

20  to look at?

21          **MR. CEBALLOS:**  Well, they don't have pages, Your

22  Honor.  I'm just referring to the Bates number.

23          **THE COURT:**  That's fine.  What Bates number would you

24  like him to --

25          **MR. CEBALLOS:**  12248.

1          **THE COURT:**  Okay.  And just so you understand, ladies

2     and gentlemen, there may be, on any exhibit that you see, down

3     in the lower corner -- this one says "US 12248."  That's

4     something not put on the document at the time it was being

5     created or in any way during the course of the events that

6     you're hearing about.  It's a way of the lawyers keeping track

7     of what exhibits have been provided.

8          So, for example, this says "US" with that number.  It means

9     that the United States gave that particular exhibit to the

10    defense before trial.  And this is just a way of keeping track

11    of what they gave them.  Then occasionally there are exhibits

12    going the other way that would then show the other party, and

13    that's all it is.

14         So it doesn't have any legal significance for the -- or

15    factual significance for the trial that you're hearing, but

16    that explains why the number is there.  Okay.

17         So now we get the page because there were no page numbers

18    on the document itself.

19         And what paragraph did you want him to look at?

20         **MR. CEBALLOS:**  It's going to be the middle paragraph.

21         **THE COURT:**  The one that starts "Over" or the one that

22    starts "JC"?

23         **MR. CEBALLOS:**  Over.  "Over the next two months."

24         **THE COURT:**  Take a look at and see if it refreshes

25    your recollection.

TATUM - CROSS / CEBALLOS

1        What was the question?

2            MR. CEBALLOS:  If he and Agent Ryan Sibbald approached

3    the supervisors with continuing to pitch the idea of the

4    interdiction team.

5            THE COURT:  Okay.  So that's the question?

6            MR. CEBALLOS:  Yes.

7            THE COURT:  Did they do it?  Okay.

8            THE WITNESS:  Yes, sir.  I do remember that.

9    BY MR. CEBALLOS:

10   Q.   Okay.  So Agent Ryan Sibbald was working with you and your

11   supervisors, the commanders, to convince Chief Masterson,

12   "Let's continue the interdiction team"; is that correct?

13   A.   Yes, sir.

14   Q.   All right.  In fact, Agent Sibbald came in with an idea of

15   "Well, we can use as funding called strategic initiative

16   funding to fund the interdiction team"?

17   A.   That's correct.

18   Q.   All right.  And during this time, how would you describe

19   Chief Masterson's response to this?

20   A.   He continued to say no and he was unresponsive --

21   Q.   All right.

22   A.   -- about changing his mind.

23   Q.   But nonetheless, you persisted?

24   A.   Correct.

25   Q.   Along with the other team members?

TATUM - CROSS / CEBALLOS

1   **A.**   Correct.

2   **Q.**   Along with the commanders?

3   **A.**   Correct.

4   **Q.**   All right.  At some point, though, Commander Johnson met

5   with you and said, "I think we have Masterson going to go along

6   with it."  Do you remember that?

7   **A.**   I do, yes, sir.

8   **Q.**   All right.  And Commander Johnson, however, said, "You

9   need to act quickly before he changes his mind"?

10  **A.**   Yes.

11  **Q.**   All right.  So even though on direct you testified that he

12  didn't approve the continuing of the team, he actually did

13  authorize that you continue the team; is that correct?

14      **MR. FINE:**  Objection, Your Honor.  That misstates the

15  testimony.

16      **THE COURT:**  I think that it assumes certain facts not

17  in evidence.  Whether -- irrespective of whether either if he

18  was correct about what the state of the record is, you can't

19  really tell a witness something and then just ask him if they

20  remember it, so to speak, or -- you have to make it a question.

21      So if you reframe it, you could ask it.

22      **MR. CEBALLOS:**  I will rephrase it.

23      **THE COURT:**  All right.

24  BY MR. CEBALLOS:

25  **Q.**   You were able to convince -- well, not necessarily you

TATUM - CROSS / CEBALLOS

1    alone, but at some point Masterson was convinced to allow the

2    team to continue on; is that correct?

3    **A.**    No.  He never -- he was never convinced, never changed his

4    mind.

5    **Q.**    But Commander Johnson told you, "We have Masterson, who's

6    going to approve it"?

7    **A.**    He said he thinks he has him and we need to act quick.

8    **Q.**    All right.  If we can turn to the same exhibit, the Bates

9    Number 12249.

10       I want to have you read that third paragraph starting

11    where it says, "Commander Johnson."

12            **MR. FINE:**  Objection, Your Honor.  Again, this

13    document is not in evidence.

14            **THE COURT:**  Do you want him to read it to himself?

15            **MR. CEBALLOS:**  Yes.

16            **THE COURT:**  All right.  The first thing is that he

17    hasn't said he doesn't remember.  All right?

18       So there's no refreshing recollection here.  If you think

19    he said something different previously, would you indicate

20    where that might be.

21            **MR. CEBALLOS:**  I'll rephrase the question.

22            **THE COURT:**  Okay.

23            **MR. CEBALLOS:**  And then go from there.

24            **THE COURT:**  All right.

25    \\\

TATUM - CROSS / CEBALLOS

BY MR. CEBALLOS:

Q.    Commander Johnson did tell you you needed to act quickly and get the ball rolling; is that correct?

A.    Yes, sir.

Q.    And why did he tell you that?  What did he tell you you could do?

A.    That's just kind of how he left it.  He just said exactly that, "Act quick and get the ball rolling."

Q.    So you had tacit approval to get the team up and running, but you had to act quickly?

        MR. FINE:  Objection, Your Honor.  That misstates the testimony.

        THE COURT:  It's the "so" that creates the problem.

        MR. CEBALLOS:  I'll remove the "so."

        THE COURT:  Oh.  He hasn't disagreed he was told something by an individual.  He just says that didn't pan out.  All right.

BY MR. CEBALLOS:

Q.    Did Commander Taylor tell you that you needed to act quickly?

A.    Commander Johnson.

Q.    I'm sorry.  Commander Johnson.

      Why was it Commander Johnson you were dealing with instead of your direct supervisor, Commander Taylor?

A.    Commander Taylor was out on light duty, on medical leave,

TATUM - CROSS / CEBALLOS

1    I believe, during that time.  So Commander Johnson was acting

2    as our supervisor, per se, over interdiction.

3    Q.    And would you agree that Commander Johnson was supportive

4    of continuing the interdiction team?

5    A.    Yes, I would.

6    Q.    And so would you say he's the one that convinced

7    Masterson, "Let's get this thing rolling again"?

8    A.    He said he talked to him and he kind of left it open and

9    he never said that the chief approved it and said, yeah, go

10    ahead.

11         He just indicated to us, "Get the ball rolling."

12    Q.    So you took it from Commander Johnson, "Listen, I'm not

13    sure we have the chief but you've got to act quickly so get the

14    team up and running"; is that correct?

15    A.    He never -- he never said that.  He never said get the

16    team up and running.

17    Q.    Did Commander Johnson tell you that he was going to

18    contact Agent Sibbald to figure out how things were going to

19    work?

20    A.    He did.

21    Q.    All right.  So didn't that indicate to you that you had

22    the green light to start up your team again?

23    A.    The -- they called it strategic funding and that was the

24    federal money that was going to be used to hopefully get the

25    interdiction team back up and running.  So that was the -- the

 1  last link, I guess, or the last thing that needed to be worked

 2  out before everything was official.

 3  Q.    So did you take that as if you had approval to start

 4  working investigations again?

 5  A.    No.

 6  Q.    Would it refresh your recollection to review what you

 7  wrote?

 8         THE COURT:  He didn't say he doesn't remember

 9  anything.

10  BY MR. CEBALLOS:

11  Q.    Do you recall writing in this report that you prepared

12  that you had approval?

13         MR. FINE:  Objection, Your Honor.  Again, it's not in

14  evidence.  He answered the question.

15         THE COURT:  The problem with the form of the

16  question -- and there are -- sometimes you've done this earlier

17  but nobody objected -- is that you make a statement to the

18  witness as if it's a statement of fact and then you just ask

19  the witness if they remembered it.  But that -- the implication

20  is that it happened, it's just do they remember it.

21      So if you wanted to ask him, you can -- it's

22  cross-examination, you can ask leading questions.  You can say,

23  did so and so tell you, didn't you write down earlier something

24  different than you just said, and see what he says at that

25  point.  Okay.

TATUM - CROSS / CEBALLOS

1   BY MR. CEBALLOS:

2   **Q.**   Did you write down that you received approval from

3   Commander Johnson?

4   **A.**   I don't recall if I did.

5   **Q.**   Okay.  Since you say you didn't recall it, would it

6   refresh your recollection to review what you wrote?

7   **A.**   Yes, it would.

8   **Q.**   Okay.  If you can, please, do -- it's going to be the last

9   full paragraph, starting with "with the."

10         **THE COURT:**  Okay.  On the page you have up in front of

11  him?

12         **MR. CEBALLOS:**  It's the same Bates Number 12249.

13         **THE COURT:**  Okay.

14         **THE WITNESS:**  I do see that.

15  BY MR. CEBALLOS:

16  **Q.**   Okay.  So does that refresh your recollection that you had

17  approval?

18         **THE COURT:**  Well, actually -- okay.  You asked him a

19  few -- all right.  Never mind.  All right.

20     Go ahead.

21         **THE WITNESS:**  Thank you, Your Honor.

22     I wrote this trying to not get in trouble.  So there are

23  lies in here that I wrote that I was trying to create to not

24  get Joe and I in trouble for the stuff that we did.

25  \\\

TATUM - CROSS / CEBALLOS

1    **BY MR. CEBALLOS:**

2    **Q.**   Okay.  So I'm not sure you answered the question.

3        Did you obtain approval from Commander Johnson, as you

4    indicated?

5    **A.**   No, I did not.

6    **Q.**   So you just wrote that and that was untrue?

7    **A.**   Correct.

8    **Q.**   And when you prepared this, this was something you

9    prepared for yourself; is that correct?  Or did you give it to

10   somebody?

11   **A.**   I don't recall.

12   **Q.**   Why did you prepare this document?

13   **A.**   Trying to just document and remember stuff at the time or

14   stuff that happened because so much was going on with me

15   potentially losing our job, Joe and I get investigated.  Just

16   trying to capture and write stuff down.

17   **Q.**   You prepared this in advance of the first internal affairs

18   interview, which was in March of 2018?

19   **A.**   I don't remember the date that I prepared this.

20   **Q.**   I'm not asking about the date.

21   **A.**   Okay.

22   **Q.**   But it was prepared in advance of your internal affairs

23   interview?

24   **A.**   Yes, I believe so.

25   **Q.**   And did you review it before you were interviewed?

TATUM - CROSS / CEBALLOS

```
 1    A.    I must have.
 2    Q.    All right.  And did you reference this document in any way
 3    during the interview?
 4    A.    Yes, I did.
 5    Q.    Okay.
 6    A.    Well, I referenced things in here.  I don't know if I told
 7    Mr. Simpson that I was -- that I wrote a document, but I
 8    referenced things in here.
 9    Q.    Well, what you wrote in this document, would it be
10    consistent with what you told Investigator Thompson during your
11    internal affairs interviews?
12    A.    The -- some of the lies, yes.
13    Q.    Okay.  So, as you indicated, you admit that you told
14    Investigator Simpson lies throughout your interview; is that
15    correct?
16    A.    Yes, sir, I did.
17    Q.    All right.  There were some truths in it, however?
18    A.    That is correct.
19    Q.    All right.  So the document here you're saying is a
20    mixture of truths and lies?
21    A.    Yes, sir.
22    Q.    But you prepared this for yourself; is that correct?
23    A.    I'm not sure.
24    Q.    Let me -- let me move on.
25          How would you describe your relationship with the team
```

**TATUM - CROSS / CEBALLOS**

 1  members overall?  And I'm talking about Snyder, Snodgrass,

 2  Miller, and my client, as well as Medina.

 3  **A.**   Positive.

 4  **Q.**   Were you particularly close to any of them more so than

 5  others?

 6  **A.**   Yeah, most definitely.

 7  **Q.**   Would it be fair to say that you were close to my client?

 8  **A.**   Absolutely, yes, sir.

 9  **Q.**   Okay.  Was he perhaps, of the entire team, the closest one

10  with you?

11  **A.**   To me?

12  **Q.**   Yes.

13  **A.**   Yes, without a doubt.

14  **Q.**   All right.  I think you indicated on direct you became

15  very good friends, that you would go on these fishing and

16  hunting trips?

17  **A.**   We did, yes, sir.

18  **Q.**   Your wives would get together when you guys were out doing

19  your fishing and hunting?

20  **A.**   Yes, sir.

21  **Q.**   Your daughters, in fact, became friends?

22  **A.**   Yes, sir.

23  **Q.**   In fact, your daughters, they're about the same age?

24  **A.**   They are, yes, sir.

25  **Q.**   They would talk to each other on the phone using -- your

TATUM - CROSS / CEBALLOS

1   daughter would use your phone, his daughter would use his

2   phone?

3   **A.**   Would have been my wife's phone.  I was working a lot.  I

4   don't know if she used my phone.  It's possible but I don't --

5   no, I don't remember her using my phone.

6   **Q.**   Did you -- I mean, your relationship with my client, you

7   even had his -- the pin number to his phone?  The password to

8   his phone?

9   **A.**   I don't believe I did, no.

10  **Q.**   You'd go over to his house and visit him; correct?

11  **A.**   Yes, sir.

12  **Q.**   How often?

13  **A.**   Depending on our work week or vacations, at least once a

14  week.

15  **Q.**   Okay.  And his wife worked during the day.  She was a

16  teacher; is that correct?

17  **A.**   Yes, sir.

18  **Q.**   All right.  So when you would go visit him, the wife

19  typically wasn't there?

20  **A.**   I don't recall whether she was there the majority of the

21  time or not.  I'm not sure.

22  **Q.**   Were there times you would go over and visit Joe and you

23  would ask him, "Hey, can I use your wife's computer?"

24  **A.**   No.

25  **Q.**   You never used his wife's computer, laptop?

TATUM - CROSS / CEBALLOS

1   A.   Not that I recall, no.

2   Q.   When did -- when do you say that he joined you in this

3   scheme to extort people of their marijuana?  When did he join

4   you?

5   A.   In December of '17.

6   Q.   That was the first time?

7   A.   Yes, sir.

8   Q.   And how did that come about?  Well, whose idea was it?

9   A.   Both of our ideas.

10  Q.   Well, someone had to bring it up first.

11  A.   Yes, sir.

12  Q.   Who was it?

13  A.   I had already been doing it, and we discussed it jokingly

14  because Joe knew that Billy was involved with marijuana, and a

15  joke turned into reality the more we talked about it.

16  Q.   So up until December 2017, my client had never

17  participated in any of these interdiction rip-offs?

18  A.   That's correct.  Yes, sir.

19  Q.   But you're saying he knew about it?

20  A.   No, I never said that.

21  Q.   Okay.  Did he?

22  A.   No, he did not.

23  Q.   All right.  So he's your closest friend.  You spent time

24  together, your wives hang out together, yet you keep this

25  secret to yourself?

**TATUM - CROSS / CEBALLOS**

1   **A.**   Yes, sir.

2   **Q.**   Why didn't you share it with him?  He's your close friend.

3   **A.**   I didn't start doing that -- it wasn't my intent when I

4   became a police officer doing that and I was embarrassed and

5   ashamed for what I was doing, and it just progressed and I got

6   more and more comfortable.  But I was ashamed to tell anybody,

7   so I didn't --

8   **Q.**   This --

9   **A.**   -- want him to look at me different.  I didn't want him to

10  get me in trouble.

11  **Q.**   But this is one of your closest friends.  You guys hang

12  out at work.  You hang out after work.  Your wives get

13  together.  Your daughters talk to each other.

14      Why at some point did you keep this secret from him and

15  say, "Hey, I got a great way to make money"?

16  **A.**   Why -- why?

17  **Q.**   Why didn't you invite him?  Why did you keep it to

18  yourself?

19  **A.**   Because I cared for him.  I didn't want him to get in

20  trouble.  I -- I was so far down the rabbit hole myself, I

21  didn't want to get him in trouble.  And I cared about him,

22  so --

23  **Q.**   So you cared about him, but when this idea came up in

24  December, "Let's go and do this," you don't say, "Stop.  I

25  don't want you involved because I care about you"?

**TATUM - CROSS / CEBALLOS**

1    **A.**    Correct.  I did not.

2    **Q.**    So you stopped caring about him in December 2017?

3    **A.**    No.  That's not true.

4    **Q.**    Then why did you let him in?  After all this time had

5    elapsed, why did you let him join you in doing these rip-offs?

6    **A.**    Because we both brought it up and we discussed it and it

7    was -- it wasn't something that I presented to him, it was us

8    talking and discussing about it and making a decision, not like

9    my -- my, "Hey, come along and let's get in trouble and rob

10    people."

11    **Q.**    In fact, you stated that it wasn't you that brought up the

12    idea, that it was my client that brought up the idea first; is

13    that correct?

14    **A.**    Yes, sir.

15    **Q.**    Okay.  And when he brought up the idea for the first time,

16    did you then say, "Hey, what a great idea.  Guess what?  I've

17    been doing it for the past two years.  I'll show you how it's

18    done"?

19    **A.**    No.

20    **Q.**    Well, when he brought up the idea, did you tell him, "I've

21    been doing it for the past two years, buddy.  I just didn't

22    want to tell you"?

23    **A.**    No, I did not.

24    **Q.**    Well, how did that come about?  When he brought it up, how

25    did it come about?

TATUM - CROSS / CEBALLOS

1  **A.**   We had several conversations jokingly, having drinks, just

2  joking around about it.

3  **Q.**   You were joking about ripping off people?

4  **A.**   Yeah.

5  **Q.**   Really?

6  **A.**   Yes, sir.

7       We didn't joke about "ripping off people."  We didn't use

8  that language.

9  **Q.**   That's what you were doing?

10  **A.**   Yes, sir, but --

11  **Q.**   All right.  So you're joking about it.  What you're

12  telling us is you're joking about robbing people, extorting

13  people?

14  **A.**   No.  I'm not saying that.

15  **Q.**   What are you saying?

16  **A.**   That it was more of a casual like, "We could do this.

17  It's possible.  We know that Billy sells marijuana," that type

18  of conversation.

19  **Q.**   So it's just a regular conversation over a beer or two,

20  it's like, "Listen, this is what we can do"; is that what

21  you're telling us?

22  **A.**   No, it's not what -- I wasn't, like, "Listen, this is what

23  we can do."  We had a conversation about it back and forth like

24  "Hey, we wouldn't wear -- we wouldn't bring our body cameras.

25  We could do this.  We wouldn't wear anything that would

**TATUM - CROSS / CEBALLOS**

1   identify us as cops with Rohnert Park," you know, how you would

2   get away with it.

3   Q.   Well, when you told him for the first time that you had

4   been doing this, what was his reaction?

5   A.   I never told him.

6   Q.   You never told him.  After he brought up this idea and

7   you're joking about doing this in December, you never told him

8   you had been doing it?

9   A.   I never told him, no, sir.

10  Q.   Why not?  Why did you keep that from him?

11  A.   I was ashamed and embarrassed and he was my close friend.

12  I didn't -- I didn't want him to look at me different or get me

13  in, you know, get me in trouble or, you know, not be friends

14  with me.  I was ashamed of what I did.

15  Q.   Wait a minute.  Wait, you're saying you're afraid he's

16  going to look at you in a different way when you're discussing

17  going out and robbing people?

18  A.   Yes, sir.  It was something that I did and not something

19  that him and I had done together.  So it hadn't happened yet,

20  so, of course, I was still embarrassed and ashamed of it.

21  Q.   You didn't do this with him, but did you do it with any

22  other officers?

23  A.   What do you mean?

24  Q.   Well, did you involve any -- excuse me.

25       Did you involve any of the other officers on the team in

TATUM - CROSS / CEBALLOS

1    your drug rip-offs?

2    **A.**    Oh, no.  No, sir.

3    **Q.**    Not at all?

4    **A.**    No, sir.

5    **Q.**    So let me go through it.  Officer Snodgrass, who is the

6    first member on your team, was he ever involved in any of your

7    drug rip-offs?

8    **A.**    No, sir.

9    **Q.**    Officer Snyder?

10   **A.**    No, sir.

11   **Q.**    Officer Miller?

12   **A.**    No, sir.

13   **Q.**    Officer Medina?

14   **A.**    No, sir.

15   **Q.**    Okay.  Do you recall, as a part of your plea, you

16   completed a signed plea agreement form; is that correct?

17   **A.**    Yes, sir.

18   **Q.**    And have you had an opportunity to review it?

19   **A.**    I have.

20   **Q.**    Do you recall in that plea form indicating that you had

21   committed several drug rip-offs with another officer?

22          **MR. FINE:**  Objection, Your Honor.  The document he's

23   referencing is not in evidence.

24          **THE COURT:**  Excuse me?

25          **MR. FINE:**  Objection.  The document he's reading from

**TATUM - CROSS / CEBALLOS**

 1    is not in evidence.

 2             **THE COURT:**  True.  All right.  Also the form of the

 3    question, again, is telling him something and just asking him

 4    if he remembers it.  So I'll sustain.

 5             **MR. CEBALLOS:**  I'll rephrase it.  Thank you, Your

 6    Honor.

 7             **THE COURT:**  That's fine.

 8    **BY MR. CEBALLOS:**

 9    **Q.**   Do you recall, in your plea agreement, referencing another

10    officer that you did these drug interdictions with?

11    **A.**   No, I do not.

12    **Q.**   You don't -- and you didn't refer him by name, but you

13    referred to him as Officer 1 and then Officer 2?

14    **A.**   No, sir.

15    **Q.**   Would it refresh your recollection to review that plea

16    agreement?

17    **A.**   Yes.

18             **MR. CEBALLOS:**  It's not an exhibit, so we're going to

19    have to mark it as an exhibit for the defense.

20             **THE COURT:**  You have a list that you provided recently

21    that has Exhibit B.

22             **MR. CEBALLOS:**  Yes.

23             **THE COURT:**  So do you have that as a document online?

24             **MR. CEBALLOS:**  Yes, we do.

25         If we could put that up, please.

1    THE COURT:  Again, when you say it, don't say that.

2    All right?  Because your investigator, unless he knows what

3    you're talking about -- and maybe you've got a code -- but I

4    don't, so I would prefer if you were not proposing to publish

5    it to the jury, that you say, "Can you put it up for the

6    witness, please."

7            MR. CEBALLOS:  Can you put it up for the witness,

8    please.

9            THE COURT:  Thank you.

10   BY MR. CEBALLOS:

11   Q.   Okay.  This is the first page of this plea agreement form?

12   A.   Yes, sir, I see that.

13   Q.   And this is the one that you signed on the last page?

14           THE COURT:  Go to the end and show him the signature.

15           THE WITNESS:  Yes, sir, that's my signature.

16   BY MR. CEBALLOS:

17   Q.   And in this plea agreement form, you indicated that --

18           THE COURT:  Well, there you go again.

19           MR. CEBALLOS:  I'm sorry.

20           THE COURT:  I'm just going to stop and, you know, kind

21   of interject myself.

22       These really should be your objections Mr. Fine, and

23   because you don't pick up on that microphone when you stand up,

24   and I understand you're trying to be polite, but in the

25   interest of audibility, you can stay where you are as long as

1    you can speak into the mic.  All right?

2            MR. FINE:  I will do that, Your Honor.  Thank you.

3            THE COURT:  All right.  Fine.

4    BY MR. CEBALLOS:

5    Q.   You indicated it would refresh your recollection to review

6    that -- this document; is that correct?

7    A.   Yes, I did.  Yes, sir.

8    Q.   All right.  Directing you to page 7.  It's going to be

9    line 18 through 27.  If you can review that.

10   A.   Yes, sir.  I do see that.

11   Q.   Okay.  So after reviewing it, does that refresh your

12   recollection that you had other officers assisting you in some

13   of these drug rip-offs?

14   A.   No, sir.

15   Q.   What -- does that refresh your recollection then?

16   A.   These dates and times and traffic stops were what the

17   Government reviewed as far as victims that I was responsible

18   for.  So I never told them who Officer 1 or 2 was.  I was

19   robbing people by myself.  The other officer was there.

20   Q.   Okay.  So there were times where you would go do an

21   interdiction, you and whoever officer would pull a vehicle

22   over, and you would take marijuana; is that correct?

23   A.   Yes.

24   Q.   So how was it the other officer wasn't involved?

25   A.   I don't know.

TATUM - CROSS / CEBALLOS

1   Q.   Well, so the officer was present when the marijuana was

2   taken; is that correct?

3   A.   Yes.

4   Q.   Okay.  So how was it that you did not involve that officer

5   in this scheme to rip off people?

6   A.   They didn't know about it, and I didn't tell them.

7   Q.   Okay.  Let's talk about how they didn't know about it.

8   A.   Okay.

9   Q.   Okay.  So you would conduct a traffic stop; correct?

10  A.   Yes, sir.

11  Q.   You'd find marijuana; correct?

12  A.   Yes, sir.

13  Q.   You'd seize the marijuana?

14  A.   Yes, sir.

15  Q.   Through whatever means, and then you would take that

16  marijuana; correct?

17  A.   Yes, sir.

18  Q.   And you would be the one that would book it into evidence;

19  correct, not the other officer?

20  A.   I don't recall.  We had so many cases, I don't recall who

21  booked what on each specific case.

22  Q.   Well, in these times that you took marijuana, that you

23  seized marijuana, did you ever take it to the station, book it

24  in evidence, and then take it back out to go sell to Timmins?

25  A.   Yes, sir.

TATUM - CROSS / CEBALLOS

1  Q.    Okay.  So on those occasions when you were planning to do

2  that, who would be the one to book the evidence in, you or the

3  other officer?

4  A.    It didn't matter.

5  Q.    So there were times you would be with other officers on

6  your team.  You would seize marijuana.  You would take it to

7  the station and book it; is that correct?

8  A.    Yes.  It would get booked at the station.

9  Q.    So -- and at some point you would then take the marijuana

10  after getting the destruction order?

11  A.    Yes.

12  Q.    And but instead of destroying it, you would take it to

13  your friend Timmins and sell it?

14  A.    Yes, sir.

15  Q.    All right.  Would there also be times where you didn't

16  bother taking the seized marijuana to the station?  You just

17  went directly to your buddy Timmins?

18  A.    I don't recall.

19  Q.    So there were a number of times you had somebody, another

20  officer with you, whether it be Snodgrass, Miller, Snyder, or

21  Medina, and they would be present and assisting you in seizing

22  marijuana from a driver; correct?

23  A.    Yes.

24  Q.    You would then take the marijuana to the station, book it

25  into evidence, either you or the other officer?

**TATUM - CROSS / CEBALLOS**

1   A.   Yes, sir.

2   Q.   You then get the order to destroy the evidence, either you

3   or the other officer?

4   A.   Yes, sir.

5   Q.   You would then take that marijuana and then sell it to

6   your friend Timmins?

7   A.   Yes, sir.

8   Q.   All without the other officer knowing?

9   A.   Prior to 2017, yes.

10  Q.   Okay.  So let's talk about this incident on

11  December 18, 2017.  You called my client up and said, "Hey,

12  since we have the go, let's go do an interdiction"; is that

13  correct?

14  A.   No.

15  Q.   How did that come about?  How did you arrange for him to

16  accompany you on that day?

17  A.   When you say accompany me?

18  Q.   You and my client went out on December 18 to go do

19  interdiction; is that correct?

20  A.   No.

21  Q.   You didn't go do interdiction with my client on

22  December 18?

23  A.   We went out to rob and steal marijuana from people.

24  Q.   Okay.  Well, you did it using your interdiction

25  techniques; is that correct?

TATUM - CROSS / CEBALLOS

1  A.   Yes, sir.

2  Q.   And one of the people you stopped was this individual

3  named Barron Lutz; is that correct?

4  A.   I don't remember the name of who we stopped.

5  Q.   This is the individual where the CHP arrived.

6  A.   I never -- I never got the guy's name.

7  Q.   Okay.  But do you recall the incident on December 18 where

8  the CHP arrived to check on you and my client?

9  A.   Yes, sir, I do.

10 Q.   All right.  And you recall how much marijuana you took

11 from that individual; is that correct?

12 A.   Yes.  Over -- right around 20 or 23 pounds.

13 Q.   All right.  And after you took the marijuana, what did you

14 do with it?

15 A.   I don't remember.

16 Q.   Well, did you take it back to the station and book it into

17 evidence?

18 A.   No.

19 Q.   Did you take it straight to your friend Billy Timmins?

20 A.   No.

21 Q.   So what did you do with it?

22 A.   I don't recall where we took it to.

23 Q.   After the traffic stop, where did you go next?

24 A.   Probably back out on the highway and continued to work.

25 Q.   Okay.  Did you first stop and drop off my client at his

**TATUM - CROSS / CEBALLOS**

1    house?

2    **A.**    I don't understand.

3    **Q.**    Well, were there times you would just pick up my client

4    from his house and then go do an interdiction?

5    **A.**    Yes.

6    **Q.**    All right.  On this occasion, did you pick him up at his

7    home prior to going out and do the interdiction?

8    **A.**    I don't recall who picked up the car on those days.

9    **Q.**    Who typically would pick up the car?

10    **A.**    It would depend.  I was living in Santa Rosa and Joe was

11    living in town.  So it would vary if he would grab the car and

12    pick me up on the way to Santa Rosa north.

13    **Q.**    Okay.  But on this particular date, you didn't drive to

14    your house after the stop; right?  You drove back to the

15    direction of Rohnert Park?

16    **A.**    I don't recall.

17    **Q.**    Okay.  How far is Rohnert Park from where this stop

18    occurred?

19    **A.**    40 miles.  40-plus miles.

20    **Q.**    At some point, though, you and my client parted ways after

21    the stop?

22    **A.**    Of course.  Yes, sir.

23    **Q.**    And you're still driving the undercover vehicle; correct?

24    **A.**    I don't remember who was -- we would rotate and switch so

25    I don't know who was driving at what times.

**TATUM - CROSS / CEBALLOS**

1    Q.    Would you park your personal vehicle there at the station?

2    A.    Would I park -- I don't know what you mean.

3    Q.    Well, when you would drive to the station, would you park

4    your personal vehicle at the station?

5    A.    Yeah.  If I was going to pick a vehicle up, I would, yeah.

6    Q.    Okay.  So is it probable on that date, if you dropped Joe

7    at his house, then you would then go to the station to drop off

8    the undercover vehicle and pick up your own?

9    A.    If I would have drove, yes.  I would have had to get home.

10    Q.    Okay.  And you would still have the marijuana with you; is

11    that correct?

12    A.    Yes.

13    Q.    You --

14    A.    Possibly.

15    Q.    You certainly didn't book it into evidence; is that

16    correct?

17    A.    That's correct.

18    Q.    Now, you do indicate at some point that my client booked

19    some marijuana into evidence, just not that -- not that

20    marijuana that was seized; is that correct?

21    A.    I boxed that marijuana in, yes.

22    Q.    You wrote that he collected it?

23    A.    Yes, sir.

24    Q.    Okay.  So when did you get the marijuana that you seized

25    from this individual to Billy Timmins?  Was it that same day or

**TATUM - CROSS / CEBALLOS**

1  was it the following day?

2  **A.**   I don't recall.

3  **Q.**   When you gave Mr. Timmins the marijuana, how soon

4  thereafter did you get the call from the Mendocino County

5  Sheriff's Department?

6  **A.**   I don't recall.

7  **Q.**   Well, was it within a couple of hours?

8  **A.**   No, it would have been days.

9  **Q.**   It would have been days?  All right.

10  **A.**   Yeah.

11  **Q.**   When did you take the marijuana that you booked into

12  evidence that you connected to that incident?

13  **A.**   I don't understand the question.

14  **Q.**   Well, you booked some evidence in the following day on the

15  19th; is that correct?

16  **A.**   Yes, sir.

17  **Q.**   Okay.  And what was that evidence supposed to represent?

18  **A.**   The marijuana that Joe and I took from the driver.

19  **Q.**   The day before, on the 18th?

20  **A.**   Yes.

21  **Q.**   Okay.  But it wasn't the marijuana; is that correct?

22  **A.**   It was not; correct.

23  **Q.**   Where did you get that marijuana?

24  **A.**   From the Conex box at the department.

25  **Q.**   So you went to the Conex box and took out some old

TATUM - CROSS / CEBALLOS

1    marijuana and put it in the -- these boxes?

2    A.    I believe I did.  Actually, I'm not -- I'm not sure.

3    Q.    Do you remember arriving to that station in your

4    personal -- personal vehicle and wearing a pair of shorts and

5    carrying the boxes into the property room?

6    A.    I slightly remember seeing a video at some point but I

7    don't -- I don't recall if it was on this date.

8              MR. CEBALLOS:  If we can put Exhibit 14, I believe.

9              THE OFFICIAL REPORTER:  1-4?

10             MR. CEBALLOS:  14, yes.  1-4.

11   BY MR. CEBALLOS:

12   Q.    Do you see that, Mr. Tatum?

13   A.    Yes, I do.

14   Q.    Okay.  Can you describe what it is?

15   A.    This is the chain of custody report from --

16   Q.    For this -- for this case?

17   A.    Yes.

18   Q.    All right.  And you recognize it how?

19   A.    By the case number and Joe and my's name.

20   Q.    And who actually inputted that name, "Collected by Joe

21   Huffaker"?

22   A.    I did.

23   Q.    He didn't do that himself, you did it?

24   A.    Correct.

25   Q.    And this indicates all the individuals that handled that

1   piece of evidence; is that correct?

2   **A.**   I'm not sure I know what you mean.

3   **Q.**   Well, let's talk about the first entry.  December 19,

4   2017, at 3:30 in the afternoon, that's your name?

5   **A.**   Yes, it is.

6   **Q.**   Jacy Tatum?

7   **A.**   Yup.

8   **Q.**   And it indicates "intake temporary locker"?

9   **A.**   Yes, sir.

10  **Q.**   What's that supposed to represent?

11  **A.**   That -- I don't know how the time could be because you --

12  you just open the locker and there's no timer on the locker,

13  you just lock.  You open it, it locks, and you put it in there.

14  So I'm not sure how the 3:31 is accurate.

15  **Q.**   Well, does that sound like the approximate time that you

16  booked this marijuana into the evidence locker room?

17  **A.**   Yes.

18  **Q.**   All right.  And that was the last time you handled it?

19  **A.**   Yes, sir.

20  **Q.**   Those other names on this document, who's Jim Cates?

21  **A.**   He's one of our property and evidence techs.

22  **Q.**   Looks like he handled it that same date four minutes after

23  you did; is that correct?

24  **A.**   Yes, sir.

25  **Q.**   And it shows that he removed it from the intake temporary

TATUM - CROSS / CEBALLOS

1    locker?

2    **A.**    Correct.

3    **Q.**    And he moved it where?

4    **A.**    The overflow Conex box.

5    **Q.**    All right.  Did he tell you or notify you that he was

6    doing that?

7    **A.**    I slightly remember talking to him that day.

8    **Q.**    Was that perhaps because the quantity, the size of the

9    marijuana, the weight, that it should be moved to the Conex box

10   instead of staying there in the locker?

11   **A.**    Yes.  Actually, he was injured.  I remember I carried it

12   for him.  He was injured during the time so I carried it out to

13   the Conex box for him.

14   **Q.**    Okay.  So you carried this both into the station, and then

15   from the station, into the Conex box?

16   **A.**    That is what I remember, yes, sir.

17   **Q.**    All right.  And then the next time someone touches this is

18   on February 27 of 2018, a Christine Palm.  Who is that?

19   **A.**    She's also one of the evidence techs.

20   **Q.**    And that indicates "Shelf 429 - Floor."  What does that

21   mean?

22   **A.**    I do not know.

23   **Q.**    Is that back in the property room?

24   **A.**    I'm not familiar with that.

25   **Q.**    All right.  Now, let's talk about your friend Billy

1    Timmins.

2              THE COURT:  This might be a good place to break, then.

3              MR. CEBALLOS:  Okay.

4              THE COURT:  Because if you're going to a new subject

5    and it's 2:30, so it will be about the time we would break,

6    unless it would be a problem for you.

7              MR. CEBALLOS:  No.  That's fine, Your Honor.

8              THE COURT:  Okay.  Then, ladies and gentlemen, we'll

9    take our midafternoon break.  Remember my admonition.  Come

10   back, please, at a quarter to 3:00.

11                   (The jury leaves the courtroom.)

12    (Proceedings were heard out of the presence of the jury.)

13             THE COURT:  Okay.  So we'll be in recess then unless

14   anybody has anything you need to take up.  No?

15             MR. CEBALLOS:  No.

16             THE COURT:  Okay.  Then we're in recess, 15 minutes.

17                   (Recess taken at 2:31 p.m.)

18                   (Proceedings resumed at 2:47 p.m.)

19    (Proceedings were heard out of the presence of the jury.)

20             THE COURTROOM DEPUTY:  Please come to order.

21             THE COURT:  Okay.  Apparently, we have a problem with

22   one of the monitors in the jury box, the last one.  But

23   Ms. Geiger has some kind of system she's got worked out with

24   the juror to test it and see if it's going to work.  And if it

25   doesn't, then she'll contact IT again.  All right.

**TATUM - CROSS / CEBALLOS**

1          (The jury enters the courtroom.)

2      (Proceedings were heard in the presence of the jury.)

3          **THE COURT:**  Okay.  So please be seated.

4          **THE COURTROOM DEPUTY:**  Please be seated.

5          **THE COURT:**  I understand from Ms. Geiger that one of

6   the monitors may not be working.

7      Mr. Jenkins, is that the one that's down by you?

8          **JUROR JENKINS:**  That is correct.

9          **THE COURT:**  He's nodding yes.

10     I think that, Ms. Geiger, you've asked him to just alert

11  you if nothing comes up on the screen?

12         **THE COURTROOM DEPUTY:**  Yes.

13         **THE COURT:**  And then we're going to stop briefly and

14  you'll go over there and see if you can do some kind of magic

15  with it.  And if that doesn't work, the best we're going to be

16  able to do is get the IT people here at the end of the day,

17  I guess, at this point because it's already 10 to 3:00.

18     Okay.  All right.  You're on again, Mr. Ceballos.

19         **MR. CEBALLOS:**  Thank you, Your Honor.

20  **BY MR. CEBALLOS:**

21  **Q.**   Mr. Tatum, I think before the break I was about to get

22  into your relationship with William Timmins.  I think we've

23  been referring to him as Billy, though.

24  **A.**   Yes, sir.

25  **Q.**   Okay.  And Billy has been a lifelong friend of yours; is

**TATUM - CROSS / CEBALLOS**

1    that correct?

2    **A.**    Yes, that's correct.

3    **Q.**    You've known him since you were little children?

4    **A.**    Correct.

5    **Q.**    And would you say that he's one of your closest, if not

6    closest friends?

7    **A.**    Was, yes, sir.

8    **Q.**    Was?

9    **A.**    Yes, sir.

10    **Q.**    All right.  And he at some point became the person that

11    you would take the marijuana you stole from people and he would

12    sell it for you?

13    **A.**    Yes, sir.

14    **Q.**    Why did you go to him?  Why did you know to go to him?

15    **A.**    He cultivated marijuana for a long time and knew that that

16    was his business, that he could get rid of marijuana.

17    **Q.**    You indicated before that you were take -- well, when did

18    you start with him?

19        When did you start taking the marijuana to him to sell?

20            **THE COURT:**  Could I stop you for a minute and

21    just ask, maybe have your investigator turn off the monitor if

22    you're not going to show the witness that exhibit because he's

23    scrolling through it, looking at it, but I'm -- it's kind of

24    distracting.

25            **MR. CEBALLOS:**  Thank you, Your Honor.

TATUM - CROSS / CEBALLOS

1      **THE COURT:**  Thank you.

2      **THE WITNESS:**  I'm sorry.  What was the question?

3  **BY MR. CEBALLOS:**

4  **Q.**   When did you start taking the marijuana to him to sell?

5  **A.**   The later part of '16, 2016.

6  **Q.**   So November?  December?

7  **A.**   I don't remember what month.

8  **Q.**   And prior to that, who were you taking the marijuana you

9  stole to sell?

10 **A.**   Uncle by marriage, guy named Joe Porcaro.

11 **Q.**   Okay.  And why did you take it to him?

12 **A.**   He -- we just had a conversation at it -- or conversation

13 about it.  He used to sell and move marijuana when he was

14 younger, and family parties and get togethers, you know, he

15 knew how busy we were at the department and he just approached

16 me and said, "Hey, if you ever want to get rid of some

17 marijuana, I can sell it."

18 **Q.**   Wait a minute.

19      He approached you, knowing you were a police officer, and

20 said, "If you have marijuana to sell, I can do it for you"?

21 **A.**   Yes, sir.  We were family.

22 **Q.**   Well, did he know you were in the marijuana business?

23 **A.**   What do you mean?

24 **Q.**   Well, did you used to cultivate marijuana while you were a

25 police officer?

TATUM - CROSS / CEBALLOS

1   A.   No.

2   Q.   So why would he know to come up to you and say, "If you

3   have marijuana to sell, bring it to me and I'll sell it"?

4   A.   I was getting awards, going all over training, we had

5   discussions at family get-togethers.  Sometimes I wouldn't be

6   at family get-togethers because I was working.  So he knew how

7   successful I was at interdiction.

8   Q.   Right.

9        There's a difference betweens interdiction and ripping off

10  people, though.  Would you agree?

11  A.   Correct.

12  Q.   Okay.  So one doesn't necessarily implicate the other, so

13  how did he know to go to you and say, "Listen, if you decide

14  not to turn in the marijuana you interdict, I'll sell it for

15  you instead"?

16  A.   I don't know.  I never asked him.

17  Q.   Did you ever present it to him and say, "Listen, can you

18  get rid of some marijuana if I steal it for you"?

19  A.   No.

20  Q.   Who brought up the idea?

21  A.   He brought it up to me.

22  Q.   All right.

23  A.   Yeah.

24  Q.   And when was that?

25  A.   In -- sometime in '16.

TATUM - CROSS / CEBALLOS

1    Q.    2016?

2    A.    Yes, sir.

3    Q.    All right.

4    A.    Approximately.

5    Q.    So who did you sell the marijuana to in 2015?

6    A.    I'm sorry.  That's when we ended.  That's when Billy and I

7    started in 2016.

8    Q.    All right.  Let's try to get the dates.  When did you

9    start selling or giving the marijuana you stole to Mr. Porcaro?

10   A.    In the beginning of '15, approximately.

11   Q.    Okay.  Now, was he the only person you dealt with up until

12   that point who would sell the marijuana that you stole?

13   A.    Yes.

14   Q.    And this relationship, this business relationship you had

15   with him lasted for how long?

16   A.    Until sometime in 2016.

17   Q.    So would you say a year and a half or more than a year and

18   a half?

19   A.    I'm not sure.

20   Q.    Well, would it be more than a year and a half or less?

21   A.    Approximately, yes, sir.

22   Q.    And what was your agreement or understanding in how you

23   would split the proceeds of the marijuana you stole?

24   A.    We both agreed that it was 50-50.

25   Q.    All right.  So how much marijuana did he sell for you?

**TATUM - CROSS / CEBALLOS**

1    **A.**    I don't remember.

2    **Q.**    Just give us an estimate.

3    **A.**    I don't remember.

4    **Q.**    Okay.  Would it be over a hundred pounds?

5    **A.**    I don't remember.

6    **Q.**    Would it be over 500 pounds?

7    **A.**    I don't remember, sir.

8    **Q.**    How much money did you make off him?

9    **A.**    A little under 150,000.

10   **Q.**    Okay.  So marijuana was going for approximately what, how

11   much a pound?

12   **A.**    It varied.

13   **Q.**    Give us a range.

14   **A.**    It varied, indoor prices, outdoor prices.  That was

15   nine years ago.

16   **Q.**    All right.  So back then, how much were Porcaro selling

17   the marijuana you stole? [sic]

18   **A.**    I don't recall.

19   **Q.**    Well, what was the low end?  Was it a thousand dollars a

20   pound?

21   **A.**    I don't recall the price, sir.

22   **Q.**    You don't recall what the price of marijuana was back in

23   2017, when you were in charge of the marijuana interdiction

24   team?

25   **A.**    As I said, there was indoor prices, outdoor prices, light

TATUM - CROSS / CEBALLOS

1    depth, so many different varieties, strains.  There was a

2    ballpark of prices that marijuana went for.

3    Q.   But you knew what you were stealing; right?  You were very

4    particular about what kind of marijuana you seized?

5    A.   No.

6    Q.   When you would stop these drivers, would you inquire,

7    "What kind of strain of marijuana is this?"

8    A.   As part of our training to document in a legitimate report

9    we'd ask questions about their knowledge of cannabis and

10   marijuana.

11   Q.   And you knew that certain strains command a higher price;

12   is that correct?

13   A.   Yes, sir, most definitely.

14   Q.   And sometimes that can be as much as $2-, $3,000 a pound?

15   A.   Yes.

16   Q.   All right.  And some of the marijuana you seized was of

17   this high-quality nature; would you agree?

18   A.   Yes.

19   Q.   All right.  And that, in fact, is the type of marijuana

20   you looked to seize from drivers; is that correct?  Because it

21   meant more money for you?

22   A.   I mean, just marijuana in general.  But obviously, if it

23   was higher quality, yes, I would be more interested in that.

24   Q.   Okay.  And even the lower quality of marijuana, it would

25   still get you some money; correct?

**TATUM - CROSS / CEBALLOS**

1  A.    Yes, sir.

2  Q.    Maybe on the low end, a thousand dollars a pound; is that

3  correct?

4  A.    I don't recall the prices back then, so I can't say if it

5  was worth a thousand or less.

6  Q.    So the $150,000 you got from Mr. Porcaro, would that

7  represent at least 3- to 400 pounds of marijuana, more or less?

8  A.    I don't know.

9  Q.    How many deliveries had you made to Mr. Porcaro,

10  approximately?

11  A.    I don't recall how many.

12  Q.    And you said this relationship ended when?

13  A.    In 2016.

14  Q.    And why did it end?

15  A.    Just bad blood over prices, and we just didn't get along.

16  He's kind of a crazy, different guy, and we just went our

17  separate ways.

18  Q.    He never really liked you, did he?

19  A.    What do you mean?

20  Q.    Well, you're married to -- or, rather, your wife is his

21  uncle? [sic]

22  A.    Correct.

23  Q.    Okay.  So did you always get along with him?

24  A.    We did, yes, sir.

25  Q.    Up until this time that you broke off the relationship.

**TATUM - CROSS / CEBALLOS**

1   You broke it off, not him?

2   **A.**   It was mutual, I'd say.

3   **Q.**   So your friend Mr. Timmins -- or Billy -- who you knew was

4   involved in the marijuana business, your close friend, why

5   didn't you take the marijuana to him in the first place instead

6   of Mr. Porcaro?

7   **A.**   Because everything was working fine.  I -- why -- why

8   change or switch something up that was working fine?

9   **Q.**   I'm not asking about working fine, but Mr. Timmins is your

10   best friend, your best -- your close friend.  Why wasn't he the

11   first one you went to since he's your best friend and say,

12   "Hey, I need you to sell this marijuana"?

13   **A.**   I don't know.

14   **Q.**   You want to help your friends, wouldn't you?

15   **A.**   That's kind of a vague question.  I'm not sure what you

16   mean.

17   **Q.**   What's vague about wanting to help your friends?

18   **A.**   In what respect?

19   **Q.**   Well, making him money.  You steal the marijuana.  He

20   sells it.  You split the proceeds.  He makes money.

21   **A.**   Correct.

22   **Q.**   That's helping your friend, isn't it?

23   **A.**   It's involving him with criminal activity, so it's not

24   that much help.  It's kind of both.

25   **Q.**   Oh, so the reason why you didn't get him involved is

1  because you did not want to get him involved in criminal

2  activity; is that what you're telling us?

3  **A.**    No.

4  **Q.**    What are you telling us?

5  **A.**    What I originally told you was that everything was working

6  fine and that opportunity didn't present itself.

7  **Q.**    That opportunity did not present itself.

8        You're saying the opportunity to sell the marijuana

9  through your friend, through your best friend Timmins, did not

10 present itself; is that what you're saying?

11 **A.**    Yes, sir.

12 **Q.**    How does it have to present itself?

13 **A.**    What do you mean?

14 **Q.**    Well, how much effort would it have taken you to pick up

15 the phone or drive over to Mr. Timmins' house and say, "Hey, I

16 just stole a load of marijuana.  Can you sell it for me?"

17 **A.**    Not much effort at all.

18 **Q.**    So why didn't you do that in the first place?

19 **A.**    Because it didn't work out that way.

20 **Q.**    What's to work out?

21 **A.**    It didn't happen that way, so how can I expect --

22 **Q.**    What I'm asking is why didn't it happen that way?

23 **A.**    That is like asking me why didn't it rain today.

24 **Q.**    No, no.

25 **A.**    I don't know.  It didn't happen.

TATUM - CROSS / CEBALLOS

1   Q.   That's not what I'm asking, sir.  All right.  Mr. Tatum,

2   listen.  This is your best friend, your best buddy since

3   childhood.  You want to help him out; right?  Right?

4   A.   You asked me that question and I said --

5   Q.   I'm asking you again.

6   A.   Helping somebody out and getting them involved in my

7   criminal activity is not something I was proud of, so...

8   Q.   Well, Mr. Timmins was already involved in criminal

9   activity.  He was cultivating marijuana.

10  A.   He was.

11  Q.   So you weren't getting him involved in any more trouble

12  than he already was?

13  A.   He wasn't in trouble for cultivating.

14  Q.   He could have been; right?

15  A.   I don't know.

16  Q.   What do you mean you don't know?  You're a police officer.

17   What do you mean you don't know?

18  A.   You asked if he could have got in trouble?

19  Q.   Yes.

20  A.   Yes.

21  Q.   All right.

22  A.   Yes, he could have got in trouble.

23  Q.   So making that extra effort to help your friend by having

24  him sell the marijuana you stole wasn't really going to get him

25  in any more trouble than he already was in?

TATUM - CROSS / CEBALLOS

1    A.    He wasn't in trouble.

2    Q.    All right.

3          When did you -- after you stole the marijuana on

4    December 18, when did you take that marijuana to Mr. Timmins,

5    Billy?

6    A.    I don't recall.  At some point.

7    Q.    Well, was it a week later, a day later?

8    A.    It would have been prior to getting a phone call -- prior

9    to getting the phone call from the Mendocino task force guys.

10          MR. CEBALLOS:  All right.  Can we put up Exhibit 169,

11   please.

12          THE COURT:  Pardon me?  Which one?

13          MR. CEBALLOS:  169. I'm sorry.

14   BY MR. CEBALLOS:

15   Q.    As he's getting that, I'm going to ask you some questions.

16          Do you remember on direct the prosecutor going over your

17   phone records?

18   A.    I do.

19   Q.    Or asking you about different phone calls during this

20   particular time period; is that correct?

21   A.    Yes, sir.

22   Q.    And --

23          THE COURT:  Is that up on the screen for everyone?  It

24   is an admitted exhibit.

25          MR. CEBALLOS:  I believe so.

1          **THE COURT:**  All right.  Then can we find out from --

2    thumbs-up.  All right.  It's back working again.  Thank you.

3    **BY MR. CEBALLOS:**

4    **Q.**   Now, the Government here just showed you the call records;

5    right?

6    **A.**   Yes, sir.

7    **Q.**   They didn't show you your text messages, did they?

8    **A.**   They did not.

9    **Q.**   Okay.  And is it fair to say that you -- in addition to

10   making calls, you did text as well?

11   **A.**   Correct, yes, sir.

12   **Q.**   And so there are times that you wouldn't call your friend

13   Billy.  You would text him?

14   **A.**   Correct.

15   **Q.**   Saying, "Hey, I'm on my way.  I've got some marijuana I

16   need you to sell"?

17   **A.**   No, I wouldn't say that.

18   **Q.**   What would you say?

19   **A.**   I'd be more tactful and, "Hey, I'm on my way to see you,"

20   or, "I'm going to come by and have a beer," or, "Are you

21   around?"  Something like that.

22   **Q.**   And you're saying you want to be more tactful.  You just

23   didn't want to leave a -- an evidence trail, if you will?

24   **A.**   Correct.

25   **Q.**   Okay.  Because you know we can get your text messages; is

TATUM - CROSS / CEBALLOS

1    that right?

2    **A.**    Correct.

3    **Q.**    All right.  So you would use some sort of code?

4    **A.**    Yes.

5    **Q.**    And what was the code you would use with your friend Billy

6    when you told him, "Hey, I've got some marijuana I need to

7    sell"?

8    **A.**    I think we used paint, like either gallons of paint, or

9    pounds of meat, pounds.  I think.

10    **Q.**    So you would, I don't know, text "Hey, Billy, I've got

11    40 pounds of meat I need you to get rid of"?

12    **A.**    I think it was more paint.

13    **Q.**    Okay.  Paint?

14    **A.**    Yeah.

15    **Q.**    So, "40 gallons of paint I need you to sell"?

16    **A.**    I don't remember putting amounts.  I may have but I don't

17    remember if I put amounts in there or not.

18    **Q.**    Okay.  But "paint" was the code word for marijuana?

19    **A.**    We used that at some point, yes.

20    **Q.**    These phone records that you were shown by Mr. Fine, they

21    don't show that there were any calls between you and

22    Mr. Timmins the day before; is that correct, when you were

23    reviewing them?

24    **A.**    The day before?

25    **Q.**    The day before you went to go take the marijuana that you

TATUM - CROSS / CEBALLOS

1  had stolen?

2  **A.**    I don't recall if there was or not.

3  **Q.**    All right.  Do you recall if you called him the day that

4  you drove the marijuana to him?

5  **A.**    I don't know.

6  **Q.**    Is it possible you texted him?

7  **A.**    Yes.

8  **Q.**    All right.  And when did you get this call from the

9  Mendocino sheriffs, approximately?

10  **A.**    The 19th of December.

11  **Q.**    What time?  Morning?  Afternoon?

12  **A.**    Early.  Earlier afternoon, if I remember correctly.

13  **Q.**    Okay.  And at the time you got that phone call, you had

14  already delivered the marijuana to Mr. Timmins; is that

15  correct?

16  **A.**    Yes, I believe so.

17  **Q.**    And that's what caused you to panic a little bit; right?

18  **A.**    Yes.

19  **Q.**    Okay.  Because now, you don't have it with you, and you're

20  getting this call, you've got to figure out a way out of this?

21  **A.**    Correct.

22  **Q.**    All right.  So what do you do?  When you get that call,

23  what do you do?

24  **A.**    What do you mean what do I do?

25  **Q.**    Well, you get the call from the sheriff's department

TATUM - CROSS / CEBALLOS

1    inquiring about this traffic stop and the seized marijuana.

2    What's your next step?

3    **A.**    I went down to the department, or probably called -- I

4    called Billy at some point that day.

5    **Q.**    Why would you call him?

6    **A.**    To let him know what was going on.

7    **Q.**    Why would you need to let him know what was going on?

8    **A.**    Because he was involved.

9    **Q.**    Well, did you call him to see if he still had the

10   marijuana?

11   **A.**    I don't know if I asked him that or not.

12   **Q.**    At some point did you learn from him that he no longer had

13   the marijuana that you delivered to him?

14   **A.**    Yes, I did.

15   **Q.**    Okay.  And is that the reason why you decided, well, I've

16   got to go find some other marijuana?

17   **A.**    Correct.

18   **Q.**    Okay.  And you don't recall where you got this marijuana

19   that you eventually booked into evidence?

20   **A.**    I don't.

21   **Q.**    Okay.  It could have been marijuana that was in the Conex

22   book -- Conex box?  Sorry.

23   **A.**    It could have.

24   **Q.**    Or it could have been from where?

25   **A.**    From Billy's.

TATUM - CROSS / CEBALLOS

1    Q.    Okay.  So it's possible you either called Billy after you

2    got the phone call from the sheriff's department.

3          Did you drive down to his house?

4    A.    To Billy's house?

5    Q.    Yeah.

6    A.    Yes.

7    Q.    And where does he live?

8    A.    He was living in Rohnert Park at that time.

9    Q.    Where is that location in relationship to Rohnert Park?

10   Or it's in Rohnert Park?

11   A.    Yes, sir.

12   Q.    Okay.  So it's very close to the station then?

13   A.    Yes.

14   Q.    All right.  So you went to Billy's house to inquire if he

15   still had the marijuana?

16   A.    Yes.

17   Q.    And he didn't have it?

18   A.    He did not.

19   Q.    So you had to find a substitute?

20   A.    Correct.

21   Q.    And fortunately for you, and for him, he had some

22   marijuana lying about?

23   A.    Yes.  I believe so.

24   Q.    And so you took -- how -- did you just estimate 20,

25   30 pounds of marijuana?

TATUM - CROSS / CEBALLOS

1    A.    Yes, sir.

2    Q.    Okay.  And did he have these boxes lying around or where

3    did these boxes come from?

4    A.    He did.

5    Q.    So you went ahead and took -- what? -- approximately

6    15 pounds of marijuana and put it in each of these two boxes?

7    A.    Correct.

8    Q.    And what else did you do?

9    A.    Drove them to the station.

10   Q.    Okay.  And these are the boxes that you eventually booked

11   into evidence?

12   A.    Yes.

13   Q.    All right.  And then at some point you even moved it from

14   the regular locker into the Conex box?

15   A.    Correct.  Yes.

16   Q.    And what -- the marijuana that you seized from the driver,

17   how was that packaged in any way different from the marijuana

18   that you actually booked into evidence?

19   A.    The marijuana we stole was in plastic bags and the

20   marijuana that I booked in was just loose bud marijuana, no

21   plastic bags, just in the cardboard box.

22   Q.    When you went to Mr. Timmins to see if he still had the

23   marijuana, he obviously didn't have it; correct?

24   A.    He did not, no, sir.

25   Q.    So he sold it that quickly?

TATUM - CROSS / CEBALLOS

1  **A.**   I don't know if he already sold it.  I knew it wasn't

2  there.

3  **Q.**   Well, did he give you any money?

4  **A.**   No.

5  **Q.**   When did you eventually get money from him?

6  **A.**   I don't recall.

7  **Q.**   Well, do you remember if it was later in the week?  A

8  couple of weeks after that?  How long did it take for him to

9  give you your share of the money?

10  **A.**   I remember it being more than a couple of weeks.

11  **Q.**   So even though he got rid of the marijuana the same day

12  you delivered it, it took him two weeks to pay you off?

13  **A.**   As I said, I didn't know if it was gone.  It just wasn't

14  there.  And sometimes it took a long time for him to get paid,

15  for me to get paid.  So it wasn't uncommon that it could take a

16  long time for him to get paid.

17  **Q.**   Well, where was it if it wasn't there at Mr. Timmins'

18  house?

19  **A.**   He would have given it to somebody -- or actually, I don't

20  know.  I can't guess.

21  **Q.**   You didn't ask him?

22  **A.**   Not that I remember, no.

23  **Q.**   When you spoke to the sheriff's department, that's when

24  you indicated you then -- well, what did you do afterwards?

25  **A.**   I believe I called Billy, and then drove down to

TATUM - CROSS / CEBALLOS

1    Rohnert Park.

2    **Q.**    Okay.  And then after you booked the evidence in, what was

3    the next thing you did?

4    **A.**    I called Joe at some point during that day.

5    **Q.**    You were still there at Rohnert Park at the station when

6    you did that?

7    **A.**    I don't recall.

8    **Q.**    Do you recall when you contacted or when you called my

9    client?

10   **A.**    Sometime that day, but, no, not a time.

11   **Q.**    And when did you get this call from the FBI agent?

12   **A.**    When?

13   **Q.**    Yep.

14   **A.**    The 13th of February, okay.

15   **Q.**    Okay.  And was that a call you were expecting or was it a

16   surprise when you got the call?

17   **A.**    No, I wasn't expecting his phone call.

18   **Q.**    The deputy that interviewed you from Mendocino sheriff,

19   did he indicate that he was going to contact the FBI or if that

20   person had already contacted the FBI?

21   **A.**    There was some mention of the FBI, but I don't remember

22   the specifics.

23   **Q.**    Okay.  So when mention of the FBI came up, did that

24   concern you?

25   **A.**    Yeah.

TATUM - CROSS / CEBALLOS

1   Q.    And is that one of the reasons why you issued the press

2   release?

3   A.    Could you repeat that?

4   Q.    Well, let me back up.

5         The other reason why you issued the press release is

6   because you got a call from the sheriff; is that correct?

7   A.    Yes.

8   Q.    You would not have issued that press release had the

9   sheriff not called you directly?

10  A.    Correct.

11  Q.    Okay.  And the sheriff being Tom Allman?

12  A.    Yes, sir.

13  Q.    Okay.  How was -- was it that he had your phone number?

14  A.    I have no idea.

15  Q.    Had you ever met him before?

16  A.    No.

17  Q.    All right.  Try to take us back.  So you get this phone

18  call.  Do you recognize who it is when he calls you?

19  A.    The phone call from the sheriff?

20  Q.    Yes.

21  A.    No.

22  Q.    All right.  You get the call.  You say hello.

23        I'm assuming he identifies himself.

24  A.    He did.

25  Q.    Okay.  And then what happens then?

1   A.   He asked me if I knew why he was calling me.  And I told

2   him probably to do with the prior phone call I got from one of

3   his deputies about the traffic stop.  He went on to tell me

4   about that he's getting a lot of grief from the media, that

5   it's an election year, he doesn't need the bad publicity.  He

6   asked me to do him a favor by doing a press release and us

7   taking responsibility for -- or identifying, not taking

8   responsibility, but identifying that we were the ones that made

9   the traffic stop.

10       That was the gist of -- oh, I told him I had to ask and

11  get permission to do a press release.  So I don't know if I

12  ended up calling him back at some point and letting him know or

13  just sending it and forwarding it to him once it was done.

14  Q.   But after speaking to him, you called one of your

15  commanders; correct?

16  A.   Yes, Joe and I called him.

17  Q.   Okay.  Who did you call?

18  A.   Jeff Taylor.

19  Q.   Okay.  Who was your direct supervisor right at that time?

20  A.   Yes, he -- well, he was off on administrative leave

21  medically, so I was in the fire division so he wasn't my direct

22  supervisor.

23  Q.   Well, then, why did you call him if he's on -- on leave

24  and he's not your supervisor?

25  A.   Because he knows interdiction stuff and it's -- it's

TATUM - CROSS / CEBALLOS

1   easier to talk to somebody that knows about interdiction stuff

2   than have to talk to somebody else.

3   **Q.**   All right.  So you call him up, you tell him you get this

4   phone call from the sheriff who's asking for a favor to issue a

5   press release.

6        Is that the gist of it?

7   **A.**   Yes, sir.

8   **Q.**   And Commander Taylor says, "Sure, go ahead and do it"?

9   **A.**   Yes.

10  **Q.**   All right.  And so you begin preparing the press release;

11  is that correct?

12  **A.**   Yes, Joe and I did.

13  **Q.**   Okay.  In your internal affairs interview, do you recall

14  saying it was just you who prepared the press release?  You

15  never mentioned my client.

16  **A.**   I don't remember saying that.

17  **Q.**   Would it refresh your recollection to review your

18  transcript of that internal affairs statement?  Would it

19  refresh your recollection?

20  **A.**   Yes.

21  **Q.**   Okay.

22       **MR. CEBALLOS:**  Your Honor, if I just confer with my --

23            (Counsel and client conferring.)

24       **MR. CEBALLOS:**  If we can switch it on.

25       **THE COURT:**  Pardon me?

1          MR. CEBALLOS:  If we can go ahead and mark this as --

2          THE COURT:  So this is not on your list; correct?

3          MR. CEBALLOS:  It is not, Your Honor.

4          THE COURT:  So this is a transcript from internal

5   affairs?

6          MR. CEBALLOS:  Yes, dated --

7          THE COURT:  It doesn't really matter.

8          MR. FINE:  -- March 22, 2018.

9          THE COURT:  March what?  March what?

10         MR. CEBALLOS:  22nd.

11         THE COURT:  22?

12         MR. CEBALLOS:  Yes.

13         THE COURT:  2018.

14         MR. CEBALLOS:  I've just been told it was Defense C.

15         THE COURT:  All right.  Fine.  What do you want to do

16   with that, just show it to him?

17         MR. CEBALLOS:  Yes, Your Honor.

18         THE COURT:  All right.  It's just being shown to the

19   witness.

20      And what part do you want him to look at?

21         MR. CEBALLOS:  The part that's highlighted.  I'm

22   sorry.  This is the wrong one.  This is the wrong transcript --

23   or wrong page.

24         THE COURT:  So that's not what you want?

25         MR. CEBALLOS:  No, this is different.  My apologies,

TATUM - CROSS / CEBALLOS

 1   Your Honor.

 2           **THE COURT:**  There are several exhibits listed on your

 3   list.

 4           **MR. CEBALLOS:**  This is -- we do have the correct one.

 5           **THE COURT:**  Is Exhibit C what you did want to show the

 6   witness?

 7           **MR. EASTER:**  It's Defense E, as in Edward.

 8           **THE COURT:**  E as in Edward?

 9           **MR. EASTER:**  Yes, Your Honor.

10           **THE COURT:**  Also of that same date, different page.

11   All right.

12   **BY MR. CEBALLOS:**

13   **Q.**   Mr. Tatum, if you can review that and see if it refreshes

14   your recollection.

15   **A.**   It does.

16   **Q.**   Okay.  So according to this --

17           **THE COURT:**  You can't say that.  I don't know how many

18   times I've tried to point this out.  If you want to ask him the

19   question again, now, his recollection apparently refreshed, and

20   then hopefully he can give you an answer.

21   **BY MR. CEBALLOS:**

22   **Q.**   Now that your recollection is refreshed, do you recall

23   saying in your --

24           **THE COURT:**  No, you can't say it that way.  In fact,

25   don't start any question with "Do you recall" or "Do you

1    remember."  Just ask questions.  When you start with "Do you

2    recall" or "Do you remember," you then fill in a blank with

3    some fact as if it's a given.  You can't do that.

4        If the witness can't recall, he'll tell you, "I don't

5    recall."  He is not concerned about telling you that.  So

6    just ask the question.

7        You could ask a leading question, "You told someone this,

8    didn't you?" and then see if he says, "Yes, I did," or "No, I

9    didn't."  You can say, "Did you tell someone something?"

10   Whatever you want to do, but don't start any question with "Do

11   you remember."

12               MR. CEBALLOS:  Yes, Your Honor.

13               THE COURT:  All right.  Now, try it again.  Okay.

14   BY MR. CEBALLOS:

15   Q.   What did you tell the IA investigator, Mr. Simpson?

16   A.   It says --

17               THE COURT:  Don't say what it says.  Do you remember

18   what --

19               THE WITNESS:  No, I don't.  I don't remember.

20               THE COURT:  All right.  Okay.

21   BY MR. CEBALLOS:

22   Q.   Did you tell the investigator that you drafted the press

23   release?

24   A.   I don't recall.

25   Q.   In reading this transcript, it doesn't refresh your

TATUM - CROSS / CEBALLOS

 1   recollection of what you said?

 2   **A.**   It's -- I don't recall.

 3            **THE COURT:**  Okay.  Now, you have a document here.

 4   What do you want to do with it?

 5            **MR. CEBALLOS:**  Mark it and admit it.

 6            **THE COURT:**  It's already marked.  It can't all be

 7   admitted.

 8            **MR. CEBALLOS:**  Publish, Your Honor.

 9            **THE COURT:**  No, what you can do is you can first offer

10   if you want something, and I'll see if there's an objection.

11            **MR. CEBALLOS:**  I'm offering it into evidence.

12            **THE COURT:**  What?  That one page?  Is it the whole

13   page, page 18?

14            **MR. CEBALLOS:**  No.  One page.

15            **THE COURT:**  Exhibit E?

16            **MR. CEBALLOS:**  Yes.

17            **THE COURT:**  Now, that includes all manner of

18   commentary beyond, apparently, what you're looking for.  So I

19   have to see whatever the response is over there.

20            **MR. FINE:**  Your Honor, we would object.  This has

21   highlights in it.  There's lots of other stuff that are

22   unrelated to the questions that he's asking, so I think this

23   exhibit that's on the screen we would object to.

24            **THE COURT:**  Okay.  As far as any foundation for the

25   exhibit, do you have any agreement about that or not?

1          **MR. FINE:**  I believe we do have an agreement as to the

2   foundation for this --

3          **THE COURT:**  Okay.  Then it is what a purports to be,

4   essentially?

5          **MR. FINE:**  Yes, Your Honor.

6          **THE COURT:**  By the way, ladies and gentlemen, a

7   stipulation -- you've heard that a number of times, and I don't

8   know whether I've ever identified to term for you, but it's

9   just an agreement between the lawyers that something can be

10  either admitted or a particular fact is agreed upon.  That's

11  all it means.  It's just a legal word.

12      Okay.  So under the circumstances, because you at the

13  moment don't have anything that is edited, so to speak, and

14  doesn't include your highlights, why don't you just ask him if

15  the transcript does say and then read whatever it is.  All

16  right?

17          **MR. CEBALLOS:**  All right.

18          **THE COURT:**  And then you can figure out later if

19  there's some way to put it in.  Okay?

20  **BY MR. CEBALLOS:**

21  **Q.**  Mr. Tatum?

22  **A.**  Yes, sir.

23  **Q.**  Does the transcript say, "Regarding the press release, you

24  sent a copy to the sheriff?"

25      Your response is: "Yes, I did."

TATUM - CROSS / CEBALLOS

1    I -- yes.

2    "So I came in, drafted it, and texted the sheriff back."

3    **A.**    Yes, it does say that.  Yes, sir.

4    **Q.**    And that doesn't refresh your recollection that you

5    drafted it?

6    **A.**    It refreshes my recollection that I drafted some of it.

7    **Q.**    Well, you didn't say that, did you?

8    **A.**    No, I did not.

9    **Q.**    Okay.

10        **MR. FINE:**  Your Honor, we would ask that the next

11    sentence of the transcript be read in because it very much, I

12    think, clarifies the response.

13        **THE COURT:**  Which sentence?  So what does it start

14    with?

15        **MR. FINE:**  It's in the quotes, "Hey" --

16        **THE COURT:**  All right.  Thank you.  Just a minute.

17            (Pause in proceedings.)

18        **THE COURT:**  I don't -- I don't really get what it

19    means.  And you objecting to the readings since you wanted to

20    put the whole page in anyway?

21        **MR. CEBALLOS:**  I'll read it.

22        **THE COURT:**  All right.  After the part that says, "So

23    I came in, drafted it, texted the sheriff back."

24        **MR. CEBALLOS:**  (As read):

25            "Hey, we're in the process."  Period.  "Thank you

TATUM - CROSS / CEBALLOS

1    very much.  Thank you for reaching out to me."

2          THE COURT:  Yeah, it didn't say period.  You're --

3    that's the punctuation mark.

4          MR. CEBALLOS:  Yes.

5          THE COURT:  All right.

6          THE WITNESS:  Yes, that's what it says.

7    BY MR. CEBALLOS:

8    Q.   All right.  So you did not mention in that interview that

9    my client, Joe Huffaker, assisted you in preparing the press

10   release; is that correct?

11   A.   I didn't name him specifically, but I was referring to him

12   when I said, "We're in the process."  That's who I was

13   referring to.

14   Q.   Where is his name mentioned at all?

15   A.   It's not.  As I said, I didn't list him specifically.

16   Q.   So now you remember you're referring to him; correct?  Is

17   that what you're saying?

18   A.   I just -- I've always said I was referring to him when I

19   said "we're," that was the first time that I brought it up.

20   Q.   And where were you when you prepared the press release?

21   A.   At Joe's house.

22   Q.   Were you ever at the station?

23   A.   Yes.

24   Q.   Okay.  When was that?

25   A.   To be able to send it out and get my e-mail pulled up and

TATUM - CROSS / CEBALLOS

1  finish the rest of it.

2  Q.   So you couldn't finish preparing the press release at my

3  client's house?

4  A.   No.

5  Q.   You actually had to go to the station?

6  A.   To put it on a letterhead and fax it out, yes.

7  Q.   And did my client accompany you, or did you go by

8  yourself?

9  A.   I don't recall that.

10  Q.   Do you recall if you met Commander Taylor there?

11  A.   I don't recall.

12  Q.   Do you recall sharing it with Commander Taylor before you

13  actually issued it?

14  A.   I may have e-mailed it to him, but I don't remember if I

15  met with him in person or not.  I don't recall.

16  Q.   Did you e-mail it to him from my client's house or from

17  the station?

18  A.   I don't recall.

19  Q.   And once you got to the station, how long did it take you

20  to put it on the letterhead and officially issue it?

21  A.   I'm not sure.  I don't recall.

22  Q.   You don't recall?

23  A.   No, sir.

24  Q.   Okay.  After you issued the press release, what did you do

25  next?

TATUM - CROSS / CEBALLOS

```
 1    A.    I'm not -- I'm not sure.

 2    Q.    Well, did you go back to my client's house and tell him

 3    that you had finished issuing the press release?

 4    A.    I don't recall.

 5          MR. CEBALLOS:  Actually, could we put up Exhibit 149.

 6    And we don't have Bates here, but it's ending in 12254.

 7    BY MR. CEBALLOS:

 8    Q.    Mr. Tatum, this is a document you prepared prior to your

 9    internal affairs interview; correct?

10    A.    Correct, yes, sir.

11    Q.    And in this document, did you make reference to this press

12    release?

13    A.    I did.

14    Q.    And in this document, did you --

15          MR. FINE:  Objection, Your Honor.  We'd object again.

16    This document is not in evidence.

17          THE COURT:  Now, what's the objection, though, that

18    you're actually making?

19          MR. FINE:  Well, this document, Your Honor, is full of

20    hearsay, I think --

21          THE COURT:  Thank you.  Objection is hearsay.  What's

22    the exception?

23          MR. CEBALLOS:  Admissions.

24          THE COURT:  He's not a party.

25          MR. CEBALLOS:  Impeachment.
```

TATUM - CROSS / CEBALLOS

1            THE COURT:  So far he hasn't said anything to the

2    contrary, has he?

3            MR. CEBALLOS:  Well, I'm -- I'll ask him first.

4            THE COURT:  Well, that would help.

5            MR. CEBALLOS:  Okay.

6            THE COURT:  All right.

7    BY MR. CEBALLOS:

8    Q.   Mr. Tatum?

9    A.   Yes, sir.

10   Q.   In this document, did you indicate who drafted the press

11   release?

12           MR. FINE:  Objection.

13           THE COURT:  Excuse me.  Okay.  If you want to ask

14   him -- you're trying to find out whether he's agreeing that

15   some event occurred?

16           MR. CEBALLOS:  Yes.

17           THE COURT:  All right.  And what is the event you're

18   asking him as to whether it occurred or not?

19           MR. CEBALLOS:  Whether he indicated --

20           THE COURT:  No.  What he said before is hearsay unless

21   it fits into one of the accepted, written-down-in-the-rules-of-

22   evidence, exceptions.  All right?

23     A statement made out of court by a witness or anybody else

24   is hearsay.  It hasn't been tested with cross-examination,

25   whatever, and that's why it's not admissible.

1          Now, there are many exceptions, but you haven't identified

2    one yet.  You said impeachment, but he hasn't been asked the

3    question about did something happen.  Not what he said, that's

4    hearsay.  All right.

5          You want to put in something he said earlier as apparently

6    inconsistent with something you think he is about to say or has

7    said; correct?

8                    MR. CEBALLOS:  Yes.

9                    THE COURT:  All right.  Has he said it yet?

10                   MR. CEBALLOS:  I believe so, but I can ask him again.

11                   THE COURT:  Why don't you ask him again, just so we

12   know where you're coming from here.

13   BY MR. CEBALLOS:

14   Q.   Mr. Tatum, did you state --

15                   THE COURT:  No.

16   BY MR. CEBALLOS:

17   Q.   Did you --

18                   THE COURT:  That's the whole point.

19   BY MR. CEBALLOS:

20   Q.   Did you write the press release yourself?

21   A.   No, I did not.

22   Q.   Okay.  In this document --

23                   THE COURT:  All right.  So you think he said something

24   that was different?

25                   MR. CEBALLOS:  Yes.

TATUM - CROSS / CEBALLOS

1    THE COURT:  All right.  So you want to ask him in

2  whatever the notes were he wrote for himself, or what have you,

3  in preparation for this internal affairs investigation, did he

4  say something?

5    MR. CEBALLOS:  Yes.

6    THE COURT:  All right.  Fine.

7  BY MR. CEBALLOS:

8  Q.  Did you state that you wrote the report, drafted the press

9  release in this document?

10  A.  I did.

11  Q.  Okay.  And was that the truth?

12  A.  Partly.  I didn't say I was the only person, but I -- I

13  drafted part of it, yes.

14  Q.  Well, you do state you were the only person; is that

15  correct?

16    MR. FINE:  Objection, Your Honor.  That's not what it

17  says.

18    THE COURT:  Now, you can't object.  He's saying is

19  that what it says.  The witness is looking at the same

20  statement you are.  If he hasn't correctly described his

21  statement, the witness can say it's not correct.

22    THE WITNESS:  No, sir, it's not correct.

23  BY MR. CEBALLOS:

24  Q.  You did not mention my client in this statement, did you?

25  A.  I did not, no, sir.

TATUM - CROSS / CEBALLOS

1    Q.    All right.  Now, Mr. Tatum, how many times have you been

2    interviewed by the FBI?  Best guess.

3    A.    We met on several occasions.  We weren't -- I wasn't

4    really interviewed.  Several of those were just discussions,

5    reviewing documents.

6    Q.    The plea agreement that you eventually signed with the

7    Government was dated -- was dated December 1, 2021?

8    A.    Yes, sir, it was.

9    Q.    So it's fair to say that you met with him prior to signing

10   this plea agreement?

11   A.    Yes, sir.

12   Q.    And you went over it with them to make sure everything was

13   correct; is that --

14   A.    Yes, I did.

15   Q.    So when would be the time -- the next time after this date

16   that you met with the FBI?

17   A.    We met recently, prior to trial; but I don't recall over

18   the years if we met before then.

19   Q.    Now, in this plea agreement that you signed with the

20   Government in 2021, you never mentioned your friend Billy

21   Timmins; is that correct?

22   A.    That is correct.

23   Q.    So you weren't being completely truthful with the FBI when

24   you failed to include his name?

25   A.    That is correct.

TATUM - CROSS / CEBALLOS

1    Q.    And why did you fail to include his name?  Why did you

2    fail to tell them that?

3    A.    I thought I could protect a friend and his name never came

4    up and I tried to keep him out of it.

5    Q.    But you understood that was a lie?

6    A.    An omission.  I was never asked about him and I never

7    brought his name up.

8    Q.    The only name you brought up was Porcaro; is that correct?

9    A.    That's correct.

10   Q.    All right.  So you did bring up the name of somebody that

11   you were selling the marijuana to, you just left another name

12   out?

13   A.    That's correct, yes.

14   Q.    So that's a misrepresentation, wouldn't you agree?

15   A.    I'm not sure.

16   Q.    You're not sure?

17         You don't believe you were untruthful when you failed to

18   tell them and put in this plea agreement that Mr. Timmins, your

19   friend, was selling the marijuana that you stole?

20   A.    I believe I didn't include his name when I should have.

21   But as far as being truthful, when I was asked about him for

22   the first time, I was truthful and told the truth.

23   Q.    Okay.  So that first time that you actually mentioned

24   Timmins was back on September 14 of 2023; is that correct?

25   A.    I don't remember the date.  I'm not sure.

**TATUM - CROSS / CEBALLOS**

1  Q.    Well, it was a couple of years before you told the FBI

2  that Timmins was your go-to guy or your second go-to guy for

3  selling marijuana?

4  A.    Yes.

5  Q.    So you kept this secret to yourself for two years?

6  A.    I did.

7  Q.    And at that time, you were actually still talking to your

8  buddy, Billy Timmins; is that correct?

9  A.    Yes, that's correct.

10 Q.    You were still friends?

11 A.    Yes, we were.

12 Q.    You would speak regularly about your case?

13 A.    It was getting continued and continued so there wasn't a

14 lot to talk about.  Nothing changed over those two years except

15 continuances.

16 Q.    Well, at any point did your buddy tell you, "Hey, you

17 haven't given me up, have you, Jacy?"

18 A.    Oh, yeah.

19 Q.    You did?

20 A.    We talked about that a lot.

21 Q.    And up until then, you hadn't given his name up?

22 A.    That is correct.

23 Q.    Because you were trying to protect him?

24 A.    I was.

25 Q.    All right.  So what happened in September 2023 where you

TATUM - CROSS / CEBALLOS

1   said, "I'm going to give his name up"?

2   A.    I was questioned if he was associated with my crimes.

3   Q.    Who questioned you?

4   A.    My attorney.

5   Q.    Okay.  I don't want to talk about any communications

6   you've had with your attorney.

7   A.    Okay.

8   Q.    At some point did somebody from the FBI ask you about if

9   Timmins was involved?

10  A.    When my attorney and I came in and met with the FBI and I

11  told them that I was also selling marijuana to him.  And then

12  we started talking about it.

13  Q.    Did the FBI at that time tell you you needed to give them

14  more information about Mr. Timmins?

15  A.    I don't recall them asking for more information.  I

16  provided them with the information I had regarding Billy and

17  his involvement.

18  Q.    Well, why at that time did you decide to then tell the FBI

19  about Mr. Timmins?

20  A.    I remember looking at the phone logs with my attorney and

21  seeing his phone number in Hopland and putting the pieces

22  together that I was going to be questioned on who that number

23  was at some point.

24  Q.    I don't think that's what I asked you.

25        My question is:  What happened in September of 2023 where

TATUM - CROSS / CEBALLOS

1   you've decided, "I'm going to have to give up my friend Billy"?

2   **A.**   I don't recall.

3   **Q.**   Well, did the FBI say anything to you like, "Hey, we know

4   about your involvement with Mr. Timmins.  You need to come

5   clean"?

6   **A.**   I don't recall.

7   **Q.**   Did they say anything about, "You need to get someone to

8   corroborate your statement, your testimony"?

9   **A.**   No.  They never said that.

10  **Q.**   Okay.  So when they came to you and asked you about

11  Mr. Timmins, did they present any -- you with any information

12  that they already knew that he was involved?

13  **A.**   No.  My attorney reached out to them and we set the

14  meeting up and met with the FBI and I told them the

15  involvement.  Then they asked questions about that and details.

16  **Q.**   Okay.  But you made a conscious decision to, basically,

17  betray your friend; is that correct?

18  **A.**   I did, yes, sir.

19  **Q.**   And you did that why?

20  **A.**   Because you have to tell the truth at the end of the day.

21  And my family is my number-one priority.  And the facts were

22  going to come out through the phone log, and if I was lying, I

23  wouldn't get a deal, so I had to tell the truth.

24  **Q.**   You mentioned your family, that you're concerned for your

25  family; is that correct?

TATUM - CROSS / CEBALLOS

1    A.    That they're my priority, yes, sir.

2    Q.    When you interviewed with the FBI or when they questioned

3    you about Mr. Timmins, the FBI basically said, "Hey, give us

4    Timmins or we're going to go after your family"?

5    A.    No.   There was no -- my family was -- wasn't brought up

6    about the case.

7    Q.    Well, the money that you acquired, that you obtained

8    through this scheme of yours, this selling marijuana, or

9    stealing marijuana and selling it, you gave the money to your

10   family; is that correct?

11   A.    I did.

12   Q.    And why did you do that?

13   A.    Because I wanted to provide and take care of my family.

14   Q.    Well, you also wanted to try to hide it too; right?

15   A.    It was going in the bank.   I couldn't hide it.   It was

16   proof.   I mean, it was going in the bank.

17   Q.    You were depositing $400,000 cash into the bank?

18   A.    A little over 300,000, yes, sir.

19   Q.    Now, you know that every time you deposit over a certain

20   amount, $10,000, there's a record?

21   A.    I do, yes, sir.

22   Q.    Okay.   So would you ever deposit more than $10,000 at any

23   given time?

24   A.    No.

25   Q.    And why didn't you do that?

1    A.    To not have it flagged.

2    Q.    All right.  And one of the other ways to keep it from

3    being flagged is to give some of that cash to your family so

4    they can deposit it in their accounts, separate from yours?

5    A.    Correct, yes, sir.

6    Q.    And they did that?

7    A.    Yes, they did.

8    Q.    All right.  And the FBI knew they did that; right?

9    A.    Yes, sir.

10   Q.    Okay.  So to a certain extent, your family members were

11   also involved in this criminal enterprise; is that correct?

12   A.    They were.

13   Q.    So you were protecting them from also being prosecuted in

14   your mind?

15   A.    No.  Joe and I got indicted on the same day and my family

16   was never indicted, so my family was never brought up into

17   criminal prosecution or threatening criminal prosecution.

18   Q.    Well, you made a choice between your family and your

19   friend Timmins; is that correct?  You're going to give up your

20   friend Timmins over your family?

21   A.    As I just said, my family wasn't involved --

22   Q.    Your family was involved.

23   A.    Well, my whole answer was my family wasn't involved in the

24   criminal prosecution.  At the time when Mr. Timmins got brought

25   up, there wasn't a choice to make between my family and

1  Mr. Timmins as being --

2  Q.    But they could have been involved --

3  A.    As being prosecuted.

4  Q.    But your family could have been involved?

5  A.    No.

6  Q.    How do you know that?

7  A.    The FBI told me that they were not going to prosecute

8  them.

9  Q.    Oh.  So your family and the possibility of being

10  prosecuted did come up?

11  A.    That was in the beginning when we were indicted.

12  Q.    Okay.  So at some point, the FBI brought up the

13  possibility of prosecuting your family; is that correct?

14  A.    No, it's not correct.

15  Q.    You just said so.

16  A.    That they were not going to prosecuted.

17  Q.    Well, they were not going to be prosecuted because that's

18  what the FBI told you?

19  A.    Yes, sir.

20  Q.    Okay.  But that means your family was mentioned as a

21  possibility of being prosecuted?

22  A.    Past tense, that they could have been prosecuted, but they

23  were not going to be prosecuted.

24  Q.    Okay.  So great.

25        So the FBI told you, "We could prosecute your family but

TATUM - CROSS / CEBALLOS

1    we're not going to prosecute your family"?

2    **A.**    In the very beginning, yes, sir.

3    **Q.**    Okay.  Okay.

4        And the way to avoid your family being prosecuted is that

5    you go ahead and roll over on my client?

6    **A.**    We were both indicted the same day, sir.

7    **Q.**    Yeah.

8    **A.**    There wasn't any rolling over.

9    **Q.**    What are you doing now?

10   **A.**    Telling the truth.

11   **Q.**    According to you?

12   **A.**    Yes, sir.

13   **Q.**    But you didn't tell the truth when you signed your -- when

14   you signed your plea agreement and left out Timmins' name; is

15   that correct?

16   **A.**    I believe I answered that.

17   **Q.**    Well, I'm asking you again.

18   **A.**    When Mr. Timmins was brought up, I told the truth about

19   his involvement.

20   **Q.**    Yes, but you did not tell it on December 1 of 2021, when

21   you signed this plea agreement with the Government?

22   **A.**    That is correct, yes, sir.

23   **Q.**    So that was not the truth?

24   **A.**    I don't understand what --

25   **Q.**    So you kind of pick when and -- you're going to tell the

**TATUM - CROSS / CEBALLOS**

1  truth and when you're not going to tell the truth; is that

2  right?

3  **A.**    No, sir.

4         **MR. FINE:**  Objection, Your Honor.  Argumentative.

5         **THE COURT:**  Well, overruled.  He said no.

6  **BY MR. CEBALLOS:**

7  **Q.**    No?

8  **A.**    No, sir.

9  **Q.**    Okay.  When did you -- so you waited two years before you

10  told the truth about Timmins' involvement; is that correct?

11  **A.**    Yes, sir.

12  **Q.**    And at that point, was the FBI leaning on you to get

13  someone to corroborate your claim that my client was involved

14  in this?

15         **MR. FINE:**  Objection, Your Honor.  Asked and answered.

16         **THE COURT:**  Ordinarily, on cross-examination that

17  objection really won't fly.  I guess the only control is

18  possibly annoying people with continuing to ask the same

19  question.  I'm not sure this particular one was asked or

20  whether it applied to Timmins in the last inquiry.  In any

21  event, overruled.

22         **THE WITNESS:**  I'm sorry.  Could you --

23         **THE COURT:**  So what's the question?

24         **MR. CEBALLOS:**  Your Honor, can we have that read back?

25         **THE COURT:**  No.

TATUM - CROSS / CEBALLOS

1          MR. CEBALLOS:  No.  Sorry.

2          THE COURT:  Want me to give you a hint?

3          MR. CEBALLOS:  Yes, that would help, Your Honor.

4          THE COURT:  Well, I don't actually remember it exactly

5   either.  I don't want to misquote you.

6          MR. CEBALLOS:  It will come back to me, Your Honor.

7   BY MR. CEBALLOS:

8   Q.   After this interview with the FBI where you now mentioned

9   Timmins, what happened after that?

10  A.   That was it.  The case kept getting continued, and nothing

11  else really transpired that I remember.

12  Q.   Well, after you told the FBI about Timmins, did you go and

13  tell your buddy Timmins, say, "Hey, I'm sorry.  I had to tell

14  the FBI about you"?

15  A.   I did, yes, sir.

16  Q.   And when was that?

17  A.   I don't recall the date, but it would have been after I

18  told FBI.

19  Q.   So shortly after September of 2023?

20  A.   Yes, sir.

21  Q.   And do you remember how you told him?

22  A.   I do.

23  Q.   How?  What did you tell them?

24  A.   We met -- he had a doctor's appointment for his knees.  We

25  met at the Kaiser parking lot.  I got in his car, and we had a

TATUM - CROSS / CEBALLOS

1   heart-to-heart and I told him, "Hey, I had to give them your

2   name, there's phone records, and I'm sorry."

3   Q.   What was his reaction?

4   A.   He was upset.

5   Q.   Did he say anything to you?

6   A.   He did.

7   Q.   What did he say?

8   A.   That he didn't understand.  That he was worried about his

9   name.  He didn't understand why this case has taken so long and

10  it should have been done already.

11       He was frustrated and mad at me.

12  Q.   Did you also tell him something to the effect of -- you

13  referred to him as brother; right, or bro?

14  A.   Yeah, big bro.

15  Q.   Did you say something to the effect, "Hey, bro, I need

16  someone to corroborate me"?

17  A.   No.

18  Q.   You didn't tell him that the FBI needed another person

19  other than yourself to corroborate your statements?

20  A.   No, sir, I didn't.

21       THE COURT:  Your question that was objected to was:

22  Did the FBI tell you they needed someone to corroborate his

23  statements about your client?

24       MR. CEBALLOS:  Yes, yes.

25       THE COURT:  Okay.  That was the question you asked

TATUM - CROSS / CEBALLOS

```
 1   that he objected to.
 2           MR. CEBALLOS:  Oh.  Thank you.
 3           THE COURT:  Okay.
 4           MR. CEBALLOS:  Can we ask that --
 5           THE COURT:  You can ask it.
 6      And don't object again, Mr. Fine.  All right.  I'll just
 7   assume you are objecting.
 8           MR. CEBALLOS:  I'm sorry.  I didn't hear Your Honor
 9   about what my question was.  I missed it.
10           THE COURT:  You didn't hear it?
11           MR. CEBALLOS:  No.
12           THE COURT:  You asked him:  Did the FBI tell you they
13   needed someone to corroborate what you're saying about my
14   client -- about your client -- okay -- my client, yes, that
15   they needed somebody.
16           MR. CEBALLOS:  Thank you.
17           THE WITNESS:  No, sir.
18   BY MR. CEBALLOS:
19   Q.   Okay.  No?
20   A.   No, sir.
21   Q.   All right.  After you told Mr. Timmins that you gave his
22   name to the FBI, did you continue to speak with and stay on
23   friendly terms with him?
24   A.   That was the last time we ever spoke.
25   Q.   Well, how did it end up?  I mean, did he say, "That's it.
```

1    Our friendship is over.  We're never talking again"?

2    **A.**    He said he would get ahold of an attorney and he would

3    call me.  And that's the last thing we said to each other.  And

4    I've seen him in passing since, but we've never talked.

5    **Q.**    Including on the phone?

6    **A.**    On the phone, everything.

7    **Q.**    So the last time you've had any communication, any

8    dealings with him was way back in September of 2023?

9    **A.**    On a verbal level, yes.  I saw him in Ukiah at an MMA

10   fight that one of my friends was at, and he gave me a really

11   nasty look and we kept walking.

12   **Q.**    After this interview with the FBI in September 2023, your

13   next interview was June of this year, 2025?

14   **A.**    Yes, sir.  It wasn't really an interview.  We met to talk

15   about stuff.

16   **Q.**    And when was that?

17   **A.**    I'm sorry?

18   **Q.**    Approximately, when was that?

19   **A.**    We met three times over the last month, I believe.

20   **Q.**    You're speaking of recent?

21   **A.**    Yes, sir.

22   **Q.**    All right.  The first one would have been June 11 of 2025?

23   **A.**    Yes.

24   **Q.**    All right.  And was this in person, or was this over a

25   video link?

TATUM - CROSS / CEBALLOS

1   A.    In person.

2   Q.    And then was it a couple weeks later that you interviewed

3   with them again?

4   A.    Yes.  We met and had another discussion.

5   Q.    Okay.  And was it at that meeting that you then told him

6   about an incident where Mr. Huffaker and Mr. Timmins were

7   involved in an incident?

8   A.    What do you mean?

9   Q.    Well, you referenced an incident that occurred on

10  December 6 of 2017?

11  A.    Yes, sir.

12  Q.    And that incident, again, is what?

13  A.    That is the day that Mr. Timmins came up, and Joe and I

14  gave him weed.

15  Q.    Okay.  And that incident is not referenced in your plea

16  agreement; is that correct?

17  A.    That's correct.

18  Q.    Okay.  And you omitted that incident in your plea

19  agreement, that that occurred?

20  A.    I did.

21  Q.    Now, so you were untruthful?

22  A.    I was.

23  Q.    And how was it you recall this incident on December 6

24  of 2017?

25  A.    Because it was dramatic.  I mean, that was the first time

TATUM - CROSS / CEBALLOS

1   Billy and Joe and I were all committing the same crime

2   together.  And the text messages reminded me about that date.

3   I remember the weather.  I remember the exit.

4   Q.   Text messages between whom?

5   A.   The -- I'm sorry if I said text messages, phone calls,

6   that Billy continued to call my phone.

7   Q.   This -- just so it's clear, this is the first time you'd

8   ever mentioned it to anyone that my client was involved with

9   you and Mr. Timmins; is that correct?

10  A.   No, that's not correct.

11  Q.   When was the first time?

12  A.   It would have been in September when I first -- of '23

13  when I told the FBI about Mr. Timmins.  I told them how he was

14  involved and including how Joe was involved with meeting Billy

15  up there in Hopland.

16  Q.   And you told him back then it was on December 6 --

17       THE COURT:  Mr. Ceballos, after 4:00, so I want you to

18  find some appropriate place to break.  You want to ask the

19  question that I interrupted you on, that's fine and then a

20  couple more, but trying to find a logical place to --

21       MR. CEBALLOS:  No, this might be logical, Your Honor.

22       THE COURT:  You just want to stop --

23       MR. CEBALLOS:  Yes, I can do that.

24       THE COURT:  Do you have the next question in mind?

25  You're not going to forget that?

TATUM - CROSS / CEBALLOS

1        **MR. CEBALLOS:**  I have a number of questions in mind.

2        **THE COURT:**  All right.  Fine.

3     Okay.  Then, ladies and gentlemen, again, as the case goes

4  on and you've heard more and more and I know it's so tempting

5  to want to discuss it with somebody, please remember my full

6  admonition.  Thank you very much for your attention today.

7  We'll see you tomorrow, 9:00 a.m.  Okay.

8                  (The jury leaves the courtroom.)

9      (Proceedings were heard out of the presence of the jury.)

10       **THE COURT:**  You may step down, Mr. Tatum, and you're

11  ordered to come back tomorrow at 9:00.

12       **THE WITNESS:**  Yes, ma'am.

13                (End of Excerpt - 4:04 p.m.)

14               (Proceedings adjourned: 4:17 p.m.)

15                          ---o0o---

16                  **CERTIFICATE OF REPORTER**

17       I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19

20  DATE:   Saturday, September 27, 2025

21

22

23

24  _____
      Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                 Official Reporter, U.S. District Court

25