Pages 1 - 100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) **NO. 3:21-cr-00374-MMC-2** |
| | ) |
| JOSEPH HUFFAKER, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Wednesday, July 9, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

**(EXCERPT - BRENDON "JACY" TATUM and WILLIAM TIMMINS)**

<u>**APPEARANCES:**</u>

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        United States Attorney
                        1515 Clay Street
                        Oakland, California 94612
                BY:  **ABRAHAM H. FINE**
                        **BENJAMIN K. KLEINMAN**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        FERRONE LAW GROUP, APLC
                        4333 Park Terrace Drive - Suite 200
                        Westlake Village, California 91631
                BY:  **RICHARD CEBALLOS**
                        **ROBERT L. BAUMANN**
                        **ATTORNEYS AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
                Official Reporter, CSR No. 12219

1    **<u>APPEARANCES</u>:    (CONTINUED)**

2    Also Present:        Special Agent Duncan Haunold, FBI
                          Veronica Hernandez, Paralegal
3                          Michael Easter, Investigator

# **I N D E X**

Wednesday, July 9, 2025 - Volume

**GOVERNMENT'S WITNESSES**                                    **PAGE**   **VOL.**

**TATUM, BRENDON (RECALLED)**
(PREVIOUSLY SWORN)                                              4       0
Cross-Examination by Mr. Ceballos                              4       0
Redirect Examination by Mr. Fine                              38       0
Recross Examination by Mr. Ceballos                           46       0

**TIMMINS, WILLIAM**
(SWORN)                                                       47       0
Direct Examination by Mr. Kleinman                            47       0
Cross-Examination by Mr. Ceballos                             74       0
Redirect Examination by Mr. Kleinman                          96       0
Recross Examination by Mr. Ceballos                           99       0

| | |
|---|---|
| 1 | <u>**Wednesday - July 9, 2025**</u>                                        <u>**8:46 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | (Begin Excerpt - Tatum - 9:09 a.m.) |
| 5 | **THE COURT:**  In the meantime, I think we'll just keep |
| 6 | going for now and that would be Mr. Tatum back on the stand for |
| 7 | continued cross-examination.  Somebody should ask him to come |
| 8 | in. |
| 9 | (Brendon Tatum steps forward to resume the stand.) |
| 10 | **THE COURT:**  Okay.  Mr. Tatum, if you'd come back up to |
| 11 | the stand and be seated, please. |
| 12 | **THE WITNESS:**  Yes, ma'am. |
| 13 | <u>**BRENDON TATUM**</u>, |
| 14 | called as a witness for the Government, having been previously |
| 15 | duly sworn, testified further as follows: |
| 16 | **THE COURT:**  Okay.  And as I mentioned yesterday, you |
| 17 | remain under the oath that you took a couple of days ago. |
| 18 | **THE WITNESS:**  Yes, ma'am. |
| 19 | **THE COURT:**  Okay.  Please continue. |
| 20 | **MR. CEBALLOS:**  Thank you, Your Honor. |
| 21 | <u>**CROSS-EXAMINATION**</u> |
| 22 | BY MR. CEBALLOS: |
| 23 | **Q.**   Mr. Tatum, yesterday you told us that you had filed a |
| 24 | workers' comp claim against the City; is that correct? |
| 25 | **A.**   Yes, I believe I did. |

**TATUM - CROSS / CEBALLOS**

1  Q.  When was that?

2  A.  I don't recall the specific date.

3  Q.  Well, when did you leave the department?

4  A.  2018, I believe.

5  Q.  Okay.  And you left the department of your own accord, or

6  were you fired?

7  A.  I resigned.

8  Q.  You resigned?

9  A.  Yes, sir.

10  Q.  And did you file this workers' comp claim before you

11  resigned or after you resigned?

12  A.  After I resigned.

13  Q.  And you filed the claim for what?

14  A.  Stress related to the job.

15  Q.  The stress related to robbing people?

16  A.  No, sir.

17  Q.  Then what?

18  A.  I was in two police shootings during the time I was a

19  police officer and went through several other traumatic events

20  that changed my life.

21  Q.  But you also were under the stress that you were under

22  investigation; is that correct?

23  A.  Yes, sir.

24  Q.  But you didn't testify to that during the deposition;

25  correct?

1    **A.**    I don't remember if that was brought up or not.

2    **Q.**    You did, however, admit that you lied during that

3    deposition?

4    **A.**    I did, yes, sir.

5    **Q.**    Okay.  And, in fact, it wasn't just a lie.  You committed

6    perjury because it was under oath?

7    **A.**    Yes, sir.

8    **Q.**    And it's not the first time you've committed perjury; is

9    that correct?

10    **A.**    I'm not sure.

11    **Q.**    Well, you were placed on the DA's *Brady* list; is that

12    correct?

13              **MR. FINE:**  Objection, Your Honor.

14              **THE COURT:**  We've talked about this, Mr. Ceballos, and

15    I have a ruling regarding that that you apparently have

16    forgotten.

17       So we may have to send the jury out and discuss this matter

18    since I think I made that quite clear.

19       All right.  Ladies and gentlemen, please follow Ms. Geiger.

20                     (The jury leaves the courtroom.)

21       (Proceedings were heard out of the presence of the jury.)

22              **THE COURT:**  You stay up here, Mr. Tatum.

23              **THE WITNESS:**  Sorry, ma'am.

24              **THE COURT:**  I do not know yet what we're doing with

25    you.

1    I believe, that I had a ruling regarding the *Brady* list.

2    Mr. Ceballos is shaking your head.  You are incorrect if you're

3    shaking your head.  My ruling was you don't bring it up, and if

4    you believe that there's something relevant about being on the

5    *Brady* list, then you are going to have to take that up outside

6    the presence of the jury.  You tried to put this in and I told

7    you before, being on the *Brady* list is irrelevant.

8    If somebody is on somebody else's list, as some type of

9    heads up, if you will, for the DA's office, that there may be

10    cases where someone may have something about them that has to

11    be disclosed, then it is possible that there may be some

12    reputation evidence or something, but not coming from him,

13    coming from somebody in the DA's office, which I pointed out

14    very clearly would have to be somebody that knew, personally,

15    whatever facts there were that put him on the *Brady* list, or

16    that the *Brady* list is, in fact, some kind of reputational

17    thing about credibility in their office or whatever and you're

18    going to call him as a character witness.

19    But you have nothing that I allowed you to do to just say,

20    "Hey, didn't somebody think you were untruthful?  Didn't

21    somebody think you did something?"

22    And, by the way, it doesn't have to be untruthful.  You can

23    have people who have prejudices against one group or another.

24    And maybe you've got a case that involves a defendant that

25    falls in that group and that you might have to disclose that

 1 | that person has expressed whatever prejudice they have against
 2 | that group if they're going to be testifying against that
 3 | witness.
 4 |     Think about the OJ trial, if you can remember it.
 5 |     Anyway, as far as I'm concerned, this is out.  And then the
 6 | question is how you're going to explain this or we're going to
 7 | explain to the jury that it's irrelevant.
 8 |     So why did you think you could ask this, Mr. Ceballos?
 9 |         MR. CEBALLOS:  Because, Your Honor, I believe that
10 | the Court's ruling was I could not bring in this individual
11 | from the DA's office.
12 |         THE COURT:  What?  That was the exact opposite.  Exact
13 | opposite of my ruling.  My ruling is the *Brady* list is
14 | irrelevant.  What's relevant is if you had something that went
15 | to character and that you could put it in in a way that is
16 | admissible.
17 |     I repeat, read the rules of evidence.  So, at this point,
18 | what do we tell the jury?
19 |         MR. FINE:  Your Honor, I would like a minute to confer
20 | with my colleagues.
21 |         THE COURT:  Fine.
22 |         MR. FINE:  At this point, I think we could just leave
23 | it and say that there was a -- I don't know -- a court order
24 | that --
25 |         THE COURT:  I don't want to tell them about a court

1   order --

2           **MR. FINE:**  Okay.

3           **THE COURT:**  -- and start telling them how the sausage

4   is made.  Think of something else.

5       Okay.  Go talk to Mr. Kleinman.

6       And I think my ruling was very clear.  And how anybody

7   could misunderstand it is beyond me.  Though, I accept that

8   this was not an intentional violation.

9               (Government counsel conferring.)

10          **THE COURT:**  Oh.  Yes, sorry.

11          **MR. FINE:**  Your Honor, our position is that we would

12  request that the Court instruct the jury that defense counsel

13  asked a question about the *Brady* list.  The question was

14  irrelevant and the jury should be instructed not to speculate

15  as to what any potential answer might have been and disregard.

16  Strike the question from the record and completely disregard

17  it.

18          **THE COURT:**  Okay.  I'll think about that in just a

19  second.  Possibly a little bit of an amendment to that, but

20  just a second.

21              (Pause in proceedings.)

22          **THE COURT:**  Anyway, I suggest everybody look at

23  Rule 608, which is the rule that covers character evidence and

24  what can be used to challenge character, and only for

25  credibility.  You can never put in evidence to show character

1    and -- on a particular quality that one wants to say would

2    cause someone to be more likely to act in a particular way or

3    commit a crime.  Except for prior convictions, a felony

4    conviction.

5        Okay.  So, in any event, I think what I'll tell the jury,

6    rather than repeat the question, which they may well have

7    forgotten by now, is just to tell them there was a question

8    asked and that there may have been some misunderstanding about

9    what my ruling was, but that that question did not call for

10   relevant evidence and they're just not to speculate, if they

11   even remember it, what the answer might have been.

12       Okay.  If necessary, I'd ask the court reporter to find

13   a -- get me a transcript of what I ruled on.  I made it very

14   clear, tracking, essentially, Rule 608, what you would have to

15   do.

16       You wanted to add *Brady* list to the instructions; that

17   presented the whole issue here.  So -- why it wasn't relevant

18   at all as a list.  At least without some witness coming in.

19   And you would have to make an offer outside the presence of the

20   jury.

21       Okay.  Let's call them back in.

22                    (Pause in proceedings.)

23               (The jury enters the courtroom.)

24        (Proceedings were heard in the presence of the jury.)

25            **THE COURTROOM DEPUTY:**  Please be seated.

1          **THE COURT:**  Okay.  All right, ladies and gentlemen, so

2    we're going to move forward with Mr. Tatum's testimony.

3          As far as that question that prompted us asking you to step

4    out for a short while, before this trial, I was asked to look

5    at a lot of different issues that might be raised during the

6    case, some having to do with admissibility of evidence, other

7    things, relevance, what have you.  I made a lot of rulings and

8    there was a ruling regarding this particular matter that came

9    up by way of the question.  I think there was just perhaps some

10   misunderstanding about it.

11         So, in any event, that question did not call for relevant

12   information and you're not to speculate or try and figure out

13   what the answer would have been.  Frankly, I don't even know

14   what it is.

15         All right.  So we'll go on, then, with the

16   cross-examination.  Okay.

17         **MR. CEBALLOS:**  Thank you.

18   **BY MR. CEBALLOS:**

19   **Q.**   Mr. Tatum, yesterday you spoke about the method in

20   conducting these traffic stops, these interdiction stops; is

21   that correct?

22   **A.**   Yes, I did.

23   **Q.**   And you indicated why it was necessary to have two

24   officers when you actually conducted these stops; is that

25   correct?  For officer safety purposes?

TATUM - CROSS / CEBALLOS

1   **A.**    I did.

2   **Q.**    Okay.

3   **A.**    Yes, sir.

4   **Q.**    And the reason behind that, to have the two officers, is

5   what again?

6   **A.**    Officer safety.

7   **Q.**    Okay.  One officer does one thing, another officer does

8   another?

9   **A.**    They exchange and do different roles, but, yes, only -- I

10  mean, you can talk and multitask, but, yes, doing multi things.

11  **Q.**    You have one officer that actually approaches the driver

12  and another officer that stands back to -- in case there are

13  other passengers in the vehicle; is that correct?

14  **A.**    It's really on a traffic stop base or a case-by-case.  If

15  there's more people in the vehicle, sometimes the officer

16  would -- both officers would approach to have that presence.

17  It would just kind of depend on the traffic stop.

18  **Q.**    All right.

19  **A.**    The time of day.

20  **Q.**    It was more dangerous to conduct one of these stops if

21  you're just by yourself; would you agree?

22  **A.**    Yes, of course.

23  **Q.**    So not only your general preference, but your custom and

24  practice was to conduct these stops with at least another

25  partner officer?

1  **A.**   If two officers were available, we would always have two

2  officers.  But sometimes there would be just one officer in --

3  in the car by himself.

4  **Q.**   Would there be another officer nearby in another vehicle

5  to assist that officer in case something was necessary or

6  needed?

7  **A.**   We would always try to do that, but I'm not -- I don't

8  remember if every time we went out, if there was always two

9  officers available or another patrol car.

10 **Q.**   There were times that you would do these interdiction

11 stops and there would be one officer in one vehicle and another

12 officer in another vehicle; is that correct?

13 **A.**   Yes.

14 **Q.**   All right.  And again, is that -- the purpose behind that,

15 one, officer safety?

16 **A.**   It would be better to have an officer in that vehicle,

17 have two officers doubled up, that would be the most -- or the

18 safest.  But to have both of them split up for officer safety I

19 would disagree with, no.

20 **Q.**   You testified yesterday that you committed a number of

21 these stops -- well, let me rephrase that.

22     You testified yesterday that you committed a number of

23 these thefts by yourself.  Does that mean that you were the

24 only person or the only officer who was involved in the theft

25 or that you were always alone by yourself?

TATUM - CROSS / CEBALLOS

1   **A.**   That means that -- well, prior to 2017, when I said I was

2   committing these by myself, I mean, no one was involved in

3   criminal activity with me.

4   **Q.**   All right.  So you committed a number of these thefts when

5   you had another officer next to you, they just weren't

6   involved; is that correct?

7   **A.**   Yes, sir.

8   **Q.**   All right.

9         **MR. CEBALLOS:**  If we could put on Exhibit 79.

10        **THE COURT:**  Mr. Ceballos, somebody at your -- you

11   investigator, I think, has --

12        **MR. CEBALLOS:**  It hasn't switched over.

13        **THE COURT:**  Ms. Geiger.

14        **THE COURTROOM DEPUTY:**  It takes a minute.

15        **THE COURT:**  Takes a minute?

16        **THE COURTROOM DEPUTY:**  Yeah.

17        **MR. CEBALLOS:**  The technology isn't quick.

18                     (Pause in proceedings.)

19        **THE COURT:**  Nothing yet.  Well, right now we have a

20   black screen.  Somebody is pointing to something.  You want to

21   go over there and just see what they're talking about.

22        **MR. EASTER:**  Your Honor, it is on this screen, it's

23   just not showing up on the screens in front of us.

24        **THE COURT:**  The jurors have it.  Counsel apparently

25   don't, nor do I.

TATUM - CROSS / CEBALLOS

```
 1            MR. CEBALLOS:  It's not here.  I don't know if

 2    there's --

 3            THE COURT:  Is there anything to push?  There doesn't

 4    seem to be.

 5        This is our first trial since they redid the entire sound

 6    system.  That's one of the reasons we have had a number of

 7    problems.

 8        Something looked like it was starting to come on on that

 9    table monitor there, Ms. Geiger, but that -- oh, we're back to

10    the -- well, court seal on and off.

11        All right.  Well, that's -- the jurors have it.  I do not,

12    so -- and now it's off again.  Well, back up again.

13        All right.  The monitor that's on the clerk's table here is

14    on.  Mine isn't.  How about yours, Mr. Tatum?  No?

15            THE WITNESS:  No, ma'am.

16            THE COURT:  And he's going to be asked about?  I

17    gather Ms. Geiger is going to contact somebody at some point

18    here.

19            THE COURTROOM DEPUTY:  Yes.

20            THE COURT:  Your tax dollars at work, ladies and

21    gentlemen.

22        Let me ask, Ms. Geiger, are you trying to do something with

23    it yourself or do we have a call in?

24            THE COURTROOM DEPUTY:  I put in a call to Stefan.  Let

25    me turn it off and turn it back on.
```

1              THE COURT:  All right.  She's going to try the

2    tried-and-true turn off/turn on idea and see if that makes any

3    difference.

4         The main problem is Mr. Tatum doesn't have it.  I can look

5    at the screen down here on the table if I have to.

6         Okay.  Now, I've got a court seal.  How about jurors, court

7    seal?

8         What about you, Mr. Tatum, court seal?

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  Okay.

11             THE COURTROOM DEPUTY:  Let me try it again.

12             THE COURT:  Oh, mine went off.  So did the jurors'.

13   So did counsel's.

14        I'm assuming you don't have anything, Mr. Tatum.

15             THE WITNESS:  No, ma'am.

16             THE COURT:  Nothing?  All right.

17        There's one monitor bringing it up on the clerk's table.

18        Oh, now the jurors have it again.  Oh, did it go off?  Up

19   or down?  It's up for them, but not for the witness.  So...

20             THE WITNESS:  I can see that document.

21             THE COURT:  The one on here?

22             THE WITNESS:  Yes, ma'am.

23             THE COURT:  All right.  This is that -- those

24   statistics, if you will, something you put together, I believe

25   you testified to; is that correct?

 1              THE WITNESS:  Yes, ma'am.

 2              THE COURT:  All right.  Somebody asked you to do it?

 3     Okay.  Fine.

 4        All right.  If you can see it, do the best you can,

 5     Mr. Ceballos.

 6              MR. CEBALLOS:  I don't have it here but I will proceed

 7     anyways.

 8              THE COURT:  Oh, you don't have it?

 9              MR. CEBALLOS:  No, but that's okay.  I can proceed.  I

10     recall it.

11              THE COURT:  Okay.  Give it your best shot.

12              MR. CEBALLOS:  Thank you.

13     BY MR. CEBALLOS:

14     Q.   Mr. Tatum, do you have Exhibit 79 in front of you?

15              THE COURT:  About 15 feet away, he's got it.  Maybe

16     10 feet.

17              THE WITNESS:  Yes, sir.  I do remember that.

18     BY MR. CEBALLOS:

19     Q.   This is the exhibit or document you created for your

20     supervisors?

21     A.   Yes, sir.

22     Q.   And this lists all the interdiction stops and -- that were

23     completed by your team in December of 2016; correct?

24     A.   To the best of my knowledge, that was all of them.

25     Q.   All right.

1    **A.**    Yes.

2    **Q.**    When would you have actually completed that document?

3    **A.**    I don't recall.

4    **Q.**    But the document indicates not only whether evidence, that

5    is marijuana, was seized, but also if cash was seized; correct?

6    **A.**    Yes.

7    **Q.**    And it actually has a number of how many stops were made

8    by your team on a given day?

9    **A.**    Yes, it does.

10   **Q.**    And it further says which officers were involved in the

11   stops?

12   **A.**    Yes, sir.

13   **Q.**    So looking at this document, you indicated that my client

14   was not involved in any incident prior to December of 2017;

15   correct?

16   **A.**    I don't understand that question.

17   **Q.**    Well, you testified that he was not involved in any of

18   your thefts -- thank you -- prior to 2017, December of 2017?

19          **THE COURT:**  Is that a question?

20          **MR. CEBALLOS:**  Yes.

21          **THE COURT:**  All right.

22          **THE WITNESS:**  I still don't understand.

23   BY MR. CEBALLOS:

24   **Q.**    Well, so looking at the document as best you can --

25   **A.**    Yes, sir.

TATUM - CROSS / CEBALLOS

1    Q.    -- you indicate that my client, Officer Huffaker, was

2    involved in an interdiction stop on December 5th, 6th, 7th,

3    8th, the 13th, 20th, and 21st; is that correct?

4         THE COURT:  I'm sorry.  One of jurors has his hand up.

5         JUROR:  The document has the year 2016.

6         THE COURT:  Excuse me.  You can't talk to counsel.

7         JUROR:  Sorry.  I can talk to you?

8         THE COURT:  Not really, no.  If you're just saying

9    that there's something that's inconsistent that you think in

10   the question, that's up to you to just evaluate or for Mr. Fine

11   to pay attention to.  In other words, your understanding the

12   year is not being correctly described; is that right?

13        JUROR:  Yes.

14        THE COURT:  That's what the juror is nodding to say.

15   That may be correct.  Now, whether Mr. Martin's got it right,

16   you've got it right, you can think about what his concern was,

17   Mr. Ceballos.  Give you a hint here.

18        MR. CEBALLOS:  Sure.  I'll clarify it.

19   BY MR. CEBALLOS:

20   Q.    This document refers to interdiction stops in December of

21   2016; correct?

22   A.    Yes, sir.

23   Q.    Okay.

24        THE COURT:  Okay.  Now, what?

25        THE COURTROOM DEPUTY:  The technician wants to come in

 1    and fix the monitors.

 2            THE COURT:  Now?

 3            THE COURTROOM DEPUTY:  Do you want me to tell him not

 4    to do it?

 5            THE COURT:  Okay.  Apparently -- now, I did want to

 6    hear this last answer, not be disrupted for a minute, but

 7    apparently, the technician who is either on the line or

 8    wherever they are electronically would like to come in and fix

 9    the equipment now.

10        So the question is, can we get by until the first break,

11    for example, knowing that you don't have the visuals,

12    Mr. Ceballos.  The witness's eyes are good enough to read the

13    screen on Ms. Geiger's table, so it's really your decision what

14    you think.

15            MR. CEBALLOS:  I can proceed, Your Honor.

16            THE COURT:  All right.  Please let them know we'll

17    need them at the first break which I think we'll just take in

18    an hour, 10:30-ish and -- okay.  All right.

19        We don't want to extend our estimate of the trial by all

20    these problems.  Any event, soldier on, if you can.

21            MR. CEBALLOS:  I don't know if we got an answer to my

22    last question.

23            THE COURT:  I'm not sure what it was.  Do you

24    remember?  I could ask the reporter to read it back to you.

25            MR. CEBALLOS:  If possible, Your Honor.

1          THE COURT:  Okay.  You wouldn't mind, Ms Ekhaus.

2                    (The record was read.)

3          ("This document refers to interdiction stops in

4      December of 2016; correct?

5          Yes, sir.")

6          MR. CEBALLOS:  All right.

7   BY MR. CEBALLOS:

8   Q.   And in this document, you referred to a number of stops

9   that you and Officer Huffaker were involved in?

10  A.   Yes, sir.

11  Q.   And in December of 2016, Officer Huffaker was not involved

12  in your scheme to steal marijuana from people?

13  A.   Correct, he was not.

14  Q.   This document also refers that on one occasion on

15  December 19, you were with another officer, Officer Snodgrass;

16  correct?

17       I don't know if you can see it.

18          THE COURT:  It's about three up from the bottom.

19          THE WITNESS:  Yes, I see that, December 19.

20  BY MR. CEBALLOS:

21  Q.   And was Officer Snodgrass ever involved in your scheme to

22  steal marijuana from people?

23  A.   No, he was not.

24  Q.   So prior to December of 2017, you had officers with you

25  conducting stops, they just were never involved in your scheme

TATUM - CROSS / CEBALLOS

1   to rip marijuana off for people?

2   **A.**   Was it -- did you say December '17?   I thought that -- are

3   you referring to '16 or '17?   I'm sorry.

4   **Q.**   '17.

5   **A.**   Can you ask it one more time?

6   **Q.**   All through 2015, 2016, the only -- and up till December

7   of 2017, you were the only officer involved in ripping people

8   off?

9   **A.**   Yes, sir.

10  **Q.**   However, many of the times you had other officers with you

11  when you eventually stole the marijuana?

12  **A.**   Yes, sir, that's correct.

13  **Q.**   You just never involved the other officers?

14  **A.**   That's correct.

15  **Q.**   And in this case, with Officer Snodgrass, it was 62 pounds

16  of marijuana that was seized?

17          **THE COURT:**  Can you see it there?

18          **THE WITNESS:**  Yep.   Yes, ma'am.

19     Yes, sir.

20  **BY MR. CEBALLOS:**

21  **Q.**   You stole the 62 pounds of marijuana.   Officer Snodgrass

22  had no idea what you were doing?

23  **A.**   I don't recall if I stole that marijuana or not.

24  **Q.**   So there is some marijuana that was seized in this

25  document that you may have stolen or may not have stolen?

1  A.   Yes, sir.  I didn't -- I didn't steal every pound or piece

2  of marijuana that we confiscated.

3  Q.   Would you make a determination whether you were going to

4  steal the marijuana based on the quality of the marijuana?

5  A.   Yes.

6  Q.   All right.  So if it was good-quality marijuana, you made

7  the decision to steal that marijuana?

8  A.   Yes, sir.

9  Q.   If it was bad quality, you said, "Forget it, I'm just

10  going to turn it in and book it"?

11  A.   Yes, sir.

12  Q.   And you alone made that decision?

13  A.   Up until December of 2017.

14  Q.   All right.  This document also references on December 7,

15  that you seized $160,000 in currency; is that correct?

16        THE COURT:  Is there --

17        THE WITNESS:  Yes.  Yes, sir.

18  BY MR. CEBALLOS:

19  Q.   And this was a stop that you did with my client,

20  Officer Huffaker; correct?

21  A.   Yes, sir.

22  Q.   And that was along with 214 pounds of marijuana?

23  A.   Yes, sir.

24  Q.   You would admit this is a sizable seizure -- is that

25  correct? -- for that day?

1  **A.**    Yeah, most definitely.

2  **Q.**    And you have no independent recollection whether or not

3  you stole that marijuana and sold it?

4  **A.**    I do not, no, sir.

5  **Q.**    $160,000, is that from one stop or is that from an

6  accumulation of stops?

7  **A.**    That would have been one stop, but I -- I recall, I think,

8  that was a search warrant that may have been served along with

9  a traffic stop.  So those aren't just vehicle stops.  It could

10  be associated with a rollback search warrant --

11  **Q.**    Well, you --

12  **A.**    -- after the traffic stop.

13  **Q.**    You have this labeled as "Interdiction," so interdiction

14  included more than just a traffic stop?

15  **A.**    Yes.  It could be partial interdiction at the post office,

16  any type of other enforcement we were doing.

17  **Q.**    Mr. Tatum, let me ask you this:  If on that date, you

18  seized $160,000 in currency, why not just take the money

19  instead of the marijuana?

20  **A.**    I don't know.

21  **Q.**    There had to be a reason why you turned in the money and

22  just took the marijuana.

23  **A.**    Because nobody at the department was looking for the

24  marijuana.  Somebody would be looking for the cash, and the

25  marijuana was enough without getting caught.

TATUM - CROSS / CEBALLOS

1   Q.   So you made a deliberate decision to just steal the

2   marijuana and not the cash because you could get away with it?

3   A.   At the time, yes, sir.

4   Q.   Well, not only at the time, that's what you did

5   throughout; correct?

6   A.   Yes.

7   Q.   Did you ever steal money?

8   A.   I did not.

9   Q.   Did you ever steal anything else like property such as

10  jewelry or other items from these drivers?

11  A.   I did not.

12  Q.   So the only thing you would take from people is marijuana?

13  A.   Yes, sir.

14  Q.   Any cash, any currency that you seized you would turn in

15  to the department?

16  A.   Actually, on one traffic stop, I was accused of taking

17  currency.

18  Q.   When was that?

19  A.   I don't recall the date.  It's in my plea agreement.

20  Q.   All right.  How much money were you accused of taking?

21  A.   $3,700.

22  Q.   Okay.  And you remember that incident?

23  A.   I do, vaguely.

24  Q.   Okay.  And do you recall who was with you at the time?

25  A.   I do not, no, sir.

TATUM - CROSS / CEBALLOS

1    Q.   Do you recall if you seized or stole marijuana at that --

2    on that incident?

3    A.   I do not.

4    Q.   You said you were accused of taking the money.

5         Did you take the money?

6    A.   I did, yes, sir.

7    Q.   And did you put that in your plea agreement?

8    A.   Yes, I did.

9    Q.   Okay.  So why did you take the money on that occasion and

10   not take currency on other occasions?

11   A.   I'm not sure.

12   Q.   Were you just in need on that particular day that you

13   needed money?

14   A.   I don't remember.

15   Q.   Is that the only time you took money from any of these

16   drivers?

17   A.   Yes.

18   Q.   So you did it one time and that was it?

19   A.   Yes, it was.

20   Q.   Okay.  And you don't remember which officer was with you?

21   A.   I do not.

22   Q.   You would agree that you were the ringleader of this --

23   we'll just loosely say -- criminal enterprise; is that correct?

24   A.   I'm not sure.

25   Q.   Well, you developed the scheme to steal marijuana from

TATUM - CROSS / CEBALLOS

1  drivers; is that correct?

2  **A.**   Yes.

3  **Q.**   You're the -- you were the supervisor.  You were the

4  sergeant of this team; is that correct?

5  **A.**   My title, I didn't think about my title as far as the

6  scheme, but, yeah -- I don't understand.

7  **Q.**   Well, you were in charge of all these officers as the

8  sergeant?

9  **A.**   Yes, sir.  When we were out doing interdiction, I was.

10 **Q.**   So you were their supervisor?

11 **A.**   At times when we were out doing interdiction, yes.

12 **Q.**   Okay.  And as their supervisor, as their sergeant, you

13 were the one that determined when you were going to go and do

14 these interdiction stops?

15 **A.**   No, sir.

16 **Q.**   You, however, made the decision which marijuana you were

17 going to steal and which marijuana you weren't going to steal?

18 **A.**    If it was a traffic stop that I was involved with, yes,

19 but there were days that my team went out when I wasn't there

20 and there were team -- there was guys that made traffic stops

21 when I wasn't there.  So I didn't oversee every enforcement

22 stop that was made.

23 **Q.**   Well, those other guys, those other officers weren't

24 stealing marijuana like you?

25 **A.**    Correct.

TATUM - CROSS / CEBALLOS

1    Q.   All right.   You, as their leader of this organization,

2    you're the one that made the decision to have this Mr. Porcaro

3    and Mr. Timmins sell the marijuana you stole; is that correct?

4    A.   No.   I'd say that's incorrect.

5    Q.   Okay.   Then who selected them?

6    A.   I was approached by Mr. Porcaro.   We made an agreement.

7    Q.   But you're the one that entered into the agreement?

8    A.   I was, yes, sir.

9    Q.   No one else entered into this agreement with him?

10   A.   Not that I know of.

11   Q.   What do you mean not that you know of?

12   A.   My criminal activity with Mr. Porcaro was him and I.   I

13   didn't know if anybody else was doing any criminal activity

14   with him also or selling marijuana, giving marijuana to him.

15   But as far as him and I, it was just him and I.

16   Q.   All right.   But none of your other officers were involved

17   in selling marijuana or giving Mr. Porcaro marijuana to sell?

18   A.   Not to my knowledge, no, sir.

19   Q.   And the same thing with Mr. Timmins?

20   A.   Not to my knowledge.

21   Q.   I mean, you're the one that actually went to Mr. Timmins

22   after your fallout with Mr. Porcaro?

23   A.   I'm not sure.

24   Q.   Well, no one -- I mean, Mr. Timmins was your childhood

25   friend, correct, as you testified yesterday?

TATUM - CROSS / CEBALLOS

1   **A.**   Yes, sir.  That's correct.

2   **Q.**   All right.  So you're the one that approached him after

3   falling out with Mr. Porcaro and said, "Can you sell the

4   marijuana for me?"

5   **A.**   I'm not sure.

6   **Q.**   You're not sure if you're the one that approached him?

7   **A.**   Yes, sir.

8   **Q.**   Are you saying he approached you?

9   **A.**   I don't recall how that developed exactly.

10  **Q.**   But ultimately, whoever approached who, you made the

11  decision -- you alone made the decision that Mr. Timmins,

12  instead of Mr. Porcaro, is going to be the one to sell the

13  marijuana you steal?

14  **A.**   Yes, sir.

15  **Q.**   All right.

16  **A.**   That's correct.

17  **Q.**   And when Mr. Timmins or Mr. Porcaro sold the marijuana,

18  they would give you the cash?

19  **A.**   Yes, they would.

20  **Q.**   And to a certain extent, Mr. Porcaro and Mr. Timmins were

21  a part of this criminal enterprise with you?

22  **A.**   Yes.

23  **Q.**   And to a certain extent, your family was also involved in

24  this criminal enterprise?

25  **A.**   At parts of it, yes, sir.

**TATUM - CROSS / CEBALLOS**

1  Q.  Well, because you gave them the money that you made so

2  they could hide it?

3  A.  Correct.

4  Q.  You're here testifying in hopes of getting a reduced

5  sentence; is that correct?

6  A.  Along with telling the truth, yes, sir.

7  Q.  And what are you hoping for?

8  A.  The best possible outcome.

9  Q.  And what do you believe is the best possible outcome?

10  A.  A fair sentencing.

11  Q.  And what do you believe is a fair sentencing?

12  A.  I don't know.

13  Q.  Do you believe you deserve to go to prison?

14  A.  Possibly, yes, sir.

15  Q.  Possibly?

16      So are you hoping not to go to prison?

17  A.  Yes, sir.

18  Q.  You, in your plea agreement, indicated how much money you

19  made out of this enterprise; correct?

20  A.  Yes, sir, I did.

21  Q.  You indicated it was approximately $440,000 in 2016 alone?

22  A.  Correct.

23  Q.  Okay.  How much did you make in 2015?

24  A.  I don't recall.  I think it was under 150,000, I believe.

25  Q.  Okay.  So the combined years of 2015 and 2016 were at well

1   over a half million dollars?

2   **A.**   That is correct.

3   **Q.**   How much did you make in 2017?

4   **A.**   I don't recall.

5   **Q.**   In your plea agreement, you promised to obey all laws;

6   correct?

7   **A.**   Yes, sir, I did.

8   **Q.**   And if you didn't obey all laws and abide by the

9   agreement, that would cause a violation of your agreement?

10  **A.**   Yes, sir.

11  **Q.**   And your understanding, if you violated the agreement,

12  what would happen to you?

13  **A.**   That I'd be in trouble.  I wasn't -- I'd violate

14  presentencing probation.

15  **Q.**   And what would the result be?  Or probable result?

16  **A.**   I'm not sure.

17  **Q.**   You're out on bail; is that correct?

18  **A.**   Yes, I am.

19  **Q.**   So a possible -- excuse me -- a possible outcome of

20  violating the agreement is that your bail could be revoked and

21  you could be placed back in jail?

22  **A.**   Placed -- I've never been in jail, but placed in jail,

23  yes, sir.

24  **Q.**   Okay.  So you understand that was a possibility?

25  **A.**   I do, yes, sir.

1  Q.   So in 2024, when that search warrant was conducted at your

2  property, at your -- where your house is located and the

3  marijuana was discovered, that was a violation of your plea

4  agreement?

5  A.   I don't believe so.  No, sir.

6  Q.   How do you not believe so?

7  A.   I had tenants that rented the barn.  It was locked.  They

8  had total control over the barn.  It was detached from my

9  house.  And I had nothing directly to do with the marijuana.

10 Q.   All right.  So you have your main house, where you reside

11 with your family; correct?

12 A.   Yes, sir.

13 Q.   And then there's this outhouse or outbuilding; correct?

14 A.   A barn, yes, sir.

15 Q.   It's a barn.

16      And how far is the barn from your outhouse?

17 A.   Two and a half football fields at least.

18 Q.   And during this administrative search warrant, you

19 happened to be present?

20 A.   Yes, I was home.

21 Q.   And at some point did they take you into the barn and show

22 you what they had found?

23 A.   I'm sorry?

24 Q.   Did they take you into that house -- that outhouse, that

25 building, or the barn, and show you the marijuana?

TATUM - CROSS / CEBALLOS

1    **A.**    No, they did not.

2    **Q.**    You saw photos, though; is that correct?

3    **A.**    Online I did, yes, sir.

4    **Q.**    Okay.  And there was something in the neighborhood of 500

5    plants growing in your barn?

6    **A.**    The barn I rented out, yes, sir.

7    **Q.**    Okay.  So -- and how long had you been renting it out?

8    **A.**    I believe it was a year and a half approximately.

9    **Q.**    And who were you renting it out to?

10    **A.**    A guy named Kyle.

11    **Q.**    A guy named Kyle?

12    **A.**    Yes.

13    **Q.**    Do you know Kyle's last name?

14    **A.**    Harrison.  Harris.  Something along those lines.

15    **Q.**    Okay.

16    **A.**    H.

17    **Q.**    Who is he?  Is he a friend or a relative?

18    **A.**    Nope.  He was just a tenant.  Never met him before.

19    **Q.**    Okay.  So this individual comes to you and says, "I'd like

20    to rent out your barn"?

21    **A.**    Yes.  I had an ad on Craigslist for a barn rental.

22    **Q.**    Okay.

23    **A.**    And he replied to that.

24    **Q.**    And did he tell you why he wanted to rent your barn?

25    **A.**    No, he did not.  Not at first.

1  Q.   You didn't inquire?

2  A.   I didn't.

3  Q.   And how long had he been renting your barn before this

4  search warrant uncovered all those plants growing in your barn?

5  A.   About a year and a half approximately.

6  Q.   And during that year and a half, did you ever go to the

7  barn to inspect it?

8  A.   I did not, no, sir.

9  Q.   So this is your barn, it's on your property; correct?

10  A.   Yes, sir.

11  Q.   And you never walked over to check to see what he was

12  doing with your barn?

13  A.   I knew he was growing marijuana.  I could smell it.  But I

14  didn't go in and check because I knew what he was doing.

15  Q.   Okay.  So you knew he's growing marijuana on your property

16  and yet you did nothing to stop him?

17  A.   As I said, I didn't think it was a violation.  It was

18  under his control.  It was rented to him.  It was locked.  I

19  had nothing to do with it.  He had medicals that he said he was

20  selling to legitimate dispensaries --

21                    (Cell phone ringing.)

22          MR. CEBALLOS:  Let me get us back.

23  BY MR. CEBALLOS:

24  Q.   Mr. Tatum, you're a police officer.  You knew that growing

25  marijuana, while maybe not a violation of state law, is still,

```
 1   nonetheless, a violation of federal law?
 2   A.   Yes.
 3   Q.   So you knowingly allowed an individual to grow marijuana
 4   on your property that you knew to be a violation of federal
 5   law?
 6   A.   A violation he was committing, yes, sir.
 7   Q.   Well, it's on your property, Mr. Tatum.  You're committing
 8   it as well.
 9            THE COURT:  Is that a question?
10            MR. CEBALLOS:  Yes.
11            THE WITNESS:  No, sir.
12   BY MR. CEBALLOS:
13   Q.   Do you remember talking to a reporter and telling that
14   reporter that you were just thinking of your family and you
15   wanted to make some money before you went to prison?
16   A.   I said that to the code enforcement officer.  I never
17   talked to a reporter.
18   Q.   So you made that statement to the code enforcement
19   officer?
20   A.   I did.
21   Q.   Okay.  So you're making money off of what this person is
22   doing in your barn?
23   A.   The reporter wrote that article how they wanted to write
24   it.  When I was talking to the code enforcement officer, we
25   were talking about rent and trailers and the rent from the
```

 1  barn.  And that's what I was referring to as far as making

 2  money.  I was never referring to marijuana.

 3  Q.  Well, Mr. Tatum, you can infer that if he's growing

 4  marijuana in your barn, that he's likely selling that

 5  marijuana?

 6  A.  Correct, yes, sir.

 7  Q.  And the proceeds of the sale of the marijuana, he's using

 8  that to pay you rent?

 9  A.  Legally, yes, sir.

10  Q.  Well, you're being paid with illegal proceeds; correct?

11  A.  Illegal or legal, I didn't --

12  Q.  Illegal?

13  A.  I did not see it that way at the time.  I do now.

14  Q.  Which is why yesterday, when you were questioned by

15  Mr. Fine, you admitted that you violated the terms of your

16  agreement?

17  A.  I don't believe I said that yesterday.

18  Q.  Well, as it stands today, do you believe you violated the

19  terms of your plea agreement?

20  A.  No, I do not.

21  Q.  How about when you omitted the reference to Mr. Timmins'

22  involvement?

23  A.  No, I do not.

24  Q.  You don't believe that was a violation of your plea

25  agreement?

1  **A.**    No, sir.  Not at the time.

2  **Q.**    So making a misrepresentation, an omission in your plea

3  agreement, you don't believe that was a violation of your plea

4  agreement?

5  **A.**    When my attorney and I brought up Mr. Timmins, we

6  disclosed -- I disclosed his full involvement at the time.  He

7  was not involved in a conversation prior to me bringing it up

8  during my plea agreement.

9  **Q.**    But you intentionally omitted telling the FBI and the U.S.

10 attorney about Mr. Timmins' involvement in that plea agreement?

11 **A.**    I was trying to protect a friend, yes, sir.

12 **Q.**    Okay.  So you intentionally omitted that information?

13 **A.**    It was never brought up and I didn't offer it.

14 **Q.**    Mr. Tatum, I'm not asking if it was brought up.  I'm

15 asking, when you omitted Mr. Timmins' name in the plea

16 agreement, you did that intentionally; correct?

17 **A.**    Yes.

18 **Q.**    To protect your friend?

19 **A.**    Yes, sir.

20 **Q.**    And you would agree that that omission is a

21 misrepresentation?

22 **A.**    I'm not sure.

23 **Q.**    You're not sure when you lie?

24 **A.**    I wasn't saying that I wasn't sure when I lie.  I was just

25 saying I don't know to your question.

1   Q.   Okay.  So there are --

2           MR. CEBALLOS:  You know what, Your Honor, I don't have

3   anything further.

4           THE COURT:  Okay.  So we would then go back to any

5   redirect.

6       Yes, whenever you're ready.

7           MR. FINE:  Thank you.

8                   <u>REDIRECT EXAMINATION</u>

9   BY MR. FINE:

10  Q.   Good morning, Mr. Tatum.

11  A.   Good morning, sir.

12  Q.   I'd like to follow up on a couple of the questions defense

13  counsel was asking you in cross-examination yesterday as well

14  as -- as well as this morning.

15      Do you recall yesterday when defense counsel was asking

16  you about whether you had written the February 2018 press

17  release by yourself?  Do you recall those questions?

18  A.   Yes.

19  Q.   Did you write it by yourself, or did you and Mr. Huffaker

20  write it together?

21  A.   We wrote it together.

22  Q.   And, in fact, yesterday, you talked through some e-mails.

23  Do you remember that?

24  A.   Yes, sir, I do.

25  Q.   And do you recall talking through an e-mail that was sent

1    from Mr. Huffaker's wife's e-mail address?

2    A.   Yes, sir.

3    Q.   And that was -- can you tell us, again, how that came

4    about?

5    A.   Yes.  Joe and I were at his house, and we used his wife's

6    computer.  And we were discussing the press release, what to

7    put in there and, ultimately, that draft had to be sent to my

8    e-mail through her e-mail so that I could publish it on the

9    final letterhead at the department later on.

10   Q.   So Mr. Huffaker e-mailed it to your personal e-mail, that

11   first draft; right?

12   A.   Yes, sir.

13   Q.   And then you forwarded it to your Rohnert Park e-mail

14   address so that you could put the proper letterhead on;

15   correct?

16   A.   Yes, sir.

17   Q.   Thank you, Mr. Tatum.

18        Now, on to a different topic.

19        Do you recall both yesterday and today defense counsel

20   asking you about some of the times you stole marijuana in 2016?

21   A.   Yes.

22   Q.   Now, specifically in 2016, you said you committed those

23   crimes by yourself; correct?

24   A.   The criminal part?

25   Q.   Yes, you stole marijuana without the involvement of other

1  officers; right?

2  A.   Yes, sir.

3  Q.   Even though on some of those occasions, other officers

4  were out doing interdiction with you; correct?

5  A.   Yes, that's correct.

6  Q.   Now, I'd like to compare some of those times in 2016 when

7  you stole marijuana with the December 2017 extortions you

8  committed with Mr. Huffaker.

9       When you committed the December 2017 extortions with

10  Mr. Huffaker, you and Mr. Huffaker and Billy Timmins met by the

11  side of the road on an occasion and loaded marijuana into

12  Mr. Timmins' car; correct?

13  A.   Yes, sir.

14  Q.   And you described that incident in pretty specific detail

15  yesterday; is that right?

16  A.   Yes, I did.

17  Q.   Mr. Huffaker was there loading the marijuana into

18  Mr. Timmins' car with you; correct?

19  A.   He was, yes, sir.

20  Q.   Now, in 2016, when you were stealing the marijuana by

21  yourself, sometimes you said there was another officer there

22  with you; right?

23  A.   Yes.

24  Q.   But did you take that officer with you to deliver the

25  marijuana to Billy Timmins?

**TATUM - REDIRECT / FINE**

 1   A.   No, never.

 2   Q.   Because that officer wasn't involved in the criminal

 3   activity; right?

 4   A.   They were not, no, sir.

 5   Q.   But in 2017, Mr. Huffaker was; right?

 6   A.   Yes, sir.

 7   Q.   Now, Mr. Tatum, when you committed the December 2017

 8   extortions with Mr. Huffaker, you and Mr. Huffaker identified

 9   as ATF agents; right?

10   A.   We did.

11   Q.   And you heard Mr. Huffaker himself identify as an ATF

12   agent during some of these stops; right?

13   A.   Yes, sir.

14   Q.   In fact, during these stops, you and Mr. Huffaker both

15   spoke to drivers and gave them the kind of the extortion

16   options of letting you take the marijuana or being arrested;

17   right?

18   A.   Yes.

19   Q.   And both you and Mr. Huffaker were present for these

20   conversations with the drivers; right?

21   A.   Yes.

22   Q.   Now, when you committed the crimes in 2016 by yourself,

23   you had your Rohnert Park badge on; right?

24   A.   Yes.  We were either wearing our uniform badge or cloth or

25   our belt badge.

1    Q.    So in 2016, when you were stealing this marijuana, nobody

2    identified as an ATF agent then; right?

3    A.    No.

4    Q.    When you committed the December 2017 extortions with

5    Mr. Huffaker, you and Mr. Huffaker made a plan to commit the

6    extortions beforehand; correct?

7    A.    Yes.

8    Q.    You had talked it over beforehand to make sure you were on

9    the same page; right?

10    A.    We did.

11    Q.    Now, when you committed these crimes in 2016, when you

12    stole the marijuana, did you talk beforehand with the officers

13    you were going out with to tell them you were going to steal

14    marijuana?

15    A.    No, of course not.

16    Q.    When you committed the -- the December 2017 extortions

17    with Mr. Huffaker, the interdiction team had already been

18    disbanded at that time; right?

19    A.    Yes.

20    Q.    It wasn't up and running; correct?

21    A.    No, it was not.

22    Q.    And you and Mr. Huffaker weren't even supposed to be out

23    there; right?

24    A.    We were not.

25    Q.    And you didn't tell people from the department you were

1  going out there; right?

2  **A.**    No, we did not.

3  **Q.**    So now, in 2016, when you were committing these crimes by

4  yourself, was the interdiction up and running?

5  **A.**    Yes, sir.

6  **Q.**    It was fully functional; right?

7  **A.**    It was.

8  **Q.**    And the leadership in the department knew you were out

9  there in 2016 doing interdiction; right?

10  **A.**    Yes, they did.

11  **Q.**    When you committed the December 2017 extortions with

12  Mr. Huffaker, you didn't submit for overtime on your time

13  sheets; right?

14  **A.**    No, of course not.

15  **Q.**    Because, again, you and Mr. Huffaker weren't supposed to

16  be out there; right?

17  **A.**    Correct.

18  **Q.**    When you stole the marijuana in 2016 by yourself, did you

19  typically submit overtime for interdiction?

20  **A.**    Always.

21  **Q.**    Because you wanted to get paid; right?

22  **A.**    Yes, sir.

23  **Q.**    When you committed the December 2017 extortions with

24  Mr. Huffaker, you and Mr. Huffaker together wrote up a false

25  press release and a false police report; correct?

1   **A.**   We did, yes, sir.

2   **Q.**   Now, when you committed the crimes in 2016 by yourself,

3   did you write up any false press releases or false police

4   reports with other officers?

5   **A.**   No.

6   **Q.**   Mr. Tatum, is it fair to say the extortions that you

7   committed in December of 2017 with Mr. Huffaker were quite

8   different than when you stole marijuana by yourself in 2016?

9   **A.**   Yes.

10   **Q.**   Mr. Tatum, now I'd like to turn to a slightly different

11   topic.

12      Do you recall yesterday when defense counsel was asking

13   you about why you didn't tell Mr. Huffaker that you had

14   committed crimes and stolen marijuana in 2015 and 2016?  Do you

15   recall that?

16   **A.**   Yes, I do.

17   **Q.**   Was one of the reasons that you didn't tell Mr. Huffaker

18   about your previous extortions that you didn't want him to have

19   leverage over you?

20   **A.**   Yes.

21   **Q.**   Because if your new criminal venture went south, you

22   didn't want him to know about your previous stuff; is that

23   right?

24   **A.**   Yes.  That was part of the reasons I said yesterday.

25   **Q.**   I just have one additional topic, Mr. Tatum.

TATUM - REDIRECT / FINE

1    A.    Yes, sir.

2    Q.    Do you recall yesterday when defense counsel was asking

3    you some questions about the call that you received from the

4    FBI on February 14 of 2018?

5    A.    Yes.

6    Q.    And the day after you received that call from the FBI, you

7    and Mr. Huffaker spoke on the phone; correct?

8    A.    Yes, we did.

9    Q.    And you discussed the FBI agent's call; right?

10    A.    Yes.

11    Q.    And during that call with Mr. Huffaker, did you -- did you

12    pretty much relay to him everything the FBI agent said to you?

13    A.    I did.

14    Q.    You told him that the FBI had gotten a complaint from a

15    driver about having his marijuana stolen; right?

16    A.    Correct.

17    Q.    And you told him that the FBI wanted a police report;

18    right?

19    A.    I did.

20    Q.    Did a police report exist at that point?

21    A.    No.

22    Q.    And so did you and Mr. Huffaker discuss drafting up a

23    false police report to send to the FBI?

24    A.    We did.

25    Q.    And then Huffaker sent you an e-mail with the first draft

TATUM - RECROSS / CEBALLOS

 1  of that false police report; is that right?

 2  **A.**   Yes, he did.

 3          **MR. FINE:**  No further questions, Your Honor.

 4          **THE COURT:**  Okay.  Then we would have recross.

 5                    <u>**RECROSS EXAMINATION**</u>

 6  **BY MR. CEBALLOS:**

 7  **Q.**   Mr. Tatum, how come when the AUSA asked you questions, you

 8  answer very quickly, but when I ask you, you take some time

 9  before you answer?

10  **A.**   He was asking questions that I already answered yesterday

11  and the day before, and you've asked me questions today that

12  I've never heard.  So I heard those questions yesterday, that's

13  the only reason.

14          **MR. CEBALLOS:**  Nothing further.

15          **THE COURT:**  Any redirect?

16          **MR. FINE:**  No, Your Honor.

17          **THE COURT:**  All right.  Then thank you, Mr. Tatum.

18  You're excused at this time.

19          **THE WITNESS:**  Thank you, ma'am.

20                      (Witness excused.)

21              (End of excerpt - Tatum - 10:13 a.m.)

22              (Begin excerpt - Timmins - 11:34 a.m.)

23          **THE COURT:**  All right.  Thank you.

24      Okay.  Now, following that evidence, who's your next

25  witness?

1           **MR. KLEINMAN:**  Yes, Your Honor.  The Government calls

2    to the stand William Timmins.

3           **THE COURT:**  Okay.

4       (William Timmins steps forward to be sworn.)

5           **THE COURT:**  All right.  Mr. Timmins, if you'll come up

6    to the witness stand, please, and then remain standing to be

7    sworn.

8           **THE WITNESS:**  Yes, ma'am.

9           **THE COURTROOM DEPUTY:**  Please raise your right hand.

10                          <u>WILLIAM TIMMINS</u>,

11   called as a witness for the Government, having been duly sworn,

12   testified as follows:

13          **THE WITNESS:**  I do.

14          **THE COURTROOM DEPUTY:**  Thank you.  Please be seated.

15          **THE WITNESS:**  Just like getting married.

16          **THE COURTROOM DEPUTY:**  Please state your full name for

17   the record and spell your full name, please.

18          **THE WITNESS:**  William Dean Timmins.  W-I-L-L-I-A-M.

19   Dean is D-E-A-N.  Timmins is T-I-M-M-I-N-S.  And I go by Billy.

20          **THE COURT:**  Very good.  And for court you'll be

21   Mr. Timmins.

22       All right.  Go ahead, please, Mr. Kleinman.

23                       <u>DIRECT EXAMINATION</u>

24   BY MR. KLEINMAN:

25   Q.   Good morning, Mr. Timmins.

TIMMINS - DIRECT / KLEINMAN

1    A.    Good morning.

2    Q.    Where did you grow up?

3    A.    Good afternoon.  I grew up in Rohnert Park, California.

4    Q.    Have you lived there your whole life?

5    A.    I mean, I've bounced around.  I guess when I was in

6    kindergarten -- well, I lived in Petaluma for a year.  Lived in

7    Ukiah for a year in kindergarten.  Moved to Rohnert Park after

8    graduation.  When I had my daughter, I lived in Windsor.  Then

9    Santa Rosa.  Now I'm back in -- well, I was in Penngrove.  Now

10   I'm back in Windsor.

11   Q.    Would you say you've lived in the Santa Rosa area for the

12   majority of your life?

13   A.    Correct.

14   Q.    And where did you go to school?

15   A.    High school?

16   Q.    High school.

17   A.    Rancho Cotate High School.

18   Q.    Did you attend any college classes?

19   A.    I went to college for a year to play football, and then,

20   unfortunately, I had to work for a living and had a few jobs so

21   I had to stop that.

22   Q.    And what are some of the job that you've had?

23   A.    Oof.  I've been working since 13, so bear with me.

24   Janitorial work when I was 13.  I'd walk to -- down from the

25   high school and walk to some apartments and clean the

1    apartments when they -- people moved out.

2        I've been -- worked for a painting contractor in the city.

3    UPS was one of my longer stints.  15 years at UPS out of

4    Petaluma.

5        And then I've opened my own businesses.  I've done floor

6    cleaning.  I had this floor cleaning company for 17 years.

7    **Q.**   I want to ask you about owning some of your own

8    businesses.

9    **A.**   Sure.

10   **Q.**   Let's start with right now.  Where do you currently work?

11   **A.**   I own my own hauling business, hauling and demolition

12   business.

13   **Q.**   When did you start that business?

14   **A.**   I started that at the end of '23.

15   **Q.**   That's 2023?

16   **A.**   Yes, sorry.  2023.

17   **Q.**   And how many employees do you have?

18   **A.**   I have one and myself.  And my teenage son when he's not

19   being lazy.

20   **Q.**   And what are some of the other businesses that you

21   yourself have owned?

22   **A.**   Well, I owned the -- like I said, the floor cleaning

23   company for 17 years.  I did that for about 17 years.

24        Excuse me.  I opened a gym in 2015, a training facility

25   for athletes in Rohnert Park.  Mostly student athletes.  And I

1  had that probably until I moved to Penngrove, which is 2000 --

2  about 2020, I think, I kept it till.

3  Q.   I want to ask you about that time period in your life.

4       First, what was the gym called?

5  A.   Timmins Performance Training Center.  TPTC.

6  Q.   And you mentioned that was in Santa Rosa; correct?

7  A.   Rohnert Park.

8  Q.   Rohnert Park.  Excuse me.

9       As I said, I'm about to ask you about that 2015 to 2020

10 time period.  Before I do that, I just have a few additional

11 questions.

12      Upon request by the United States Attorney's Office,

13 you've been granted immunity prior to your testimony today;

14 correct?

15 A.   Correct.

16 Q.   And what is your understanding of what that immunity

17 entails?

18 A.   It just means that anything I say today can't be used

19 against me in the future is my understanding.

20 Q.   Are you --

21 A.   So I've got to be honest, truthful.  And that's -- that's

22 basically what I -- what I -- what I believe it is.

23 Q.   I was about to ask you, are you permitted to lie under

24 oath as part of that immunity?

25 A.   No.  And I'm a very -- a lot of people laugh, but I'm a

1    born-again Christian recently so there's a bigger man that

2    would be upset with me if I lied.

3    **Q.**    And are you testifying today because you've been

4    subpoenaed by the United States Attorney's Office to do so?

5    **A.**    Correct.  I wouldn't be here otherwise.

6    **Q.**    Now, turning your attention specifically to the 2015 and

7    2000 -- through 2017 time period, you testified that you owned

8    your own gym.

9    **A.**    Correct.

10    **Q.**    How did you, if at all, supplement your income during that

11    time period?

12    **A.**    I didn't have to supplement my income, but I -- but I grew

13    cannabis.  I was a cannabis cultivation -- I cultivated

14    cannabis.

15    **Q.**    Can you please describe for the jury what cultivating

16    cannabis entails as it related to what you were doing.

17    **A.**    Sure.  I mean, you have -- I don't know what your

18    knowledge is of cannabis, but it's a lot of work is what it is.

19    And, you know, I -- I did from seed to sale, which meant I grew

20    the cannabis, put the seed in, grew it.  Cultivated it just

21    means I grew the plant.  You know, indoor growing is a little

22    different than outdoor growing.  I had an outdoor farm as well.

23        It's just -- it's just you're cultivating a plant to

24    flower eventually.  Take the fruits of that plant, you're going

25    to trim it up -- you're going to dry it, trim it up, you're

 1   going to put it in bag and you're going to sell it.

 2   Q.   I want to ask you --

 3         THE COURT:  Are you instructing all these witnesses to

 4   look over at the jury while they're testifying?  Because I

 5   could have counsel go back over here to the middle despite

 6   whatever problems that creates for the court reporter.

 7         MR. FINE:  No -- no, Your Honor, but it would --

 8         MR. KLEINMAN:  I think --

 9         MR. FINE:  I'm sorry.

10         MR. KLEINMAN:  -- if I'm may.  I think it was my

11   question.  I said could you please explain to the jury, and

12   then Mr. Timmins turned over.  So my apologies, Your Honor.

13   I'll --

14         THE COURT:  All right.  Fine.  Okay.

15         MR. KLEINMAN:  Yeah.  I believe that was my mistake.

16         THE COURT:  Okay.

17         MR. KLEINMAN:  Thank you, Mr. Timmins.

18         THE WITNESS:  Sure.

19   BY MR. KLEINMAN:

20   Q.   So I want to talk about the phrase "seed to sale," and I'm

21   going to focus on the sale portion.

22         How long would it take for you to get paid?

23   A.   That's a pretty open question.  Like sometimes it would

24   take months.  You know?  It wasn't an easy business.  Sometimes

25   it would be immediate, depending on what the market was asking

1    for.  You know, when you do it long enough, you see the market,

2    you know, it has -- it has its ebb and flows.

3        Now, because every other state, you know, in the United

4    States is cultivating cannabis, California is not the number 1

5    state so it's not profitable anymore -- any longer.

6        I no longer am in cannabis.  I just do the hauling and

7    demolition.  But it's just -- that's a pretty broad question, I

8    would say.

9    Q.   So fair to say what makes it broad are the various factors

10   that change the length of time it takes to get paid; correct?

11   A.   That's -- that's -- yeah, that's right.  It's just -- it's

12   just the -- yeah, like I said, it's what the market's asking

13   for.

14   Q.   You mentioned -- when you say what the market is asking

15   for, another way to say it is demand; correct?

16   A.   Correct.

17   Q.   What about the quality of the marijuana, what -- how does

18   that affect whether a sale happens very quickly or over a

19   longer period of time?

20   A.   It's everything.  You know, people don't want to buy

21   garbage.

22   Q.   I have another broad question for you.  How much would you

23   get paid for -- let's say, per pound of marijuana?

24   A.   Another -- another very broad question; right?  Because if

25   you were to ask me what cannabis is going for now, first of

TIMMINS - DIRECT / KLEINMAN

1   all, indoor cannabis goes for more than outdoor; right?

2       But if you were -- so let's take indoor, for example.

3   Right now if you grew A-plus-plus, which means it was flawless,

4   you're -- you know, you're maybe getting 1,000, 1,100 a pound.

5   But back in 2020, during COVID, 2021, you're looking at 32- to

6   3,400.  That's a pretty big drop-off.

7       Outdoor, same thing.  You're looking at -- during COVID,

8   2020, 2021, you're looking at 18-, 2,000 a unit for a pound for

9   outdoor.  For -- for light dep.  Light dep, we call it.  It's a

10  greenhouse.  Now, 200.

11      Like I said, it's just not -- it's not a business you want

12  to be in.

13  Q.   And let's take 2017 as an example.

14  A.   Ooh.

15  Q.   Give me the -- if you wouldn't mind, the high end and the

16  low end for marijuana during that time period.

17  A.   I'm going to give you my best -- my best recollection,

18  because I don't have the best memory.  And I'm not using that

19  as an excuse.  I'm trying to remember my girlfriend's birthday

20  on Friday and if I don't, I'm in trouble.

21      So she -- in 2017, I would say it was toward the low end.

22  It was gearing down a little bit.  2018 I remember because I

23  built out a facility, a shop, and I remember it was still low.

24  The indoor was right around 11- to 1,200, and then it shot up

25  soon after that.  You know, it made steps, 1,700, 18-, 19-.  It

1  just shot up.  And then when you got COVID and everybody is

2  sitting around spending COVID money, it got up to 32-, 33-.

3  Q.  And what about the low end; right?  This is the -- right

4  before marijuana became legal in the state of California.

5  A.  What year are you talking?  Do you know what year that is?

6  Q.  December of 2017, let's say, the low end.

7  A.  Oh, the low end?  Probably what I said, it was probably

8  right around -- almost what it's at right now.  Maybe not as

9  low.  I would say the indoor was probably right around 12- or

10 1,300 and the outdoor was probably right around 6- or 700, the

11 light dep.

12 Q.  And in this business, now focusing on 2015 through 2017,

13 how would you typically be paid?  Would it be in cash,

14 electronic bank transfers, or something else?

15 A.  Cash.  They didn't have Venmo back then, I don't think.

16 Q.  Now, turning your attention to the end of 2015 through

17 2016.  What were your sources of supply for marijuana?

18 A.  I grew it.

19 Q.  Fair to say that was your primary source of supply?

20 A.  Correct.  Right.

21 Q.  Did you end up having any other sources of supply for

22 marijuana?

23 A.  I mean, if we're going to get to the point, yeah, I got

24 some cannabis from Jacy Tatum.  Officer Jacy Tatum.

25 Q.  You mentioned Jacy Tatum.  How do you know that person?

TIMMINS - DIRECT / KLEINMAN

1   **A.**   Well, we used to be best friends.

2   **Q.**   How long have you known that person?

3   **A.**   30 years.  Maybe more.

4   **Q.**   Fair to say you grew up with him?

5   **A.**   Yeah.  He's younger than me but he was like a little

6   brother to me.

7   **Q.**   And you used the phrase "used to be best friends."

8   **A.**   Mm-hmm.

9   **Q.**   During this 2015, 2016 time period, what was the status of

10   your relationship?

11   **A.**   Close.  We hunted together.  We fished together.  It was

12   close.

13   **Q.**   And how would you describe your relationship with

14   Mr. Tatum now?

15   **A.**   I hope not to see him in public.

16   **Q.**   Back to that 2015, 2016 time period.  You used the phrase

17   "Officer Jacy Tatum."

18   **A.**   Mm-hmm.

19   **Q.**   Where did Mr. Tatum work?

20   **A.**   Rohnert Park Police Department.

21   **Q.**   And how often would you see each other?

22   **A.**   Daily.  I mean, when we were hunting and fishing and

23   hanging out at, you know, family events, maybe not daily, but,

24   you know, four times a week.  We spent a lot of time together.

25   **Q.**   You've described your personal relationship with Mr. Tatum

 1   and you mentioned your business relationship with Mr. Tatum.  I

 2   want to ask you about now the -- that business relationship.

 3        Again, back in 2015 and 2016, how did you come to enter

 4   into this marijuana arrangement with Mr. Tatum?

 5   **A.**   Well, Mr. Tatum cultivated cannabis himself in his garage.

 6   So as a police officer, you know, of course, I thought that was

 7   a little off, but who am I to say?  I wasn't a police officer.

 8   So he had brought me cannabis to -- you usually use the term

 9   "move" -- to sell for him and give him his profits in cash.

10   **Q.**   And is that how Mr. Tatum initially said he was getting

11   the marijuana?

12   **A.**   Correct.  Yep.

13   **Q.**   He -- he said that -- that he was growing it; is that

14   correct?

15   **A.**   Correct.

16   **Q.**   And did Mr. Tatum describe how he was growing it, if other

17   family members were growing it, or some combination of that?

18   **A.**   It was in his mother's garage, so -- and I had witnessed

19   it.  So I mean, I saw the grow.  So it was happening.  Yeah.  I

20   just assumed he was trying to, you know, make some more money.

21   **Q.**   Now, as time passed, what, if anything, did Mr. Tatum say

22   about how he was obtaining the marijuana?

23   **A.**   He had mentioned that he was getting enough interdiction

24   off the freeway.

25   **Q.**   How did that conversation come up as someone who is very

1  familiar with the marijuana industry?

2  **A.**   Because it was more than normal, I knew that it wasn't out

3  of his garage.  And I had asked him, and he had just basically

4  come clean and told me what it was.

5  **Q.**   You used the phrase, "Mr. Tatum was getting it off the

6  highway."  Did he explain what that meant?

7  **A.**   Yep.

8  **Q.**   Could you please explain to the jury --

9  **A.**   Yes.

10  **Q.**   -- what that means?

11  **A.**   It is -- my understanding was he was on the freeway.  He

12  was part of -- I knew he was part of an interdiction program.

13  He was probably one of biggest police officers to recover

14  certain amounts of cannabis off the freeway without a dog.  He

15  always bragged about it.

16      And he just told me he was up on the freeway in Hopland

17  and Ukiah and north of, you know, Sonoma County and

18  intercepting vehicles, and basically shaking down growers --

19  or, really brokers.  They weren't growers.  They were people

20  that were up north buying cannabis, probably from out of state,

21  had a rented car, coming down the freeway, and he stops them

22  and does this.

23      I don't know.  Almost didn't seem like that bothered him.

24  It was almost like a *Robin Hood* story, you know:  These guys

25  are scumbags and I'm going to take their weed and that's that.

TIMMINS - DIRECT / KLEINMAN

1   Q.   And during that time period, what were the terms between

2   you and Mr. Tatum as it relates to your marijuana arrangement?

3   A.   I would -- I would broker it and then split the proceeds.

4   Q.   And just to be clear, when you say "broker it," is that

5   another term for selling the marijuana?

6   A.   It is, yeah.

7   Q.   And you used the term "split the proceeds" --

8   A.   Split the cash.  So if there was a thousand dollars, I got

9   five, he got five.

10  Q.   So fair to say you split it 50/50?

11  A.   Correct.

12  Q.   Turning your attention to the end of 2016, beginning of

13  2017, did your marijuana arrangement with Jacy Tatum

14  temporarily end?

15  A.   I -- I don't remember.  To be quite honest with you, I

16  don't know the dates, but it did stop for a little while and I

17  can't remember why.  I don't know if he just -- I don't know

18  why it stopped, to be quite honest.

19  Q.   Are you familiar, Mr. Timmins, with Proposition 64?

20  A.   I've heard it.  I don't know why it -- again, my memory is

21  not great, but...

22  Q.   Are you familiar with the law in which marijuana became

23  legal in the state of California?

24  A.   I'm not up to date on the law, no, I'm not.

25  Q.   And now I want to focus on this period where there was --

1    I believe you testified to a pause; is that right?

2    A.    Right.

3    Q.    When that happened, how was your relationship with

4    Mr. Tatum during that period?

5    A.    It was fine.  We -- like I said, we hunted together.  We

6    shot archery.  We -- I had a property up north.  We hunted up

7    there.  I mean, we hung out a lot.  Like I said, he was -- he

8    was like a little brother to me.

9    Q.    So the pause, fair to say, didn't affect your close

10    personal relationship?

11    A.    No.  Nope.

12    Q.    I have a few questions about if and when the pause stopped

13    and you resumed.

14        Turning your attention to December of 2017, did you enter

15    into a new or different marijuana arrangement with Mr. Tatum?

16    A.    What date?

17    Q.    This is in and around December of 2017.

18    A.    No, I don't think we -- we got into anything new.  It just

19    resumed, I think.  I don't know if that makes sense, like...

20    Q.    When you say "it resumed," was this arrangement with just

21    you and Mr. Tatum or was someone else involved?

22    A.    It was just Jacy Tatum and I.

23    Q.    And during that -- that time period, did Mr. Tatum tell

24    you how he was going to obtain the marijuana?

25    A.    Yeah.  He was back up on the freeway.

1  Q.    And did he say who he was going to be back on the freeway

2  with?

3  A.    He was with Officer Joe Huffaker on one occasion that I

4  can remember that I met them up on the freeway.

5  Q.    I want to talk to you about that occasion.  But taking a

6  step back, in terms of this December 2017 time frame, when

7  Jacy Tatum discussed resuming the activities on the highway,

8  what was the arrangement as it related to the split of cash

9  from any potential sales?

10  A.    It was the same.

11  Q.    And by "the same," do you mean 50/50?

12  A.    Yup.  Yeah.  Yes, sir.

13  Q.    And were you aware prior to the resuming of the

14  relationship -- excuse me -- of the marijuana arrangement who

15  Joseph -- who Jacy Tatum would be going out on the highway

16  with?

17  A.    Joe.  Joe Huffaker is who he was out there with.

18  Q.    And how do you know that?  Is that something --

19  A.    Jacy told me, yeah.

20  Q.    Now, you mentioned the name Joseph Huffaker.  How do you

21  know that person?

22  A.    I know him through Officer Jacy Tatum.

23  Q.    And is it fair to say he's just an acquaintance?

24  A.    Yeah, I mean, I like Joe.  I didn't -- we were fine, but I

25  didn't hang out with Joe like I hung out with Jacy.

TIMMINS - DIRECT / KLEINMAN

1   Q.   Prior to December of 2017, you interacted with Joseph

2   Huffaker on multiple occasions at -- through Jacy Tatum;

3   correct?

4   A.   Yes.  Family events, maybe a birthday party, 4th of July.

5   I mean, yeah, I had talked to Joe before.

6   Q.   Things like that, certain social -- social events?

7   A.   Correct.

8   Q.   Do you see the person by the name of Joseph Huffaker in

9   the courtroom today?

10  A.   I do.

11  Q.   Can you please point to that person and identify an

12  article of clothing that person is wearing?

13  A.   The gentleman wearing the nice suit, blue, nice suit.

14         MR. KLEINMAN:  Let the --

15         THE COURT:  I don't know.  It's hard to tell.

16         MR. KLEINMAN:  We have a couple of blue --

17         THE WITNESS:  They're all wearing nice suits.  I would

18  say second in from the left.

19         MR. KLEINMAN:  Let the record reflect that the witness

20  has identified the defendant.

21         THE COURT:  It will.

22  BY MR. KLEINMAN:

23  Q.   I want to talk to you about the one occasion that you

24  mentioned.  Can you describe that to the members of the jury?

25  A.   Certainly.  Jacy Tatum made a phone call to me and asked

1  me if I could come up on the freeway to an exit near Hopland,

2  Cloverdale, an exit in Cloverdale, if I could drive up there

3  and pick up, basically, a load of cannabis because he was going

4  to stay out and keep working.

5      And that wasn't something I normally did.  I would

6  typically wait at my house, and he would drop it off and that's

7  how it went down.  But that day, I went up.  I picked up the

8  bags of cannabis.  Excuse me.  I loaded them in my car.  Joe

9  Huffaker and Jacy were there helping me load them up, and I

10  brought it home and that was it.

11  Q.   And fair to say this was a fairly short interaction?

12  A.   Very short, yeah.  I didn't want to be there.

13  Q.   Do you remember roughly where the meeting took place?

14  A.   I can tell you it was -- the exit stand out because it's

15  got a different name, it's Coslinksy [phonetic] exit or -- it's

16  something along those lines.  I can't remember the exact name.

17  Q.   You said Cosinski [phonetic].  Is it Commisky?

18  A.   What is it?

19  Q.   Commisky exit.

20  A.   Commisky exit, yes, sir.  I knew it was something along

21  those lines.

22  Q.   A few more questions about -- about that day.

23      When you first got that call, were you in the Rohnert Park

24  area such that you had to drive a ways to get --

25  A.   Yeah.  I think I was.  I can't remember exactly.  Like my

1   kids had sports and I was doing other things, but I was in that

2   area.

3   Q.   And when you then -- can you tell the members of the jury

4   roughly where the Commisky exit is?

5   A.   It is -- it's up in Cloverdale, I think.  I don't think

6   it's yet in Hopland.  I think it's in Cloverdale.  Cloverdale

7   is probably 30 miles from, 25 miles from -- I don't know the

8   distance, but it's a good ways.  It's about an hour up from

9   Santa Rosa.

10  Q.   And where is Cloverdale in relation to Hopland?

11  A.   Cloverdale is on the way to Hopland.  It's right before

12  Hopland on the way to Ukiah.

13  Q.   When you got to that area, were you able to find

14  Jacy Tatum and Joe Huffaker right away or did you have to make

15  numerous calls or something else?

16  A.   I made some calls.  I didn't know where that exit was at.

17  There was a few calls made, I believe.

18  Q.   But you did eventually find them; correct?

19  A.   Oh, yeah.

20  Q.   Now I want to talk about when you first met them.  You

21  testified that you transferred the marijuana, and Jacy Tatum

22  and Joseph Huffaker helped transfer that marijuana to your car;

23  is that correct?

24  A.   Yeah.  We just threw the bags in the car.

25          THE COURT:  If you have just a few questions

1    concerning that particular date and time, that would be fine;

2    but if you're going to go into it in considerable detail, we

3    probably should take a break because we came out here, again,

4    about an hour and a half before.  Give me just an idea.  I

5    don't like to break it up right in the middle, but about how

6    much longer do you think you might be on the Commisky exit?

7         **MR. KLEINMAN:**  Just a few more questions, Your Honor,

8    I think a few minutes.

9         **THE COURT:**  There is actually a former Ninth Circuit

10   Court of Appeals judge named Alex Kozinski, but's he's not from

11   up there.  He's from Southern California.  I don't think he has

12   an exit named after him.

13        Thank you.  All right.  Go ahead.

14   **BY MR. KLEINMAN:**

15   **Q.**   Do you -- can you describe to the members of the jury the

16   car that Jacy Tatum and Joseph Huffaker were driving?

17   **A.**   I believe it was an unmarked -- the Fords, because I had

18   the same car that my ex-wife -- now my ex-wife had a -- the

19   Ford Explorer.  I believe it was that car.  Again, my memory is

20   not the best, but I believe it was something along those lines.

21   **Q.**   And what -- what were -- what was Joseph Huffaker wearing?

22   **A.**   Again, I can't remember those details.  I mean, obviously,

23   he had his service weapon and I believe a vest on.  He wasn't

24   in uniform.  He wasn't in a basic Rohnert Park PD uniform.  I

25   believe they were in plain clothes.

1           **MR. KLEINMAN:**  Your Honor, I think this is a fine

2    place to stop; although I -- I could probably finish up the

3    questions in about five minutes.  I'll just note that for the

4    record, but we can stop.

5           **THE COURT:**  Let me ask the reporter.

6       Do you need a break, or if we just went for five minutes,

7    could he finish that up?

8       It's up to the reporter.

9              (The Court and the official reporter confer.)

10          **THE COURT:**  She says it's up to you.  So it's up to

11   you, Mr. Kleinman.

12          **MR. KLEINMAN:**  We can stop.

13          **THE COURT:**  So I'll ask you to stand by here,

14   Mr. Timmins, until the jury files out.

15          **THE WITNESS:**  Okay.

16          **THE COURT:**  Then you can step down, but you need to

17   come back.

18          **THE WITNESS:**  I do?

19          **THE COURT:**  Yes, you have to come back at five after

20   1:00.

21          **THE WITNESS:**  I thought I was done.

22          **THE COURT:**  That's the same for you, ladies and

23   gentlemen, five after 1:00.

24          **THE WITNESS:**  Thank you.

25              (The jury leaves the courtroom.)

1    (Proceedings were heard out of the presence of the jury.)

2         THE COURT:  Okay.

3         THE WITNESS:  Are we good?

4         THE COURT:  You're good to step down.

5         THE WITNESS:  All right.

6         THE COURT:  All right.  So, Counsel, be back in about

7    an hour, that's five after 1:00.  See you then.

8         MR. KLEINMAN:  Thank you, Your Honor.

9              (Recess taken at 12:05 p.m.)

10             (Proceedings resumed at 1:07 p.m.)

11   (Proceedings were heard out of the presence of the jury.)

12        THE COURTROOM DEPUTY:  Please come to order.

13        THE COURT:  Okay, where is our witness?

14   Anything we need to do before I call the jury back in?

15        MR. KLEINMAN:  No, Your Honor.  Thank you.

16        THE COURT:  No?  Well, we'll just wait for Mr. Timmins

17   to come back.

18   Okay.  She's going to bring the jury in.  If he can get up

19   here before they get here, fine.  Thank you.

20        THE WITNESS:  Yes, ma'am.

21             (The jury enters the courtroom.)

22   (Proceedings were heard in the presence of the jury.)

23        THE COURT:  Okay.  Good afternoon.

24        THE COURTROOM DEPUTY:  Please be seated.

25        THE COURT:  Ladies and gentlemen, we'll continue with

1    the direct examination.

2         MR. KLEINMAN:  Yes, Your Honor.  Thank you.

3    BY MR. KLEINMAN:

4    Q.   Good afternoon, Mr. Timmins.

5    A.   Hello.

6    Q.   So we were discussing the time when the defendant and

7    Mr. Tatum transferred marijuana into your car in December of

8    2017.  Just a few more questions about -- about that instance.

9         You said that the transfer occurred and you ultimately met

10   off of the Commisky exit; is that correct?

11   A.   Correct.  I think that's the name of the exit.  It's close

12   to that.

13   Q.   Can you describe the area where the transfer actually took

14   place?

15   A.   It happened down off the road, off the highway there.

16   That exit goes down and it goes -- it's a dirt road.  Pretty

17   much it goes almost down to the river there, or the creek,

18   whatever you want to call it.  I think it's Feliz Creek.

19   Q.   Now, can you describe how the marijuana was packaged that

20   was transferred to your car?

21   A.   So when you package cannabis, it's done -- the flower is

22   put into a turkey bag.  Just like the regular turkey bags you

23   get at the store, only we get them in bulk.  But most everybody

24   does that.  Or they will -- people up north will seal it in a

25   vacuum-sealed bag.  And that's how it was sealed up, most of

1    it, so it doesn't give off an odor, so when they're coming down

2    the highway, they get in -- you know, the odor doesn't set off

3    alarms for a police officer when they're getting pulled over.

4        But, so that was -- I believe it was all in -- most of it

5    was in turkey bags.  And then it's packaged into a black

6    garbage bag, like a big black garbage bag.  And you can fit

7    approximately 20, 22 units, pounds in a bag.

8    Q.   And was the car full of those bags -- of those trash bags

9    or was it just one trash bag or some combination thereof?

10   A.   It was multiple black bags.  Probably like eight bags.  It

11   was full, the car was full, to answer that question, yeah.

12            MR. KLEINMAN:   If we could, Ms. Hernandez, pull up

13   Exhibit 169, this is already in evidence, and show it to the

14   witness and the jury, page 538.

15            THE COURTROOM DEPUTY:   69?

16            MR. KLEINMAN:   I'm sorry.  169.

17       And, Ms. Hernandez, if we could blow up the bottom portion

18   of that page.  Thank you.

19   BY MR. KLEINMAN:

20   Q.   Mr. Timmins, just a couple of questions on -- on this

21   exhibit.

22       Directing your attention to the call on December 6,

23   12:29 p.m., do you see the phone number next to that call?

24   A.   I do.

25   Q.   Whose phone number is it?

TIMMINS - DIRECT / KLEINMAN

1   **A.**   That's my phone number.

2   **Q.**   So, now, for the record if you could read your phone

3   number into the record.

4   **A.**   (707)484-9727.

5   **Q.**   And on the date of December 6, fair to say there were a

6   series of calls with your phone number there?

7   **A.**   Correct.

8        **MR. KLEINMAN:**   Okay.  If we can take this exhibit

9   down.

10  **BY MR. KLEINMAN:**

11  **Q.**   Mr. Timmins, you testified earlier this morning that you

12  said this meeting on the -- at the Commisky exit is unique; is

13  that correct?

14       You didn't typically meet and exchange marijuana off the

15  side of the road?

16  **A.**   Correct.  It was not typically how it was -- how we did

17  it; correct.

18  **Q.**   How would you typically receive the marijuana during this

19  time period?

20  **A.**   Officer Jacy Tatum would deliver it to my house.

21  **Q.**   And this is in December of 2017?

22  **A.**   Yeah, I don't -- like I said, the dates are -- I'm off on

23  dates, but, yes, it was around that time frame.

24  **Q.**   This is the time after the pause?

25  **A.**   Correct.

1  Q.    Like when it -- when you were back on?

2  A.    Correct.  Correct.

3  Q.    And once you received the marijuana, what did you do with

4  it?

5  A.    I sold it.

6  Q.    Do you recall the quality of the marijuana from those

7  trash bags?

8  A.    No.  Just -- just to be honest, if -- it was -- it wasn't

9  always great, you know.  I recall talking to Jacy Tatum about

10 it.  But it was what it was.  You know, at that time, cannabis

11 was selling and you could pretty much move anything.  And what

12 I mean by "move" is sell anything.

13 Q.    So you spoke to Jacy Tatum about the quality of the

14 marijuana, I believe you said not being great; is that right?

15 A.    Yes.  Not -- not -- not always, but, yeah, sometimes it

16 wasn't so great.

17 Q.    Now, you said you successfully sold the marijuana.  Did

18 you, in fact, receive cash from those sales?

19 A.    Yes.

20 Q.    And what did you do with the cash?

21 A.    I split it between Officer Jacy Tatum and myself.  And --

22 yeah, I just -- I split the proceeds.

23 Q.    And was that the 50/50 split that you had testified to

24 earlier?

25 A.    Correct.

1    Q.    You testified this morning that Jacy Tatum told you that

2    he was going to go out with -- this time with Joseph Huffaker.

3    A.    Right.

4    Q.    Do you recall that?

5    A.    I do.  He had mentioned Joe's name, and -- yeah, I do

6    remember that.

7    Q.    I want to ask you about that conversation.

8          When Jacy Tatum told you that, how did you react?

9    A.    I didn't like it.  I mean, I didn't like another officer

10   being around, but I didn't -- I knew Joe, but I didn't really

11   know him.  And the deal was between Jacy and I, not, you know,

12   with Joe.

13   Q.    What did Jacy Tatum say?

14   A.    He vouched for Joe.

15   Q.    Now, turning your attention to in and around September of

16   2023.  Did Jacy Tatum inform you that he had given your name to

17   federal law enforcement?

18   A.    Say that one more time.  Sorry.

19   Q.    Turning your attention to in and around September of 2023,

20   did Jacy Tatum inform you that he had given your name to

21   federal law enforcement?

22   A.    Yes.  That was right -- yes, I was -- I know that date

23   because I had gotten both my knees replaced in July and I know

24   it was -- I was going to rehab at Kaiser and I know that date

25   for a fact, yes.

1    **Q.**    And you mentioned Kaiser.

2    **A.**    Yeah.

3    **Q.**    Where did you and Jacy Tatum meet to discuss that -- that

4    information?

5    **A.**    The first time we met was the day before I went to rehab.

6    So he asked me to meet him at his house.  And so I didn't think

7    anything of it and we met in his kitchen and he told me that

8    and I wasn't real happy about it.  And the next day he called

9    me and I said, "Hey, I'm going to my rehab.  You're going to

10   have to meet me there."  And we spoke in my car.

11   **Q.**    And what did he say to you?

12   **A.**    He just told me that he was -- you know, he asked me -- he

13   needed me to corroborate -- not needed but wanted me to

14   corroborate the story about Joe being at that stop in -- on

15   Commisky at -- whatever that street is.  That he needed -- he

16   needed a corroboration to his story because he's -- you know,

17   he's not a great officer so he needed somebody to back up his

18   story.

19        And I told him, you know, I'd do anything to help him but

20   that's going a little too far if you want to drag me into your

21   mess.  This is something that -- you know, that he created.

22   And long story short, it didn't go very well.

23   **Q.**    When you say it didn't go very well, you were angry with

24   him?

25   **A.**    Oh, yeah.  Yeah.

**TIMMINS - CROSS / CEBALLOS**

1  Q.   And was that the last time you spoke to Mr. Tatum?

2  A.   The last -- the last thing I heard from Jacy Tatum was in

3  my car, I told him to get out of my car and -- yeah, I didn't

4  want to see him.  And it was pretty much -- he left me a voice

5  message -- I don't know -- about the case and, you know, the

6  evidence they had and all this.  It's kind of a threat to me.

7       And I just, you know, I've never spoken to him and I've

8  never seen him and I never want to see him.

9            MR. KLEINMAN:  One moment, Your Honor.

10      Nothing further.  Thank you.

11           THE COURT:  All right.  Cross-examination.

12           MR. CEBALLOS:  Thank you, Your Honor.

13                    **CROSS-EXAMINATION**

14  BY MR. CEBALLOS:

15  Q.   Good afternoon, Mr. Timmins.

16  A.   Good afternoon.

17  Q.   Just want to follow up on -- Mr. Kleinman was asking you

18  questions about this interview you had with the FBI back in

19  2023.

20      When the FBI first set up this meeting with you to

21  interview you, it took some time before the meeting actually

22  occurred; is that correct?

23  A.   Sure.

24  Q.   Yeah.

25      They kept calling you and you kept basically saying, "I

**TIMMINS - CROSS / CEBALLOS**

1  can't talk to you right now.  I'm busy"?

2  **A.**   No, I just -- yeah, I had to talk to my attorney and I

3  just -- I told Officer Tatum the same thing, I needed to talk

4  to my attorney.

5  **Q.**   So you actually talked to Tatum before you spoke with the

6  FBI?

7  **A.**   Just the talk that I just explained in his kitchen and

8  then in my car.

9  **Q.**   Okay.  And that's where Tatum said, "Hey, I need you to

10  corroborate my story about Officer Huffaker"?

11  **A.**   He didn't say I needed to -- that he needed me to.  He

12  just was hoping that I could speak to the FBI and give them my

13  account.

14  **Q.**   Okay.  And so eventually you did actually meet up with the

15  FBI?

16  **A.**   Correct.

17  **Q.**   All right.  And in that interview with the FBI, in fact,

18  it was one of the agents seated here in court; correct?

19  **A.**   Correct.

20  **Q.**   All right.  That's Agent Duncan Haunold?

21  **A.**   Correct.

22  **Q.**   And he was there with another agent; correct?

23  **A.**   Correct.

24  **Q.**   And at this meeting, which occurred at some diner --

25  **A.**   I think it was a coffee --

TIMMINS - CROSS / CEBALLOS

1  Q.   Coffee shop?

2  A.   Yep.

3  Q.   Okay.  You explained first your relationship with

4  Jacy Tatum; correct?

5  A.   I did.

6  Q.   Very close friends?

7  A.   Very close friends.

8  Q.   Lifelong friends?

9  A.   Lifelong.

10 Q.   Went hunting, fishing, did everything together?

11 A.   Yep.  Yes, sir.

12 Q.   And they then asked you about what you knew what your

13 friend was up to when it came to marijuana and stealing it;

14 correct?

15 A.   Correct.

16 Q.   You did tell him at the time that you knew that he was

17 cultivating marijuana out of his mom's house; right?

18 A.   I don't remember if I did or not at that meeting.  I

19 can't -- I don't recall.

20 Q.   Okay.  But --

21 A.   Yeah.

22 Q.   He was; right?

23 A.   Was he?

24 Q.   Yeah.

25 A.   Yes.

1  Q.   How long had you been cultivating marijuana?

2  A.   I don't -- I don't know the exact dates but it had been a

3  couple of years, I'm sure.

4  Q.   So this occurred in 2023.

5       Was he cultivating marijuana back when he was asking you

6  to sell the marijuana he stole?

7  A.   He was at one time or another, yeah.

8  Q.   Okay.  So it would be fair to say in 2015 and 2016, he was

9  cultivating marijuana?

10  A.   That can be a fair assessment.  I'm not sure of the dates

11  but that could be correct.

12  Q.   Okay.

13  A.   Yep.

14  Q.   And you knew that because you actually went to his mom's

15  house and saw the cultivation; correct?

16  A.   Yes.

17  Q.   Was it a large cultivation or -- describe it.

18  A.   No.  It was small garage, two-car garage.

19  Q.   Okay.  How many plants do you think he was cultivating?

20  A.   I don't know.

21  Q.   And did you ever ask him, say, "Hey, Jacy, you're a police

22  officer.  What are you doing cultivating marijuana?"

23  A.   Yeah.  But I mean, that's his business.  He's a grown man.

24  Q.   Okay.  You asked him, though.  So what was his response?

25  A.   He didn't have one.  He just said he's got to make extra

**TIMMINS - CROSS / CEBALLOS**

1  money.  I mean, it's -- it's pretty fair to say that's why you

2  do it.

3  **Q.**  But you're his close friend; right?

4  **A.**  Correct.

5  **Q.**  So why didn't you as a close friend say, "Hey, Jacy, what

6  are you doing?  You shouldn't be growing marijuana"?

7  **A.**  No.  It's not my business.  Sorry.  It's not my business.

8  He's a grown man, like I said.

9  **Q.**  Okay.

10      So he's cultivating marijuana while he's a police officer,

11  and he's asking you to sell the marijuana that he cultivates?

12  **A.**  Not all the time.

13  **Q.**  Well, who else would he take the marijuana to if he --

14  **A.**  He had an uncle that he got rid of marijuana through.  It

15  wasn't just me.

16  **Q.**  Do you know who that was?

17  **A.**  I do not.

18  **Q.**  Did you ever meet this uncle?

19  **A.**  Never.

20  **Q.**  When you interviewed with the FBI back in 2023, did you

21  tell the FBI whether or not you were aware of Tatum's

22  interdiction scheme where he was stealing marijuana?

23          **MR. KLEINMAN:**  Objection.

24          **THE COURT:**  Grounds?

25          **MR. KLEINMAN:**  Your Honor, it -- the witness has

1    answered that he requested to speak to an attorney.

2         **THE COURT:**  Just -- I'm sorry.  The witness, "he

3    answered earlier," is not a ground.

4       What ground are you objecting under?

5       And the question is:  "When you interviewed with the FBI,

6    back in 2023, did you tell the FBI whether or not you were

7    aware of Tatum's interdiction scheme where he was stealing" --

8    I can't read the rest -- stealing something.

9         **MR. KLEINMAN:**  I'll withdraw the objection.

10        **THE COURT:**  All right.

11        **MR. CEBALLOS:**  Say it again, please.

12        **THE WITNESS:**  Sorry.

13        **THE COURT:**  When have the court reporter takes things

14   down, it's not always legible to us.

15      Okay.  Do you have your question in mind?

16        **MR. CEBALLOS:**  I can restate it, Your Honor.

17        **THE COURT:**  Okay.

18   **BY MR. CEBALLOS:**

19   **Q.**   Sir, when you interviewed with the FBI in 2023, they asked

20   you if you were aware of Mr. Tatum's interdiction scheme where

21   he would steal marijuana and then turn around and sell it?

22   **A.**   Are you speaking of the first meeting that I had with him

23   at the coffee shop?

24   **Q.**   Yes.

25   **A.**   No, I didn't answer that question.  I told him I needed to

1  speak with my attorney at that point.

2  **Q.**   Well, they at some point asked you if you were selling

3  marijuana; correct?

4  **A.**   No, not at that meeting, I don't believe.  Not that I

5  remember.

6  **Q.**   The FBI never asked you at that first meeting?

7  **A.**   No, not at the first meeting.  I don't believe that they

8  asked me that.  If they did, I told them that I needed to go

9  speak with my attorney.  Again, I can't remember that -- that

10  full meeting.  I mean, it's two years ago.  I'm doing my best

11  to remember what I said.

12  **Q.**   Okay.

13      They did ask you, though, to explain your relationship

14  with Mr. Huffaker, though?

15  **A.**   With Mr. Huffaker?

16  **Q.**   Yeah.

17  **A.**   I didn't have a relationship with Mr. Huffaker.  He was

18  Jacy Tatum's partner and eventually it got to that, I think,

19  our second meeting when we spoke.  Yes.

20  **Q.**   So do you recall telling the FBI at this first meeting

21  that you really didn't know Mr. Huffaker?

22  **A.**   I don't remember speaking about Joe.  We -- I shut it down

23  when they started asking certain questions, so then the meeting

24  ended.

25  **Q.**   You don't recall telling Special Agent Haunold that your

1  dealings with Mr. Huffaker were limited to seeing him at the

2  fire station or police station, maybe on a fishing trip, maybe

3  at a barbecue?

4  **A.**   I told them that eventually, but I'm telling you that I

5  don't know that it happened the first meeting.

6  **Q.**   You never told the agents at this first meeting about the

7  incident where he and Mr. Tatum allegedly brought marijuana to

8  you; is that correct?

9  **A.**   Are you asking me about the first meeting again?

10 **Q.**   Yes.

11 **A.**   I don't -- I don't recall.  I didn't speak of that at the

12 first meeting that I recall.  Again, I had two meetings with

13 them, and I'm sure it was said at the second meeting.

14 **Q.**   Okay.  So, again, just to clarify, this first meeting is

15 in October of 2023?

16 **A.**   First meeting was, I believe, September of 2023.

17 **Q.**   Okay.

18 **A.**   As I said, I got my new knees in July and it was

19 two months after, so I think it was September.  Could have been

20 October.  Could have run into October.  I'm not sure.

21 **Q.**   But the second meeting with them was all the way of May of

22 2025, some 17 months later?

23 **A.**   Yeah, it was a long time.

24 **Q.**   Yeah.  Why did it take that long?

25 **A.**   Because I didn't feel comfortable talking to the FBI.

**TIMMINS - CROSS / CEBALLOS**

1  Until I got an immunity deal that wasn't going to affect me,

2  I'll tell the truth; but until it happened, I wasn't

3  comfortable.

4  **Q.**  Did anything happen to you during that time?

5  **A.**  No.  What do you mean happen to me?

6  **Q.**  Well, did officers serve a search warrant on your house in

7  December of 2024?

8  **A.**  Yeah.  Yeah, they did.

9  **Q.**  Yeah?

10  **A.**  Fish and wildlife.

11  **Q.**  What did they find?

12  **A.**  They found cannabis.

13  **Q.**  Yeah.

14     So that's a huge incident, right, having a search warrant

15  served on your house?

16  **A.**  I mean, yeah, it was uncomfortable.  But they found

17  cannabis.

18  **Q.**  Cannabis.  Again, I'm sorry.  I distinguish cannabis as

19  marijuana, but I know there's a difference.

20  **A.**  There's a difference between marijuana and cannabis?

21  **Q.**  Yes.

22  **A.**  No.

23  **Q.**  No.  Okay.

24  **A.**  It's pretty much the same thing.

25  **Q.**  All right.  So they searched your house December of 2024.

1    These officers find cannabis?

2    A.   Right.

3    Q.   Okay.  That caused you some concern that you may be --

4    perhaps be looking at criminal charges?

5    A.   No.  I thought it was two separate entities.

6    Q.   You knew at the time that cultivating marijuana, while not

7    a state crime, was a federal crime?

8    A.   Yeah, it's not federally recognized; right.

9    Q.   Right.  So you had just met with the FBI in 2023, asking

10   you about marijuana --

11   A.   Right.

12   Q.   -- and now you get caught growing marijuana?

13   A.   Right.

14   Q.   That didn't concern you?  "I better do something"?

15   A.   No.

16   Q.   No?

17   A.   Not at all.

18   Q.   So --

19   A.   Again, it was fish and wildlife, and I've never been

20   charged by them.  It was cannabis that they found.  They told

21   me they were looking for, you know -- what did they say -- they

22   were there for environmental reasons up at my farm that I was

23   trying to be state compliant in, and his words out of his mouth

24   was:  We didn't find anything.  Your farm is compliant.  It's

25   very clean.

1    And so I asked:  So why are you here?

2    **Q.**   So it was about five months after that search warrant on

3    your house that you have the second interview with the FBI?

4    **A.**   Again, I'm not good with dates, but that's probably close

5    to right, yes.  Yes, sir.

6    **Q.**   And prior to having the second interview with the FBI, you

7    demanded immunity?

8    **A.**   Yes.

9    **Q.**   And you did that why?

10    **A.**   So I wouldn't be -- you know, so I could sit up here, tell

11    my story, tell the truth, and not be prosecuted for it in the

12    future.

13    **Q.**   Well, also not be prosecuted for growing marijuana; right?

14    **A.**   I don't know.  I'm not worried about being prosecuted for

15    growing cannabis or marijuana.

16    **Q.**   What about lying to the FBI?

17    **A.**   No.  I've never lied to the FBI.

18    **Q.**   Okay.  At the second meeting, did you finally admit to the

19    FBI agent that you had been selling the marijuana that Tatum

20    was stealing from people?

21    **A.**   Yes.  The second meeting I was forthcoming and told them

22    what I knew.

23    **Q.**   And did you tell them when you began selling marijuana for

24    Mr. Tatum that he had stole?

25    **A.**   Again, I'm not good with dates.  I know -- I believe it

TIMMINS - CROSS / CEBALLOS

```
 1    started in 2016 or '17, but, again, I don't know the dates
 2    exactly.  That's all.
 3    Q.   Could it have started as far back as 2015?
 4    A.   I don't think so.  I don't know.  I don't know the dates.
 5    Q.   Did --
 6    A.   I don't recall a date.
 7    Q.   When did your friend, Jacy Tatum, finally admit to you
 8    that the marijuana he was having you sell he was getting it not
 9    from cultivation, but from stealing it from people?
10    A.   It was probably a short time after we started -- excuse
11    me.  Because, like I said before, I knew that he wasn't
12    cultivating that much cannabis or marijuana, whatever you want
13    to call it.
14    Q.   So --
15    A.   So it was a conversation that we had at some point.  I
16    just don't recall the exact words.  I'm sorry.
17    Q.   So sometime in 2016, you knew, because he told you, that
18    the marijuana he was having you sell, he stole it?
19    A.   Yeah.  I believe so, yeah.
20    Q.   All right.  And, again, knowing that he's a police
21    officer, did you say anything to him to the effect, "Jacy, what
22    are you doing stealing from people?"
23    A.   We had a conversation about it.
24    Q.   Oh.  Okay.
25    A.   Yeah, like I said, before we had a conversation about it.
```

TIMMINS - CROSS / CEBALLOS

1   Q.   What did he say?

2   A.   He said that he wasn't worried about it.  He was always

3   under the assumption he's a police officer and he was pretty

4   high ranked, that it was all good.  And, again, I wasn't going

5   to sit here and keep questioning him.  He's -- like I said,

6   he's a grown man.

7   Q.   Well, the marijuana that he had you sell before, the

8   marijuana that he was growing out of his mom's house, you

9   didn't have any problem selling that for him; correct?

10  A.   No.

11  Q.   But when he starts asking you to sell marijuana that he

12  stole, that's a little different; wouldn't you agree?

13  A.   I was -- I brokered marijuana and cannabis.  I didn't have

14  a problem with it.  I mean, that was his deal.  I don't know

15  where he got it from.  I wasn't going to sit here and ask him

16  every single time that I saw him:  Where did you get this from?

17       Do you know what I mean?  It had just happened.  The

18  relationship had happened, and I sold his cannabis.

19  Q.   Yeah, but you knew that the cannabis you were selling was

20  basically stolen property?

21  A.   Yes.

22  Q.   Okay.  And you had to know that by selling stolen

23  property, that implicates you?

24  A.   I -- yes, I took that risk.  You're right.

25  Q.   And you knowingly did that?

TIMMINS - CROSS / CEBALLOS

1    A.    I did.

2    Q.    This incident that you -- well, it was at this interview

3    in May of '25 that you first mentioned to them that you recall

4    meeting my client at the side of the road in Commisky; is that

5    correct?

6    A.    It was which meeting?

7    Q.    The second meeting, the one in '25, the most recent.

8    A.    Yes.

9    Q.    Okay.

10   A.    Correct.

11   Q.    And how was it -- who brought this up?  Who brought it up?

12   Did you volunteer, "Hey, I recall an incident with

13   Mr. Huffaker"?  Or did they bring it up, the FBI?

14   A.    I knew that the case was going on.  I knew, you know -- I

15   knew I had to just tell them the story that I knew.  And so I

16   brought it up, I believe.  I don't know who brought it up, but

17   I came forth and told them what I knew.

18   Q.    Was this the information that Jacy Tatum wanted you to

19   corroborate for him?

20   A.    He didn't say exactly.  He just asked me if, you know,

21   they talked to me, if I would tell the truth.  And, you know,

22   he's sorry for bringing me into this mess.  But, you know, it

23   was what it was.  But, you know, it -- I just basically told

24   them what I knew.  That's all.

25   Q.    You've said several times today that your memory is not

TIMMINS - CROSS / CEBALLOS

1   the best.

2   **A.**   Mm-hmm.

3   **Q.**   Correct?

4   **A.**   It's not great.

5   **Q.**   So you're being interviewed in May of 2025, and you recall

6   an incident that happened on December 4 of 2017; is that

7   correct?

8   **A.**   That is correct.

9   **Q.**   How is it that you were able to remember?

10  **A.**   It was -- I mean, it's a pretty big deal when you're

11  meeting police officers to pick up cannabis.

12  **Q.**   Okay.

13  **A.**   Again, I didn't say -- I didn't know the exact dates.  I'm

14  not on there saying the exact dates.  I don't know the exact

15  date.  I believe it was in December but I don't know the exact

16  date.

17  **Q.**   When the FBI actually interviewed you, they showed you

18  some cell phone records; right?

19  **A.**   Oh.  Yeah.  The cell phone records were just here.

20  **Q.**   Yeah, yeah.  Okay.

21  **A.**   There you go.

22  **Q.**   And they actually pointed to you and said, "Hey, your cell

23  phone is here on December 24.  That had to be the date; right?"

24  **A.**   They didn't --

25          **MR. KLEINMAN:**  Objection.

1        **THE WITNESS:**  Yeah.  They --

2        **THE COURT:**  Ground?

3        **MR. KLEINMAN:**  Misstates the evidence.  December 24

4    has never been asked and answered.

5        **MR. CEBALLOS:**  I'm sorry.  December 4.

6        **THE COURT:**  Okay.

7    BY MR. CEBALLOS:

8    Q.    Did they tell you -- when they were showing you the phone

9    records, did they specifically point you to the December 4

10   phone records?

11   A.    They might have pointed those out.  I -- I'm not sure.

12   Again, I'm not sure.

13   Q.    And in looking at those phone records and your memory

14   being what it is, you just basically said, yeah, that sounds

15   about right?

16   A.    No.  I just -- I do remember that time it happening.  I

17   remember the event.  I just wasn't sure on the exact dates is

18   what I'm saying.

19   Q.    Now, your memory of this event, however, you did not

20   mention in your first meeting with the FBI; correct?

21   A.    I don't believe I did, no.  I think I shut down the

22   interview when they stated asking certain questions.  I wanted

23   to refer to my attorney.

24   Q.    I think they also showed you some phone records for the

25   date of December 6; correct?

1    A.    I'm not sure about that either.

2    Q.    Do you remember them showing you some records and you

3    stating something to the effect, "It couldn't have been that

4    date because I was up in Hopland at my farm fishing"?

5    A.    Well, they had -- they had mentioned there was a lot of

6    phone calls and I -- and I had just told them that I had a farm

7    up in Hopland, so a lot of phone calls that I made to

8    Officer Tatum or he made to me was just being up in -- at the

9    farm.  I don't know if that makes sense but a lot of those

10   phone calls were wherever they're pinging from.  I mean, my

11   farm is, you know, 20 -- 20 minutes away from Cloverdale.

12   Q.    So is it fair to say that you don't know if this incident

13   occurred on December 4 or if it occurred on December 6 or you

14   simply really don't know when it occurred?

15   A.    The -- are you asking about when I met Officer Huffaker

16   and Tatum?

17   Q.    Yes.

18   A.    I really don't remember which day, the date.  It was in

19   December but I don't remember the day, no.

20   Q.    There was a lot of phone calls between you and Jacy --

21   A.    Right.

22   Q.    -- throughout December?

23   A.    Sure.

24   Q.    Because you're friends?

25   A.    Sure.

1  Q.   And if there are phone calls between you and Jacy on

2  December 3, could it have been that date?

3  A.   Could have been.  I -- again, I'm -- I'm sorry but I don't

4  remember the exact day.

5  Q.   If there are calls between you and Jacy on December 8,

6  could it have occurred on that date?

7  A.   Could have.

8  Q.   So as you sit here today --

9  A.   It was -- it was -- let's say this:  It was -- there's a

10 couple of calls that I looked at that the call log -- it was

11 just up -- there was a couple -- there was a couple of phone

12 calls -- it was in the evening.  The 4:30, 5:30 time frame.  I

13 remember it was in the evening because I used my wife's car, my

14 ex-wife's car.

15      And so when I look at those calls, that seems to me that

16 that would have been the time.  But again, no, I don't -- I'm

17 not exact with the date, the day.

18 Q.   This May meeting was not the last meeting you had with the

19 FBI; is that correct?  You had another one on June 26 of

20 2020 --

21 A.   Again, I don't know the date but I had a Zoom meeting.

22 Q.   A Zoom meeting?

23 A.   Correct.

24 Q.   Just recently, within a couple of weeks ago?

25 A.   Correct.

TIMMINS - CROSS / CEBALLOS

1  Q.   And do you recall your conversation that you had with the

2  FBI agents?

3  A.   I don't.  Not exactly, no.

4  Q.   Is it the same agent here, Duncan Haunold?

5  A.   It was, yes, sir.

6  Q.   As well as the U.S. attorneys?

7  A.   Yes, sir.  As well -- as well as my attorney.

8  Q.   All right.  And, again, at this third meeting we'll call

9  it, you, again, admitted that you brokered or sold marijuana

10 that Jacy Tatum had been stealing from people?

11 A.   Correct.

12 Q.   I think at this meeting you said it actually started in

13 2015?

14 A.   Yeah.  I mean, I don't -- again, I'm trying to remember

15 those dates for everybody, but I can't remember the exact

16 dates.  I'm sorry.

17 Q.   And it ended in -- what? -- towards the end of 2016,

18 beginning of 2017?

19 A.   I believe so.

20 Q.   During that period of time, from 2015 to the beginning

21 of 2017, how much marijuana do you think you brokered for

22 Mr. Tatum?

23 A.   I don't recall.

24 Q.   Well, let's try to see if we can give us the best

25 estimate.

1        Would you say 500 pounds?

2    **A.**   More -- yeah, maybe about 500 pounds, I would imagine.

3    **Q.**   Could it be 1,000 pounds?

4    **A.**   I don't think it was that much.  It could be, though.

5    **Q.**   Could it be 2,000 pounds?

6    **A.**   Well, if it's not 1,000, I don't think it could be 2,000.

7    I don't think it's that much, no.

8    **Q.**   Okay.  Somewhere between 500 and 1,000 pounds?

9    **A.**   Sure.

10   **Q.**   And how much money do you think you made selling the

11   marijuana that Tatum had stolen from people?

12   **A.**   I don't know.  That's hard to say.  I didn't keep a log.

13   **Q.**   Ballpark estimate.

14   **A.**   We don't keep logs when we do this.

15   **Q.**   Okay.  Well, I think earlier you testified that it was

16   going, what, $1,000 a pound?  1,100, 1,200 a pound?

17   **A.**   Depended on the season.  Depended on --

18   **Q.**   Okay.

19   **A.**   -- yeah, what season we were in and what the market

20   demanded, yes.

21   **Q.**   Okay.

22   **A.**   So it was -- it varied quite a bit, like I said earlier.

23   **Q.**   And if it was a higher quality marijuana, it would have

24   demanded a higher price?

25   **A.**   Yes, sir.

1    Q.   And you knew the marijuana business so you knew how to

2    price the marijuana that Tatum was dealing?

3    A.   Well, your brokers kind of set the tone too.  You don't

4    get to just pick your number.  You know what I mean?  It's not

5    like that.

6    Q.   Well, who picked the number?  Was it you or was it Tatum?

7    A.   Nobody -- it was the broker --

8    Q.   Okay.

9    A.   -- that I sold the marijuana to.

10   Q.   Okay.

11   A.   I didn't get to go in and go, "Hey, man, you know, I want

12   this."  I mean, that's nice if you can do that, but sometimes

13   it didn't demand that.

14   Q.   All right.  But there were times that some of the

15   marijuana you sold that Tatum had given to you, they fetched a

16   higher price, based -- depending on the quality?

17   A.   Yes.  That's fair.

18   Q.   And there were, of course, some marijuana that weren't of

19   high quality and they just got basically your bottom dollar?

20   A.   Yes, sir.

21   Q.   So if we just use a thousand pounds as an average --

22   A.   Okay.

23   Q.   -- and let's say a thousand pounds he had you sell, would

24   that be a million dollars?

25   A.   It would be close.  It would be close.

TIMMINS - CROSS / CEBALLOS

1  Q.   So if your deal with Mr. Tatum was to go 50/50, that means

2  you got about 500,000 and Jacy Tatum got 500,000?

3  A.   I mean, it would be in the ballpark.  Like I said, I

4  didn't keep a log so I couldn't tell you an exact number.

5  Q.   And when you gave Mr. Tatum his share, it was all in cash?

6  A.   Yes, sir.

7  Q.   And just so it's clear, there was only one single incident

8  in December of 2017 where you saw my client?

9  A.   That I can recall where there was cannabis being

10 transferred, yes.  I think there was --

11 Q.   There were not two?

12 A.   There might have been two.  I -- again, I'm drawing a

13 blank.  But it wasn't a lot.

14 Q.   Mr. Timmins, are you a consumer of marijuana?

15 A.   No.

16 Q.   All right.

17 A.   I mean, sometimes I'll take CBDs and THC at nighttime to

18 go to sleep.

19 Q.   Okay.

20 A.   I don't smoke it but, you know, they have all these

21 edibles now that are great.

22 Q.   I'll take your word for it.

23 A.   Yeah.

24      MR. CEBALLOS:  All right.  I have nothing further,

25 Your Honor.

1          **THE COURT:**  Any redirect?

2              **MR. KLEINMAN:**  Yes, Your Honor.  Thank you.

3      Ms. Hernandez, if we can pull up Exhibit 169.  Show it to

4  the parties and the jury.  Going to page 538.

5      And if we could actually blow up --

6          **THE WITNESS:**  Please.

7          **MR. KLEINMAN:**  -- this entire page here with the phone

8  numbers.

9                    <u>REDIRECT EXAMINATION</u>

10  BY MR. KLEINMAN:

11  Q.   Mr. Timmins, just a couple of questions here.

12      Again, your phone number is the number ending in 9727;

13  correct?

14  A.   Yes, sir.

15  Q.   There is a phone call here on December 4 at 5:46 and the

16  origination is Cloverdale, California.

17      Do you see that?

18  A.   Yes.

19  Q.   And, additionally, looking towards the bottom of the page

20  here, there's a phone call involving your number on December 6

21  at 12:29 p.m.

22      Do you see that there?

23  A.   I do.

24  Q.   And then there's another call, December 6 at 1:24 p.m.; is

25  that correct?

**TIMMINS - REDIRECT / KLEINMAN**

1  **A.**    Correct.

2  **Q.**    1:36 p.m.; correct?

3  **A.**    Yes, sir.

4  **Q.**    1:45 p.m.; correct?

5  **A.**    Yes.

6  **Q.**    2:34 p.m.; correct?

7  **A.**    Yes.

8  **Q.**    4:24 p.m.; correct?

9  **A.**    Yes.

10  **Q.**    And then 4:36 p.m.; correct?

11  **A.**    Correct.

12  **Q.**    And these calls occurred approximately seven and a half

13  years ago; is that right?

14  **A.**    Correct.

15  **Q.**    And as you've testified here today, you do not remember

16  the exact date seven and a half years ago where -- when Joseph

17  Huffaker and Jacy Tatum transferred the marijuana from their

18  police vehicle to your car; correct?

19  **A.**    Correct.

20  **Q.**    But you remember receiving multiple phone calls?

21  **A.**    I do, yeah.  That's how it worked.

22  **Q.**    And you remember the area where you met and the rough exit

23  where you met; is that correct?

24  **A.**    That's correct.

25  **Q.**    And then you also remember certain specific details like

**TIMMINS - REDIRECT / KLEINMAN**

1    it was a Ford SUV, which was the same car that your ex-wife

2    had?

3    **A.**   Correct.

4    **Q.**   Now, defense counsel asked you a number of questions about

5    your relationship with Jacy Tatum and that conversation in

6    2023.

7        You remember those questions?

8    **A.**   I do, yes.

9    **Q.**   Now, again, Jacy Tatum said -- well, he didn't say, "I

10   need you to corroborate this story."  He said something along

11   the lines of "This is what's being asked"; correct?

12   **A.**   Correct.

13   **Q.**   Now, you've described your relationship with Jacy Tatum;

14   correct?

15   **A.**   Correct.

16   **Q.**   Are you testifying here today because you want to help

17   Jacy Tatum in any way?

18   **A.**   Hell, no, I don't -- no, excuse me, but no.  I don't want

19   to ever see him again.

20   **Q.**   And, again, you're testifying here today because you've

21   received a subpoena from the U.S. Attorney's Office to do so;

22   correct?

23   **A.**   Correct.

24       **MR. KLEINMAN:**  Nothing further, Your Honor.  Thank

25   you.

```
 1          THE COURT:  Any recross?

 2                    RECROSS EXAMINATION

 3   BY MR. CEBALLOS:

 4   Q.   You also received immunity too; right?

 5   A.   We established that, yeah.

 6   Q.   The only phone records they've been showing you are Jacy

 7   Tatum's phone records; correct?

 8   A.   I believe so.  I don't even know what his number is.  I

 9   couldn't tell you what his number was by heart.

10   Q.   Did the FBI ever show you your phone records?

11   A.   No.  Not that I know of, no.

12   Q.   You and Jacy didn't always call each other on the phone.

13   You two would text each other from time to time?

14   A.   It was usually phone calls.

15   Q.   But there were times he would text you?

16   A.   I'm sure there was times that we'd text about things, yes.

17   Q.   When he would text you, would there be a code that he

18   would use to let you know that he had some marijuana that he

19   needed you to sell?

20   A.   Not that I recall.  Just he had work.

21   Q.   Did he ever -- do you recall him using the word that "I

22   have some paint I need you to get rid of"?

23   A.   Some paint?

24   Q.   Paint.

25   A.   No, sir.
```

**TIMMINS - RECROSS / CEBALLOS**

1  **Q.**  Okay.

2  **A.**  Sorry.

3          **MR. CEBALLOS:**  Okay.  Nothing further.

4          **THE COURT:**  Anything further?

5          **MR. KLEINMAN:**  No, Your Honor.  Thank you.

6          **THE COURT:**  Thank you, Mr. Timmins.

7          **THE WITNESS:**  Thank you.

8          **THE COURT:**  You're excused at this time.

9                      (Witness excused.)

10          (End of excerpt - Timmins - 1:49 p.m.)

11          (Proceedings adjourned at 3:08 p.m.)

12                      ---o0o---

13              **CERTIFICATE OF REPORTER**

14      I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:    Saturday, September 27, 2025

18

19

20

21

22  _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
23              Official Reporter, U.S. District Court

24

25